STATE OF MINNESOTA

COUNTY OF HENNEPIN

-------------------------------------------------------

Kremer & Davis, Inc.,

                    Plaintiff,

        v.

Midwest Family Mutual Insurance
Company,

                    Defendant.

-------------------------------------------------------

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

File No.

CASE TYPE:  Contract/Other civil

**SUMMONS**

THIS SUMMONS IS DIRECTED TO:

Midwest Family Mutual Insurance Company, 4401 Westown Parkway, Suite 305, West Des Moines, Iowa 50266, and 3033 Campus Drive STE 195E, Plymouth, MN 55441, through its agents for service the Minnesota Department of Commerce, 85 7th Place East, Suite 280, Saint Paul, MN 55101, and the Minnesota Secretary of State, Business Services, Retirement Systems of Minnesota Building, 60 Empire Drive, Suite 100, St. Paul, MN 55103.

1.  **YOU ARE BEING SUED.** The Plaintiffs have started a lawsuit against you.  The Plaintiffs' Complaint against you is attached to this summons.  Do not throw these papers away.  They are official papers that affect your rights.  You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

2.  **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS.**  You must give or mail to the person who signed this summons **a written response** called an Answer within 21 days of the date on which you received this Summons.  You must send a copy of your Answer to the person who signed this summons located at:

        8300 Norman Center Drive, Suite 1000
        Minneapolis, Minnesota  55437-1060

3.  **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiffs' Complaint.  In your Answer you must state whether you agree or disagree with each paragraph of the Complaint.  If you believe the Plaintiffs should not be given everything asked for in the Complaint, you must say so in your Answer.

4.  **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS**

```
┌─────────────┐
│  EXHIBIT    │
│             │
│     A       │
└─────────────┘
```

**SUMMONS.** If you do not Answer within 21 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiffs everything asked for in the complaint. If you do not want to contest the claims stated in the complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

**LARKIN HOFFMAN DALY & LINDGREN, LTD.**

Dated: September 9, 2021

*s/Christopher H. Yetka*
Christopher H. Yetka (0241866)
Sarah Greening (0401238)
8300 Norman Center Drive
Suite 1000
Minneapolis, Minnesota 55437-1060
(952) 835-3800
cyetka@larkinhoffman.com
sgreening@larkinhoffman.com

**TTLO LAW**

*s/Jason C. Tarasek*
Jason C. Tarasek (0342592)
7101 York Avenue South
Suite 255
Edina, Minnesota 55435
(612) 568-0132
jason@ttlolaw.com

**ATTORNEYS FOR PLAINTIFF KREMER & DAVIS INC.**

4851-3714-1754, v. 1

2.

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

------------------------------------------------------

File No.

Kremer & Davis, Inc.,

CASE TYPE: Contract/Other civil

Plaintiff,

v.

**COMPLAINT**

Midwest Family Mutual Insurance
Company,

Defendant.

------------------------------------------------------

Plaintiff Kremer & Davis, Inc. ("Plaintiff" or "Kremer"), for its complaint against

Defendant Midwest Family Mutual Insurance Company ("Defendant" or "Midwest Family"),

states and alleges as follows:

## INTRODUCTION

1.      This action arises out of an insurance dispute over Midwest Family's duty to

defend and provide coverage to Plaintiff Kremer & Davis, Inc. under a standard general

commercial liability policy that includes business liability coverage, sold by Defendant Midwest

Family.  Kremer seeks a declaration of its rights and Midwest Family's obligations under the

insurance policy including Midwest Family's duty to defend and provide coverage, and for

breach of contract for withdrawing the defense, along with interest, attorneys' fees, costs, and

such other further relief as the Court may deem just and proper.

## PARTIES

2.      Plaintiff Kremer & Davis, Inc. is a Minnesota corporation with its principal

executive office in Coon Rapids, Minnesota.

3.      Defendant Midwest Family is an Iowa corporation with its principle headquarters in Plymouth, Minnesota, and regularly does business in Minnesota, including the sale of the insurance policy at issue here.

## JURISDICTION AND VENUE

4.      This Court has general subject matter jurisdiction over this action pursuant to Minn. Const., Art. VI, § 3, and Minn. Stat. § § 484.01, 555.01, *et seq.*

5.      This Court has personal jurisdiction over the Defendant pursuant to Minn. Stat. § 543.19 because it is licensed or authorized to do business in Minnesota and transacted the business of selling insurance in Minnesota within the relevant time periods.

6.      Venue is proper in Hennepin County pursuant to Minn. Stat. § 542.09.

## INSURANCE POLICY

7.      Midwest Family sold insurance, including policy, No. XXXXXXXXXX1070 to Kremer for the policy period of September 1, 2018 to September 1, 2019 (the "Policy"), which included Business Liability coverage that applies to "bodily injury" and "property damage" if the "bodily injury" or "property damage" is caused by an "occurrence" within the "coverage territory" and during the policy period. Kremer's copy of the Midwest Family Policy, with restricted identifiers, is attached hereto as **Exhibit A**.

8.      Specifically, the Policy states, "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages."

I.    **Applicable Definitions**

9.      The Policy defines "Property damage" as: "(a) physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or (b) loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

10.     The Policy defines "Occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

11.     The Policy defines "Products-Completed Operations Hazard" to include "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except: (1) products that are still in your physical possession; or (2) work that has not yet been completed or abandoned. However, 'your work' will be deemed completed at the earliest of the following times: (a) when all the work called for in your contract has been completed; (b) when all the work to be done at the job site has been completed if your contract calls for work at more than one job site; (c) when that part of the work done as the job site has been put to its intended use by any other person or organization other than another contractor or subcontractor working on the same project. Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

12.     The Policy defines "Your work" as "(a) (1) work or operations performed by you or on your behalf; and (2) materials, parts or equipment furnished in connection with such work or operations," which includes "(b)(1) warranties or representation made at any time with respect

3.

to the fitness, quality, durability, performance or use of 'your work'; and (2) the providing of or

failure to provide warnings or instructions."

13.    Kremer is an "Insured" under the insurance policy sold by Midwest Family.

14.    The Policy also contains the following Endorsement: "Insured," is amended to

include: "any insured on this policy under a written contract or a written agreement, but only

with respect to liability for bodily injury, property damage or personal and advertising injury

causes arising out of: (1) Your acts or omissions; or (2) the acts or omissions of those acting on

your behalf; and resulting from: (a) Your ongoing operations performed for the additional

insured; (b) Your work completed as included in the products completed operations hazard

performed for the additional insured." However, the Policy does not provide insurance coverage

"to any additional insured or organization (a) that is not provided to you in this policy; or that is

any broader coverage than you are required to provide to the additional insured person or

organization in the written contract or written agreement."

## II.    Policy Exclusions

15.    The Policy excludes coverage for "Damage to Your Work" which is defined as

"'property damage' to 'your work' arising out of it or any part of it and included in the

'products-completed operations hazard.' This exclusion does not apply if the damaged work or

the work out of which the damage arises was performed on your behalf by a subcontractor."

16.    The Policy excludes coverage for "'Bodily injury' or 'property damage' for which

the insured is obligated to pay damages by reason of the assumption of liability in a contract or

agreement." However, this exclusion does not apply to liability for damages: "(1)[t]hat the

insured would have in the absence of the contract or agreement; or (2) [a]ssumed in a contract

4.

or agreement that is an 'insured contract', provided the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement . . ."

17.     The Policy likewise excludes coverage for "Damage to Property" to "(5) [t]hat particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the 'property damage' arises out of those operations; or (6) [t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."

18.     However, the exclusion for Damage to Property does not apply to "property damage" included in the "products-completed operations hazard."

19.     Finally, the Defendant alleges that the Policy contains an Endorsement titled "Illinois Changes – Defense Costs "Defense Costs Reimbursement." The Endorsement states, "if we initially defend an insured or pay for an insured's defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred. The right to reimbursement for the defense costs under this provision will only apply to defense costs we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense costs."

## HISTORY OF UNDERLYING LEGAL ACTIONS

20.     Kremer was a subcontractor of ARCO/Murray National Construction Company ("ARCO/Murray") on a construction project located at 1743 N. Leavitt St., Chicago, IL 60647 (the "Project").  A copy of Kremer Subcontract Agreement is attached hereto as **Exhibit B**

21.     On May 25, 2021, Plaintiffs Zero Coupon LLC, Second City Equities LLC, and Bucktown Equities LLC, (collectively, "Owners") brought a Second Amended Complaint

against ARCO/Murray, among other parties, alleging construction defects with respect to the windows, aluminum envelope/cladding, and HVAC, purportedly arising out of the work performed by various subcontractors including Kremer. A copy of the Second Amended Complaint (without exhibits) is attached hereto as **Exhibit C**.

22.    Specifically, Paragraph 28 of the Second Amended Complaint alleges, "[w]ith respect to the windows, Northern Glass and ARCO/Murray improperly installed the glass, mishandling materials including glazing upon installation, creating thermal stress breaks. Owners have discovered a systemic problem whereunder Defendants' improper workmanship and installation resulted in stress concentrating chips on the edge of glazing. The stress concentrating chips are a current defect at the Property, and have resulted in and will result in broken windows over time with ordinary and expected heating and cooling in the Chicago weather environment."

23.    In connection with the aluminum cladding, Paragraph 37 of the Second Amended Complaint states that "[i]n some instances, entire panels have flown off."

24.    With regard to the roofing and other building envelope, Paragraph 42 of the Second Amended Complaint alleges, "[t]hese aspects of the Property's envelope have leaked and failed on the Property overtime. These problems were caused by ARCO/Murray's use of poor materials and techniques, which permitted significant water infiltration at the Property with compromises in the building envelope. These leaks have caused significant damage to the Property, inconvenience to Plaintiffs' tenants, many of whom are particularly sensitive to intrusions for repairs in the time of COVID-19, and loss of rental income."

25.    On January 29, 2021, Defendant/Cross-Plaintiff/Third-Party Plaintiff ARCO/Murray brought a Third-Party Complaint against Kremer, alleging they were damaged by Kremer's acts, errors and/or omissions, and that Kremer agreed to indemnify, defend, and hold

ARCO/Murray harmless from claims arising out of performance of [Kremer's] work, breach of [Kremer's] subcontract and for property damage or destruction. A copy of ARCO/Murray's Cross-Claim and Third-Party Complaint (without exhibits) is attached hereto as **Exhibit D.**

26.    Paragraph 9 of the Third-Party Complaint alleges that Kremer agreed to procure insurance naming ARCO/Murray as an additional insured on a primary and non-contributory basis for current, ongoing, and completed operations for three years after final completion of the project.

27.    Paragraphs 13 and 25 of the Third-Party Complaint allege that the defects and deficiencies alleged in the Second Amended Complaint arise out of the worked performed by Kremer, among other subcontractors, and by Kremer's acts, errors and/or omissions.

### THE SUBCONTRACT AND SUBSEQUENT WORK PERFORMED BY KREMER

28.    Exhibit E to the Subcontract provides that Kremer "shall provide all labor, materials, equipment, supervision as required to complete all scope-of-work items of this Waterproofing Subcontract and related work, in accordance with the Drawings, Specifications, and the Contract Documents ('Work')."

29.    Specifically, Kremer was to provide all labor, material, equipment, freight, supervision, taxes, etc. required to complete the below work:

(a)    Basement Walls Waterproofing;

(b)    Building Façade;

(c)    Storm Water Detention Vault;

(d)    Elevator Pits;

(e)    First Level Nook;

(f)    Pedestrian Traffic Coating.

30.    Kremer performed work pursuant to the Subcontract, which was completed.

7.

31.    Upon receipt of ARCO/Murray's Third-Party Complaint, Kremer informed Midwest Family of the claims against it and sought a defense and coverage pursuant to the Policy.

## KREMER TENDERED ITS DEFENSE AND CLAIM OF COVERAGE TO MIDWEST FAMILY

32.    Kremer notified Midwest Family of the Third-Party Complaint served on Kremer, acknowledged by Midwest Family's correspondence dated April 12, 2021. Midwest Family agreed to provide Kremer a defense to the Third-Party Complaint asserted against Kremer by ARCO/Murray subject to a complete reservation of rights.  A copy of Midwest Family's April 12, 2021 letter is attached hereto as **Exhibit E.**

33.    On May 27, 2021, Midwest Family sent an updated letter to Kremer, which still agreed to defend Kremer subject to a complete reservation of rights. However, the letter stated that coverage could be excluded due to the "Work Performed Exclusion" Endorsement, the exclusion for "Damage to Property," and the exclusion for "Contractual Liability." A copy of Midwest Family's May 27, 2021 letter is attached hereto as **Exhibit F.**

34.    The May 27, 2021 letter noted for the first time that the Policy allows Midwest Family to seek reimbursement of defense costs in the event that it determines that coverage does not exist.

35.    On August 18, 2021, Midwest Family sent Kremer a third letter denying coverage and withdrawing its defense, effective September 15, 2021.  Midwest Family stated that it will seek reimbursement of defense costs paid by Midwest Family for Kremer's defense from May 27, 2021 until present. A true copy of Midwest Family's August 18, 2021 letter is attached hereto as **Exhibit G.**

8.

36.     Midwest Family stated that "since the property damage alleged in the Third-Party Complaint arises from Kremer's work, and since the claims arise from an alleged breach of contract, each of the above exclusions, individually and taken together, preclude coverage for the claims in the Underlying Action." The above exclusions include the "Work Performed Exclusion," and the exclusions for "Contractual Liability," "Damage to Property," "Damage to Your Product," and "Damage to Impaired Property or Property Not Physically Injured."

**MIDWEST FAMILY HAS A DUTY TO DEFEND KREMER AND PROVIDE COVERAGE, AND BREACHED THIS DUTY WHEN IT WITHDREW THE DEFENSE**

37.     The Policy specifically provides coverage for "physical injury to tangible property, including all resulting loss of use of that property," as well as "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except: (1) products that are still in your physical possession; or (2) work that has not yet been completed or abandoned."

38.     Although the Policy articulates exclusions for "Damage to Your Work," the Second Amended Complaint alleges physical damage to the Property beyond "Your work," including but not limited, to damage to the building caused by improperly installed glass, creating systemic problems including thermal stress breaks throughout the Property, entire panels that have completely detached from the building, and significant water infiltration that caused physical damage to the Property.

39.     Midwest Family's duty to defend is broader than its duty to indemnify. Midwest Family must defend the claims against Kremer if any portion of the claim arguably falls within the scope of the policy's coverage.

40.     The Second Amended Complaint and Third-Party Complaint contain allegations that fall within the scope of the Policy's coverage.

41.    Midwest Family's withdrawal of defense and refusal to provide coverage constitutes a breach of the Policy.

42.    As a result of Midwest Family's breach, Kremer was forced to incur additional costs and attorneys' fees in establishing Midwest Family's duties.

43.    Kremer was fully cooperative with Midwest Family's inquiry into the claims under the Policy. Kremer satisfied all applicable conditions to receive a defense and coverage and requested that Midwest Family provide a defense and pay the losses under the Policy.

### FIRST CAUSE OF ACTION
### (DECLARATORY JUDGMENT)

44.    Kremer restates and realleges the foregoing paragraphs of this Complaint as though fully set forth herein.

45.    Kremer has fully complied with the terms and conditions of the Policy with regard to Kremer's claim that Midwest Family has a duty to defend Kremer against the claims asserted against it in the Third-Party Complaint.

46.    Kremer has likewise fully complied with the terms and conditions of the Policy with regard to Kremer's claim that Midwest Family must provide coverage for any losses stemming out of the Third-Party Complaint.

47.    A justiciable controversy exists between Kremer and Midwest Family as to their respective rights and obligations including whether Kremer is entitled to a defense and coverage generally for the losses under the Policy.

48.    Kremer seeks a judicial determination to resolve a present justiciable controversy among the parties regarding Midwest Family's duty to defend Kremer and provide coverage owed for losses under the Policy.

10.

49.     Kremer is entitled to a judicial declaration by this Court pursuant to Minn. Stat. § 555.01 that Midwest Family is obligated to provide a defense for Kremer against the Third-Party Complaint and provide coverage for Kremer's losses to the full extent of the limits of liability prescribed in the Policy.

50.     The issuance of declaratory relief by this Court will terminate some or all of the existing controversy among the parties.

## SECOND CAUSE OF ACTION
### (BREACH OF CONTRACT)

51.     Kremer restates and realleges the foregoing paragraphs of this Complaint as though fully set forth herein.

52.     Kremer has fully complied with the terms and conditions of the Policy with regard to Kremer's claim that Midwest Family has a duty to defend Kremer against the claims asserted against it in the Third-Party Complaint.

53.     Midwest Family's withdrawal of coverage constitutes a breach of Midwest Family's Policy.

54.     Midwest Family's breach has proximately caused Kremer harm for which Kremer is entitled to damages according to proof.

55.     By reason of the foregoing, Midwest Family is liable to Kremer for any losses it incurred due to Midwest Family's withdrawal of defense, and for additional damages Kremer has sustained as a result of Midwest Family's breach of contract and totaling at least $50,000. The damages will also include, but are not limited to: pre- and post-judgment interest, attorneys' fees, costs, and disbursements that Kremer has incurred to date and may incur in the future in prosecuting this action to obtain the benefit of its insurance coverage.

11.

**WHEREFORE**, Kremer respectfully prays for an Order of this Court declaring, determining, and providing as follows:

(a)    Entering judgment for Kremer and against Midwest Family, and for the direct and consequential losses Kremer has sustained as a result of Midwest Family's breach of contract, estimated to be at least $50,000;

(b)    Entering a declaratory judgment that Policy provides a duty to defend Kremer, and Midwest Family must defend Kremer for the claims asserted against it in the Third-Party Complaint up to the limits of liability prescribed in the Policy;

(c)    Entering declaratory judgment that the Policy provides coverage stemming from the claims asserted against Kremer and Midwest Family must pay Kremer for all losses up to the limits of liability prescribed in the Policy;

(d)    Entering declaratory judgment that Midwest Family has breached its contractual obligations to provide a defense to Kremer in the action asserted against it;

(e)    Otherwise entering a declaratory judgment of Kremer's rights and Midwest Family's obligations under the Policy;

(f)    Entering declaratory judgment that Midwest Family is obligated to pay or provide Kremer all other and further relief that the Court considers just, appropriate, necessary, or proper;

(g)    Awarding Kremer its reasonable attorneys' and expert fees, costs, and expenses incurred in prosecuting this action;

(h)    Awarding Kremer all interest allowed by law, including but not limited to all interest due under Minn. Stat. § 60A.0811, subd. 2; and

(i)    Providing such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Kremer demands a jury on all issues so triable.

Respectfully,

12.

**LARKIN HOFFMAN DALY & LINDGREN, LTD.**

Dated: September 9, 2021

_s/Christopher H. Yetka_
Christopher H. Yetka (0241866)
Sarah Greening (0401238)
8300 Norman Center Drive
Suite 1000
Minneapolis, Minnesota  55437-1060
(952) 835-3800
cyetka@larkinhoffman.com
sgreening@larkinhoffman.com

**TTLO LAW**

_s/Jason C. Tarasek_
Jason C. Tarasek (0342592)
7101 York Avenue South
Suite 255
Edina, Minnesota  55435
(612) 568-0132
jason@ttlolaw.com

**ATTORNEYS FOR PLAINTIFF KREMER & DAVIS INC.**

13.

## ACKNOWLEDGMENT

I hereby acknowledge that sanctions may be awarded pursuant to Minn. Stat. § 549.211, Subd. 3, if the court determines that this document violates Minn. Stat. § 549.211, Subd. 2.

*s/Christopher H. Yetka*
Christopher H. Yetka

4837-7563-0074, v. 2

14.

# EXHIBIT A

BUSINESSOWNERS
BP 00 03 01 10

# BUSINESSOWNERS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Form the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

In Section II – Liability, the word "insured" means any person or organization qualifying as such under Paragraph **C.** Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Paragraph **H.** Property Definitions in Section I – Property and Paragraph **F.** Liability And Medical Expenses Definitions in Section II – Liability.

## SECTION I – PROPERTY

### A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

#### 1. Covered Property

Covered Property includes Buildings as described under Paragraph **a.** below, Business Personal Property as described under Paragraph **b.** below, or both, depending on whether a Limit of Insurance is shown in the Declarations for that type of property. Regardless of whether coverage is shown in the Declarations for Buildings, Business Personal Property, or both, there is no coverage for property described under Paragraph **2.** Property Not Covered.

**a.** Buildings, meaning the buildings and structures at the premises described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery; and

**(b)** Equipment;

**(4)** Your personal property in apartments, rooms or common areas furnished by you as landlord;

**(5)** Personal property owned by you that is used to maintain or service the buildings or structures or the premises, including:

**(a)** Fire extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(6)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the buildings or structures;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the buildings or structures.

**b.** Business Personal Property located in or on the buildings at the described premises or in the open (or in a vehicle) within 100 feet of the described premises, including:

**(1)** Property you own that is used in your business;

**(2)** Property of others that is in your care, custody or control, except as otherwise provided in Loss Payment Property Loss Condition Paragraph **E.5.d.(3)(b)**;

**(3)** Tenant's improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(4)** Leased personal property which you have a contractual responsibility to insure, unless otherwise provided for under Paragraph **1.b.(2)**; and

**(5)** Exterior building glass, if you are a tenant and no Limit of Insurance is shown in the Declarations for Building property. The glass must be owned by you or in your care, custody or control.

BP 00 03 01 10                    © Insurance Services Office, Inc., 2009                    Page 1 of 49    □

**2. Property Not Covered**

Covered Property does not include:

**a.** Aircraft, automobiles, motortrucks and other vehicles subject to motor vehicle registration;

**b.** "Money" or "securities" except as provided in the:

    **(1)** Money And Securities Optional Coverage; or

    **(2)** Employee Dishonesty Optional Coverage;

**c.** Contraband, or property in the course of illegal transportation or trade;

**d.** Land (including land on which the property is located), water, growing crops or lawns;

**e.** Outdoor fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, signs (other than signs attached to buildings), trees, shrubs or plants, all except as provided in the:

    **(1)** Outdoor Property Coverage Extension; or

    **(2)** Outdoor Signs Optional Coverage;

**f.** Watercraft (including motors, equipment and accessories) while afloat;

**g.** Accounts, bills, food stamps, other evidences of debt, accounts receivable or "valuable papers and records"; except as otherwise provided in this policy;

**h.** "Computer(s)" which are permanently installed or designed to be permanently installed in any aircraft, watercraft, motortruck or other vehicle subject to motor vehicle registration. This paragraph does not apply to "computer(s)" while held as "stock";

**i.** "Electronic data", except as provided under Additional Coverages – Electronic Data. This Paragraph **i.** does not apply to your "stock" of prepackaged software.

**j.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings.

**3. Covered Causes Of Loss**

Risks of direct physical loss unless the loss is:

**a.** Excluded in Paragraph **B.** Exclusions in Section **I**; or

**b.** Limited in Paragraph **4.** Limitations in Section **I.**

**4. Limitations**

**a.** We will not pay for loss of or damage to:

    **(1)** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

    **(2)** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

    **(3)** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property. This limitation does not apply to the Optional Coverage for Money and Securities.

    **(4)** Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

    **(5)** The interior of any building or structure caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

        **(a)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

        **(b)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

**b.** We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

    **(1)** Animals, and then only if they are killed or their destruction is made necessary.

    **(2)** Fragile articles such as glassware, statuary, marble, chinaware and porcelain, if broken. This restriction does not apply to:

        **(a)** Glass that is part of the exterior or interior of a building or structure;

© Insurance Services Office, Inc., 2009                   □

(b) Containers of property held for sale; or

(c) Photographic or scientific instrument lenses.

c. For loss or damage by theft, the following types of property are covered only up to the limits shown:

(1) $2,500 for furs, fur garments and garments trimmed with fur.

(2) $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

(3) $2,500 for patterns, dies, molds and forms.

**5. Additional Coverages**

**a. Debris Removal**

(1) Subject to Paragraphs **(3)** and **(4),** we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2) Debris Removal does not apply to costs to:

(a) Extract "pollutants" from land or water; or

(b) Remove, restore or replace polluted land or water.

(3) Subject to the exceptions in Paragraph **(4),** the following provisions apply:

(a) The most that we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

(b) Subject to Paragraph **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

(4) We will pay up to an additional $10,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

(a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if Paragraphs **(4)(a)** and/or **(4)(b)** apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $10,000.

(5) **Examples**

**Example #1**

| | |
|---|---|
| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $ 500 |
| Amount of Loss | $ 50,000 |
| Amount of Loss Payable | $ 49,500 |
| | ($50,000 – $500) |
| Debris Removal Expense | $ 10,000 |
| Debris Removal Expense Payable | $ 10,000 |
| ($10,000 is 20% of $50,000) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3).**

**Example #2**

| | |
|---|---|
| Limit of Insurance | $ 90,000 |
| Amount of Deductible | $    500 |
| Amount of Loss | $ 80,000 |
| Amount of Loss Payable | $ 79,500 |
| | ($80,000 – $500) |
| Debris Removal Expense | $ 30,000 |
| Debris Removal Expense Payable | |
| Basic Amount | $ 10,500 |
| Additional Amount | $ 10,000 |

The basic amount payable for debris removal expense is provided in the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500). The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4)**, because the debris removal expense ($30,000) exceeds 25% of the loss payable plus the deductible ($30,000 is 37.5% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $30,000 = $109,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $10,000, the maximum payable under Paragraph **(4)**. Thus the total payable for debris removal expense in this example is $20,500; $9,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss of or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $2,500, unless a different limit is shown in the Declarations, for your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

**d. Collapse**

The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse as described and limited in Paragraphs **d.(1)** through **d.(7)**.

**(1)** For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**(2)** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this policy or that contains Covered Property insured under this policy, if such collapse is caused by one or more of the following:

**(a)** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

**(b)** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**(c)** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

**(d)** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

**(i)** A cause of loss listed in Paragraph **(2)(a)** or **(2)(b)**;

**(ii)** One or more of the "specified causes of loss";

**(iii)** Breakage of building glass;

© Insurance Services Office, Inc., 2009

**(iv)** Weight of people or personal property; or

**(v)** Weight of rain that collects on a roof.

**(3)** This Additional Coverage – Collapse does **not** apply to:

**(a)** A building or any part of a building that is in danger of falling down or caving in;

**(b)** A part of a building that is standing, even if it has separated from another part of the building; or

**(c)** A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**(4)** With respect to the following property:

**(a)** Awnings;

**(b)** Gutters and downspouts;

**(c)** Yard fixtures;

**(d)** Outdoor swimming pools;

**(e)** Piers, wharves and docks;

**(f)** Beach or diving platforms or appurtenances;

**(g)** Retaining walls; and

**(h)** Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in Paragraphs **(2)(a)** through **(2)(d)**, we will pay for loss or damage to that property only if such loss or damage is a direct result of the abrupt collapse of a building insured under this policy and the property is Covered Property under this policy.

**(5)** If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

**(a)** The collapse of personal property was caused by a cause of loss listed in Paragraphs **(2)(a)** through **(2)(d)** of this Additional Coverage;

**(b)** The personal property which collapses is inside a building; and

**(c)** The property which collapses is not of a kind listed in Paragraph **(4)**, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **(5)** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

**(6)** This Additional Coverage – Collapse does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**(7)** This Additional Coverage – Collapse will not increase the Limits of Insurance provided in this policy.

**(8)** The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in Paragraphs **d.(1)** through **d.(7)**.

**e. Water Damage, Other Liquids, Powder Or Molten Material Damage**

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

We will not pay the cost to repair any defect that caused the loss or damage; but we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

**(1)** Results in discharge of any substance from an automatic fire protection system; or

**(2)** Is directly caused by freezing.

**f. Business Income**

**(1) Business Income**

**(a)** We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

(i) The portion of the building which you rent, lease or occupy; and

(ii) Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

(b) We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage. We will only pay for ordinary payroll expenses for 60 days following the date of direct physical loss or damage, unless a greater number of days is shown in the Declarations.

(c) Business Income means the:

(i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and

(ii) Continuing normal operating expenses incurred, including payroll.

(d) Ordinary payroll expenses:

(i) Means payroll expenses for all your employees except:

i. Officers;

ii. Executives;

iii. Department Managers;

iv. Employees under contract; and

v. Additional Exemptions shown in the Declarations as:

● Job Classifications; or

● Employees.

(ii) Include:

i. Payroll;

ii. Employee benefits, if directly related to payroll;

iii. FICA payments you pay;

iv. Union dues you pay; and

v. Workers' compensation premiums.

(2) Extended Business Income

(a) If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

(i) Begins on the date property except finished stock is actually repaired, rebuilt or replaced and "operations" are resumed; and

(ii) Ends on the earlier of:

i. The date you could restore your "operations", with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage had occurred; or

ii. 30 consecutive days after the date determined in Paragraph (a)(i) above, unless a greater number of consecutive days is shown in the Declarations.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

(b) Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

(3) With respect to the coverage provided in this Additional Coverage, suspension means:

(a) The partial slowdown or complete cessation of your business activities; or

(b) That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

© Insurance Services Office, Inc., 2009

**(4)** This Additional Coverage is not subject to the Limits of Insurance of Section I – Property.

**g. Extra Expense**

**(1)** We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of the site at which the described premises are located.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of the site at which the described premises are located, your premises means:

**(a)** The portion of the building which you rent, lease or occupy; and

**(b)** Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

**(2)** Extra Expense means expense incurred:

**(a)** To avoid or minimize the suspension of business and to continue "operations":

**(i)** At the described premises; or

**(ii)** At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.

**(b)** To minimize the suspension of business if you cannot continue "operations".

**(c)** To:

**(i)** Repair or replace any property; or

**(ii)** Research, replace or restore the lost information on damaged "valuable papers and records";

to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage **f.** Business Income.

**(3)** With respect to the coverage provided in this Additional Coverage, suspension means:

**(a)** The partial slowdown or complete cessation of your business activities; or

**(b)** That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

**(4)** We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance of Section I – Property.

**h. Pollutant Clean-up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay for each location under this Additional Coverage is $10,000 for the sum of all such expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

**i. Civil Authority**

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

(2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority coverage for necessary Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

(1) Four consecutive weeks after the date of that action; or

(2) When your Civil Authority coverage for Business Income ends;

whichever is later.

The definitions of Business Income and Extra Expense contained in the Business Income and Extra Expense Additional Coverages also apply to this Civil Authority Additional Coverage. The Civil Authority Additional Coverage is not subject to the Limits of Insurance of Section I – Property.

**j. Money Orders And "Counterfeit Money"**

We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

(1) Money orders issued by any post office, express company or bank that are not paid upon presentation; or

(2) "Counterfeit money" that is acquired during the regular course of business.

The most we will pay for any loss under this Additional Coverage is $1,000.

**k. Forgery Or Alteration**

(1) We will pay for loss resulting directly from forgery or alteration of, any check, draft, promissory note, bill of exchange or similar written promise of payment in "money", that you or your agent has issued, or that was issued by someone who impersonates you or your agent.

(2) If you are sued for refusing to pay the check, draft, promissory note, bill of exchange or similar written promise of payment in "money", on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur in that defense.

(3) For the purpose of this coverage, check includes a substitute check as defined in the Check Clearing for the 21st Century Act, and will be treated the same as the original it replaced.

(4) The most we will pay for any loss, including legal expenses, under this Additional Coverage is $2,500, unless a higher Limit of Insurance is shown in the Declarations.

**l. Increased Cost Of Construction**

(1) This Additional Coverage applies only to buildings insured on a replacement cost basis.

(2) In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in Paragraphs (3) through (9) of this Additional Coverage.

(3) The ordinance or law referred to in Paragraph (2) of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.

(4) Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

(a) You were required to comply with before the loss, even when the building was undamaged; and

(b) You failed to comply with.

    © Insurance Services Office, Inc., 2009    BP 00 03 01 10    □

**(5)** Under this Additional Coverage, we will not pay for:

  **(a)** The enforcement of any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot; or

  **(b)** Any costs associated with the enforcement of an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants", "fungi", wet rot or dry rot.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under Section I – Property, is $10,000. If a damaged building(s) is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for each damaged building, is $10,000.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

  **(a)** We will not pay for the Increased Cost of Construction:

    **(i)** Until the property is actually repaired or replaced, at the same or another premises; and

    **(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

  **(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the same premises.

  **(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion, to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

**(9)** The costs addressed in the Loss Payment Property Loss Condition in Section I – Property do not include the increased cost attributable to enforcement of an ordinance or law. The amount payable under this Additional Coverage, as stated in Paragraph **(6)** of this Additional Coverage, is not subject to such limitation.

**m. Business Income From Dependent Properties**

**(1)** We will pay for the actual loss of Business Income you sustain due to physical loss or damage at the premises of a dependent property caused by or resulting from any Covered Cause of Loss.

However, this Additional Coverage does not apply when the only loss to dependent property is loss or damage to "electronic data", including destruction or corruption of "electronic data". If the dependent property sustains loss or damage to "electronic data" and other property, coverage under this Additional Coverage will not continue once the other property is repaired, rebuilt or replaced.

The most we will pay under this Additional Coverage is $5,000 unless a higher Limit of Insurance is indicated in the Declarations.

**(2)** We will reduce the amount of your Business Income loss, other than Extra Expense, to the extent you can resume "operations", in whole or in part, by using any other available:

  **(a)** Source of materials; or

  **(b)** Outlet for your products.

**(3)** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**(4)** Dependent property means property owned by others whom you depend on to:

**(a)** Deliver materials or services to you, or to others for your account. But services does not mean water, communication or power supply services;

**(b)** Accept your products or services;

**(c)** Manufacture your products for delivery to your customers under contract for sale; or

**(d)** Attract customers to your business.

The dependent property must be located in the coverage territory of this policy.

**(5)** The coverage period for Business Income under this Additional Coverage:

**(a)** Begins 72 hours after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the premises of the dependent property; and

**(b)** Ends on the date when the property at the premises of the dependent property should be repaired, rebuilt or replaced with reasonable speed and similar quality.

**(6)** The Business Income coverage period, as stated in Paragraph **(5)**, does not include any increased period required due to the enforcement of any ordinance or law that:

**(a)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(b)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not reduce the Business Income coverage period.

**(7)** The definition of Business Income contained in the Business Income Additional Coverage also applies to this Business Income From Dependent Properties Additional Coverage.

**n. Glass Expenses**

**(1)** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

**(2)** We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

**o. Fire Extinguisher Systems Recharge Expense**

**(1)** We will pay:

**(a)** The cost of recharging or replacing, whichever is less, your fire extinguishers and fire extinguishing systems (including hydrostatic testing if needed) if they are discharged on or within 100 feet of the described premises; and

**(b)** For loss or damage to Covered Property if such loss or damage is the result of an accidental discharge of chemicals from a fire extinguisher or a fire extinguishing system.

**(2)** No coverage will apply if the fire extinguishing system is discharged during installation or testing.

**(3)** The most we will pay under this Additional Coverage is $5,000 in any one occurrence.

**p. Electronic Data**

**(1)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore "electronic data" which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that "electronic data" is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the "electronic data" was stored, with blank media of substantially identical type.

**(2)** The Covered Causes of Loss applicable to Business Personal Property include a computer virus, harmful code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity retained by you, or for you, to inspect, design, install, modify, maintain, repair or replace that system.

(3) The most we will pay under this Additional Coverage – Electronic Data for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved, is $10,000, unless a higher Limit of Insurance is shown in the Declarations. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in, but not after, that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**q. Interruption Of Computer Operations**

(1) Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a suspension of "operations" caused by an interruption in computer operations due to destruction or corruption of "electronic data" due to a Covered Cause of Loss.

(2) With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

(a) Coverage under this Additional Coverage – Interruption Of Computer Operations is limited to the "specified causes of loss" and Collapse.

(b) If the Businessowners Coverage Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage.

(c) The Covered Causes of Loss include a computer virus, harmful code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity retained by you, or for you, to inspect, design, install, modify, maintain, repair or replace that system.

(3) The most we will pay under this Additional Coverage – Interruption Of Computer Operations for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved, is $10,000 unless a higher Limit of Insurance is shown in the Declarations. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

(4) This Additional Coverage – Interruption Of Computer Operations does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in **(3)** above has not been exhausted.

(5) Coverage for Business Income does not apply when a suspension of "operations" is caused by destruction or corruption of "electronic data", or any loss or damage to "electronic data", except as provided under Paragraphs **(1)** through **(4)** of this Additional Coverage.

**(6)** Coverage for Extra Expense does not apply when action is taken to avoid or minimize a suspension of "operations" caused by destruction or corruption of "electronic data", or any loss or damage to "electronic data", except as provided under Paragraphs **(1)** through **(4)** of this Additional Coverage.

**r. Limited Coverage For "Fungi", Wet Rot Or Dry Rot**

**(1)** The coverage described in Paragraphs **r.(2)** and **r.(6)** only applies when the "fungi", wet rot or dry rot are the result of a "specified cause of loss" other than fire or lightning that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

**(2)** We will pay for loss or damage by "fungi", wet rot or dry rot. As used in this Limited Coverage, the term loss or damage means:

**(a)** Direct physical loss or damage to Covered Property caused by "fungi", wet rot or dry rot, including the cost of removal of the "fungi", wet rot or dry rot;

**(b)** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet rot or dry rot; and

**(c)** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet rot or dry rot are present.

**(3)** The coverage described under this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungi", wet rot or dry rot, we will not pay more than the total of $15,000 even if the "fungi", wet rot or dry rot continues to be present or active, or recurs, in a later policy period.

**(4)** The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungi", wet rot or dry rot, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungi", wet rot or dry rot, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungi", wet rot or dry rot causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

**(5)** The terms of this Limited Coverage do not increase or reduce the coverage provided under the Water Damage, Other Liquids, Powder Or Molten Material Damage or Collapse Additional Coverages.

**(6)** The following applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Business Income and/or Extra Expense Additional Coverage.

**(a)** If the loss which resulted in "fungi", wet rot or dry rot does not in itself necessitate a suspension of "operations", but such suspension is necessary due to loss or damage to property caused by "fungi", wet rot or dry rot, then our payment under the Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

**(b)** If a covered suspension of "operations" was caused by loss or damage other than "fungi", wet rot or dry rot, but remediation of "fungi", wet rot or dry rot prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

    © Insurance Services Office, Inc., 2009    BP 00 03 01 10    ☐

**6. Coverage Extensions**

In addition to the Limits of Insurance of Section I – Property, you may extend the insurance provided by this policy as provided below.

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

**a. Newly Acquired Or Constructed Property**

**(1) Buildings**

If this policy covers Buildings, you may extend that insurance to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at premises other than the one described, intended for:

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2) Business Personal Property**

If this policy covers Business Personal Property, you may extend that insurance to apply to:

**(a)** Business Personal Property, including such property that you newly acquire, at any location you acquire;

**(b)** Business Personal Property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations; or

**(c)** Business Personal Property that you newly acquire, located at the described premises.

This Extension does not apply to personal property that you temporarily acquire in the course of installing or performing work on such property or your wholesale activities.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

**(3) Period Of Coverage**

With respect to insurance on or at each newly acquired or constructed property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Property Off-premises**

You may extend the insurance provided by this policy to apply to your Covered Property, other than "money" and "securities", "valuable papers and records" or accounts receivable, while it is in the course of transit or at a premises you do not own, lease or operate. The most we will pay for loss or damage under this Extension is $10,000.

**c. Outdoor Property**

You may extend the insurance provided by this policy to apply to your outdoor fences, radio and television antennas (including satellite dishes), signs (other than signs attached to buildings), trees, shrubs and plants, including debris removal expense. Loss or damage must be caused by or result from any of the following causes of loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $2,500, unless a higher Limit of Insurance for Outdoor Property is shown in the Declarations, but not more than $1,000 for any one tree, shrub or plant.

**d. Personal Effects**

You may extend the insurance that applies to Business Personal Property to apply to personal effects owned by you, your officers, your partners or "members", your "managers" or your employees. This extension does not apply to:

**(1)** Tools or equipment used in your business; or

**(2)** Loss or damage by theft.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises.

**e. Valuable Papers And Records**

**(1)** You may extend the insurance that applies to Business Personal Property to apply to direct physical loss or damage to "valuable papers and records" that you own, or that are in your care, custody or control caused by or resulting from a Covered Cause of Loss. This Coverage Extension includes the cost to research, replace or restore the lost information on "valuable papers and records" for which duplicates do not exist.

**(2)** This Coverage Extension does not apply to:

**(a)** Property held as samples or for delivery after sale; and

**(b)** Property in storage away from the premises shown in the Declarations.

**(3)** The most we will pay under this Coverage Extension for loss or damage to "valuable papers and records" in any one occurrence at the described premises is $10,000, unless a higher Limit of Insurance for "valuable papers and records" is shown in the Declarations.

For "valuable papers and records" not at the described premises, the most we will pay is $5,000.

**(4)** Loss or damage to "valuable papers and records" will be valued at the cost of restoration or replacement of the lost or damaged information. To the extent that the contents of the "valuable papers and records" are not restored, the "valuable papers and records" will be valued at the cost of replacement with blank materials of substantially identical type.

**(5)** Paragraph **B.** Exclusions in Section I – Property does not apply to this Coverage Extension except for:

**(a)** Paragraph **B.1.c.,** Governmental Action;

**(b)** Paragraph **B.1.d.,** Nuclear Hazard;

**(c)** Paragraph **B.1.f.,** War And Military Action;

**(d)** Paragraph **B.2.f.,** Dishonesty;

**(e)** Paragraph **B.2.g.,** False Pretense;

**(f)** Paragraph **B.2.m.(2),** Errors Or Omissions; and

**(g)** Paragraph **B.3.**

**f. Accounts Receivable**

**(1)** You may extend the insurance that applies to Business Personal Property to apply to accounts receivable. We will pay:

**(a)** All amounts due from your customers that you are unable to collect;

**(b)** Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

**(c)** Collection expenses in excess of your normal collection expenses that are made necessary by loss or damage; and

**(d)** Other reasonable expenses that you incur to reestablish your records of accounts receivable;

that result from direct physical loss or damage by any Covered Cause of Loss to your records of accounts receivable.

**(2)** The most we will pay under this Coverage Extension for loss or damage in any one occurrence at the described premises is $10,000, unless a higher Limit of Insurance for accounts receivable is shown in the Declarations.

For accounts receivable not at the described premises, the most we will pay is $5,000.

**(3)** Paragraph **B.** Exclusions in Section I – Property does not apply to this Coverage Extension except for:

**(a)** Paragraph **B.1.c.,** Governmental Action;

**(b)** Paragraph **B.1.d.,** Nuclear Hazard;

**(c)** Paragraph **B.1.f.,** War And Military Action;

**(d)** Paragraph **B.2.f.,** Dishonesty;

**(e)** Paragraph **B.2.g.,** False Pretense;

**(f)** Paragraph **B.3.;** and

**(g)** Paragraph **B.6.,** Accounts Receivable Exclusion.

© Insurance Services Office, Inc., 2009

## B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

### a. Ordinance Or Law

(1) The enforcement of any ordinance or law:

(a) Regulating the construction, use or repair of any property; or

(b) Requiring the tearing down of any property, including the cost of removing its debris.

(2) This exclusion, Ordinance Or Law, applies whether the loss results from:

(a) An ordinance or law that is enforced even if the property has not been damaged; or

(b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property or removal of its debris, following a physical loss to that property.

### b. Earth Movement

(1) Earthquake, including any earth sinking, rising or shifting related to such event;

(2) Landslide, including any earth sinking, rising or shifting related to such event;

(3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

(4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in Paragraphs (1) through (4) above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

(5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the loss or damage caused by that fire, building glass breakage or volcanic action.

Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

(a) Airborne volcanic blast or airborne shock waves;

(b) Ash, dust or particulate matter; or

(c) Lava flow.

All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss of or damage to Covered Property.

### c. Governmental Action

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this policy.

### d. Nuclear Hazard

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

### e. Utility Services

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

(1) Originates away from the described premises; or

(2) Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

This exclusion does not apply to loss or damage to "computer(s)" and "electronic data".

**f. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings; or

**(5)** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **(1)**, **(3)** or **(4)**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **(1)** through **(5)**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h. Certain Computer-related Losses**

**(1)** The failure, malfunction or inadequacy of:

**(a)** Any of the following, whether belonging to any insured or to others:

**(i)** "Computer" hardware, including microprocessors or other electronic data processing equipment as may be described elsewhere in this policy;

**(ii)** "Computer" application software or other "electronic data" as may be described elsewhere in this policy;

**(iii)** "Computer" operating systems and related software;

**(iv)** "Computer" networks;

**(v)** Microprocessors ("computer" chips) not part of any "computer" system; or

**(vi)** Any other computerized or electronic equipment or components; or

**(b)** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **(a)** above;

due to the inability to correctly recognize, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

**(2)** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **(1)** above.

© Insurance Services Office, Inc., 2009
BP 00 03 01 10    ☐

However, if excluded loss or damage, as described in Paragraph **(1)** above results in a "specified cause of loss" under Section **I** – Property, we will pay only for the loss or damage caused by such "specified cause of loss".

We will not pay for repair, replacement or modification of any items in Paragraph **(1)(a)** or **(1)(b)** to correct any deficiencies or change any features.

**i. "Fungi", Wet Rot Or Dry Rot**

Presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot.

But if "fungi", wet rot or dry rot result in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**(1)** When "fungi", wet rot or dry rot result from fire or lightning; or

**(2)** To the extent that coverage is provided in the Limited Coverage For "Fungi", Wet Rot Or Dry Rot Additional Coverage, with respect to loss or damage by a cause of loss other than fire or lightning.

**j. Virus Or Bacteria**

**(1)** Any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

**(2)** However, the exclusion in Paragraph **(1)** does not apply to loss or damage caused by or resulting from "fungi", wet rot or dry rot. Such loss or damage is addressed in Exclusion **i.;**

**(3)** With respect to any loss or damage subject to the exclusion in Paragraph **(1),** such exclusion supersedes any exclusion relating to "pollutants".

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a. Electrical Apparatus**

Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(1)** Electrical current, including arcing;

**(2)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(3)** Pulse of electromagnetic energy; or

**(4)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by fire.

We will pay for loss or damage to "computer(s)" due to artificially generated electrical, magnetic or electromagnetic energy if such loss or damage is caused by or results from:

**(1)** An occurrence that took place within 100 feet of the described premises; or

**(2)** Interruption of electric power supply, power surge, blackout or brownout if the cause of such occurrence took place within 100 feet of the described premises.

**b. Consequential Losses**

Delay, loss of use or loss of market.

**c. Smoke, Vapor, Gas**

Smoke, vapor or gas from agricultural smudging or industrial operations.

**d. Steam Apparatus**

Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**e. Frozen Plumbing**

Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**f. Dishonesty**

Dishonest or criminal acts by you, anyone else with an interest in the property, or any of your or their partners, "members", officers, "managers", employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees; but theft by employees is not covered.

With respect to accounts receivable and "valuable papers and records", this exclusion does not apply to carriers for hire.

This exclusion does not apply to coverage that is provided under the Employee Dishonesty Optional Coverage.

**g. False Pretense**

Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**h. Exposed Property**

Rain, snow, ice or sleet to personal property in the open.

**i. Collapse**

**(1)** Collapse, including any of the following conditions of property or any part of the property:

**(a)** An abrupt falling down or caving in;

**(b)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**(c)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to Paragraph **i.(1)(a)** or **i.(1)(b).**

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

**(2)** This Exclusion **i.,** does not apply:

**(a)** To the extent that coverage is provided under the Additional Coverage – Collapse; or

**(b)** To collapse caused by one or more of the following:

**(i)** The "specified causes of loss";

**(ii)** Breakage of building glass;

**(iii)** Weight of rain that collects on a roof; or

**(iv)** Weight of people or personal property.

**j. Pollution**

We will not pay for loss or damage caused by or resulting from the discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

**k. Neglect**

Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**l. Other Types Of Loss**

**(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force.

This exclusion does not apply with respect to the breakdown of "computer(s)";

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in Paragraphs **(1)** through **(7)** above results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**m. Errors Or Omissions**

Errors or omissions in:

**(1)** Programming, processing or storing data, as described under "electronic data" or in any "computer" operations; or

**(2)** Processing or copying "valuable papers and records".

However, we will pay for direct physical loss or damage caused by resulting fire or explosion if these causes of loss would be covered by this coverage form.

**n. Installation, Testing, Repair**

Errors or deficiency in design, installation, testing, maintenance, modification or repair of your "computer" system including "electronic data".

However, we will pay for direct physical loss or damage caused by resulting fire or explosion if these causes of loss would be covered by this coverage form.

**o. Electrical Disturbance**

Electrical or magnetic injury, disturbance or erasure of "electronic data", except as provided for under the Additional Coverages of Section **I** – Property.

However, we will pay for direct loss or damage caused by lightning.

**p. Continuous Or Repeated Seepage Or Leakage Of Water**

Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**3.** We will not pay for loss or damage caused by or resulting from any of the following Paragraphs **a.** through **c.** But if an excluded cause of loss that is listed in Paragraphs **a.** through **c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a. Weather Conditions**

Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **B.1.** above to produce the loss or damage.

**b. Acts Or Decisions**

Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c. Negligent Work**

Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

**4. Additional Exclusion**

The following applies only to the property specified in this Additional Exclusion.

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**5. Business Income And Extra Expense Exclusions**

**a.** We will not pay for:

**(1)** Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage.

**(2)** Any other consequential loss.

**b.** With respect to this exclusion, suspension means:

**(1)** The partial slowdown or complete cessation of your business activities; and

**(2)** That a part or all of the described premises is rendered untenantable, if coverage for Business Income applies.

**6. Accounts Receivable Exclusion**

The following additional exclusion applies to the Accounts Receivable Coverage Extension:

We will not pay for:

**a.** Loss or damage caused by or resulting from alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money", "securities" or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

**b.** Loss or damage caused by or resulting from bookkeeping, accounting or billing errors or omissions.

**c.** Any loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

**C. Limits Of Insurance**

**1.** The most we will pay for loss or damage in any one occurrence is the applicable Limits of Insurance of Section **I** – Property shown in the Declarations.

**2.** The most we will pay for loss of or damage to outdoor signs attached to buildings is $1,000 per sign in any one occurrence.

**3.** The amounts of insurance applicable to the Coverage Extensions and the following Additional Coverages apply in accordance with the terms of such coverages and are in addition to the Limits of Insurance of Section **I** – Property:

**a.** Fire Department Service Charge;

**b.** Pollutant Clean-up And Removal;

**c.** Increased Cost Of Construction;

**d.** Business Income From Dependent Properties;

**e.** Electronic Data; and

**f.** Interruption Of Computer Operations.

**4. Building Limit – Automatic Increase**

**a.** In accordance with Paragraph **C.4.b.,** the Limit of Insurance for Buildings will automatically increase by 8%, unless a different percentage of annual increase is shown in the Declarations.

**b.** The amount of increase is calculated as follows:

**(1)** Multiply the Building limit that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Building limit by:

**(a)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 7% is .07); or

**(b)** .08, if no percentage of annual increase is shown in the Declarations; and

**(2)** Multiply the number calculated in accordance with **b.(1)** by the number of days since the beginning of the current policy year, or the effective date of the most recent policy change amending the Building limit, divided by 365.

**Example:**

If:

The applicable Building limit is $100,000. The annual percentage increase is 8%. The number of days since the beginning of the policy year (or last policy change) is 146.

The amount of increase is

$100,000 x .08 x 146 ÷ 365 = $3,200.

**5. Business Personal Property Limit – Seasonal Increase**

**a.** Subject to Paragraph **5.b.,** the Limit of Insurance for Business Personal Property is automatically increased by:

**(1)** The Business Personal Property – Seasonal Increase percentage shown in the Declarations; or

**(2)** 25% if no Business Personal Property – Seasonal Increase percentage is shown in the Declarations;

to provide for seasonal variances.

    © Insurance Services Office, Inc., 2009

**b.** The increase described in Paragraph **5.a** will apply only if the Limit of Insurance shown for Business Personal Property in the Declarations is at least 100% of your average monthly values during the lesser of:

    **(1)** The 12 months immediately preceding the date the loss or damage occurs; or

    **(2)** The period of time you have been in business as of the date the loss or damage occurs.

## D. Deductibles

**1.** We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Deductible shown in the Declarations. We will then pay the amount of loss or damage in excess of the Deductible up to the applicable Limit of Insurance of Section I – Property.

**2.** Regardless of the amount of the Deductible, the most we will deduct from any loss or damage under all of the following Optional Coverages in any one occurrence is the Optional Coverage Deductible shown in the Declarations:

    **a.** Money and Securities;

    **b.** Employee Dishonesty;

    **c.** Outdoor Signs; and

    **d.** Forgery or Alteration.

But this Optional Coverage Deductible will not increase the Deductible shown in the Declarations. This Deductible will be used to satisfy the requirements of the Deductible in the Declarations.

**3.** No deductible applies to the following Additional Coverages:

    **a.** Fire Department Service Charge;

    **b.** Business Income;

    **c.** Extra Expense;

    **d.** Civil Authority; and

    **e.** Fire Extinguisher Systems Recharge Expense.

## E. Property Loss Conditions

**1. Abandonment**

There can be no abandonment of any property to us.

## 2. Appraisal

If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

## 3. Duties In The Event Of Loss Or Damage

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

    **(1)** Notify the police if a law may have been broken.

    **(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

    **(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

    **(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limits of Insurance of Section I – Property. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

    **(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

    **(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**(9)** Resume all or part of your "operations" as quickly as possible.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Legal Action Against Us**

No one may bring a legal action against us under this insurance unless:

**a.** There has been full compliance with all of the terms of this insurance; and

**b.** The action is brought within two years after the date on which the direct physical loss or damage occurred.

**5. Loss Payment**

In the event of loss or damage covered by this policy:

**a.** At our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to Paragraph **d.(1)(e)** below.

**b.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**c.** We will not pay you more than your financial interest in the Covered Property.

**d.** Except as provided in Paragraphs **(2)** through **(7)** below, we will determine the value of Covered Property as follows:

**(1)** At replacement cost without deduction for depreciation, subject to the following:

**(a)** If, at the time of loss, the Limit of Insurance on the lost or damaged property is 80% or more of the full replacement cost of the property immediately before the loss, we will pay the cost to repair or replace, after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:

**(i)** The Limit of Insurance under Section I – Property that applies to the lost or damaged property;

**(ii)** The cost to replace, on the same premises, the lost or damaged property with other property:

**i.** Of comparable material and quality; and

**ii.** Used for the same purpose; or

**(iii)** The amount that you actually spend that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost is limited to the cost which would have been incurred had the building been built at the original premises.

**(b)** If, at the time of loss, the Limit of Insurance applicable to the lost or damaged property is less than 80% of the full replacement cost of the property immediately before the loss, we will pay the greater of the following amounts, but not more than the Limit of Insurance that applies to the property:

**(i)** The actual cash value of the lost or damaged property; or

**(ii)** A proportion of the cost to repair or replace the lost or damaged property, after application of the deductible and without deduction for depreciation. This proportion will equal the ratio of the applicable Limit of Insurance to 80% of the cost of repair or replacement.

© Insurance Services Office, Inc., 2009

**(c)** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

**(d)** We will not pay on a replacement cost basis for any loss or damage:

**(i)** Until the lost or damaged property is actually repaired or replaced; and

**(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

However, if the cost to repair or replace the damaged building property is $2,500 or less, we will settle the loss according to the provisions of Paragraphs **d.(1)(a)** and **d.(1)(b)** above whether or not the actual repair or replacement is complete.

**(e)** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

**(2)** If the Actual Cash Value – Buildings option applies, as shown in the Declarations, Paragraph **(1)** above does not apply to Buildings. Instead, we will determine the value of Buildings at actual cash value.

**(3)** The following property at actual cash value:

**(a)** Used or secondhand merchandise held in storage or for sale;

**(b)** Property of others. However, if an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance;

**(c)** Household contents, except personal property in apartments or rooms furnished by you as landlord;

**(d)** Manuscripts; and

**(e)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marble, bronzes, porcelain and bric-a-brac.

**(4)** Glass at the cost of replacement with safety glazing material if required by law.

**(5)** Tenants' Improvements and Betterments at:

**(a)** Replacement cost if you make repairs promptly.

**(b)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(i)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(ii)** Divide the amount determined in **(i)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(c)** Nothing if others pay for repairs or replacement.

**(6)** Applicable only to the Optional Coverages:

**(a)** "Money" at its face value; and

**(b)** "Securities" at their value at the close of business on the day the loss is discovered.

**(7)** Applicable only to Accounts Receivable:

**(a)** If you cannot accurately establish the amount of accounts receivable outstanding as of the time of loss or damage:

**(i)** We will determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the loss or damage occurs; and

**(ii)** We will adjust that total for any normal fluctuations in the amount of accounts receivable for the month in which the loss or damage occurred or for any demonstrated variance from the average for that month.

**(b)** The following will be deducted from the total amount of accounts receivable, however that amount is established:

**(i)** The amount of the accounts for which there is no loss or damage;

**(ii)** The amount of the accounts that you are able to reestablish or collect;

**(iii)** An amount to allow for probable bad debts that you are normally unable to collect; and

**(iv)** All unearned interest and service charges.

**e.** Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, provided you have complied with all of the terms of this policy; and

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**6. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limits of Insurance of Section I – Property.

**7. Resumption Of Operations**

We will reduce the amount of your:

**a.** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

**b.** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

    © Insurance Services Office, Inc., 2009    BP 00 03 01 10    ☐

**8. Vacancy**

  **a. Description Of Terms**

    **(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in Paragraphs **(a)** and **(b)** below:

      **(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

      **(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

        **(i)** Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

        **(ii)** Used by the building owner to conduct customary operations.

    **(2)** Buildings under construction or renovation are not considered vacant.

  **b. Vacancy Provisions**

    If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

    **(1)** We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

      **(a)** Vandalism;

      **(b)** Sprinkler leakage, unless you have protected the system against freezing;

      **(c)** Building glass breakage;

      **(d)** Water damage;

      **(e)** Theft; or

      **(f)** Attempted theft.

    **(2)** With respect to Covered Causes of Loss other than those listed in Paragraphs **(1)(a)** through **(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**F. Property General Conditions**

  **1. Control Of Property**

    Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

    The breach of any condition of this Coverage Form at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

  **2. Mortgageholders**

    **a.** The term "mortgageholder" includes trustee.

    **b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

    **c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

    **d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

      **(1)** Pays any premium due under this policy at our request if you have failed to do so;

      **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

      **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

    All of the terms of this policy will then apply directly to the mortgageholder.

    **e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this policy:

      **(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

      **(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgage-holder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

  **f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

    **(1)** 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

    **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

  **g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**3. No Benefit To Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**4. Policy Period, Coverage Territory**

Under Section **I** – Property:

  **a.** We cover loss or damage commencing:

    **(1)** During the policy period shown in the Declarations; and

    **(2)** Within the coverage territory or, with respect to property in transit, while it is between points in the coverage territory.

  **b.** The coverage territory is:

    **(1)** The United States of America (including its territories and possessions);

    **(2)** Puerto Rico; and

    **(3)** Canada.

**G. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages also apply. These coverages are subject to the terms and conditions applicable to property coverage in this policy, except as provided below.

**1. Outdoor Signs**

  **a.** We will pay for direct physical loss of or damage to all outdoor signs at the described premises:

    **(1)** Owned by you; or

    **(2)** Owned by others but in your care, custody or control.

  **b.** Paragraph **A.3.,** Covered Causes Of Loss, and Paragraph **B.,** Exclusions in Section **I** – Property, do not apply to this Optional Coverage, except for:

    **(1)** Paragraph **B.1.c.,** Governmental Action;

    **(2)** Paragraph **B.1.d.,** Nuclear Hazard; and

    **(3)** Paragraph **B.1.f.,** War And Military Action.

  **c.** We will not pay for loss or damage caused by or resulting from:

    **(1)** Wear and tear;

    **(2)** Hidden or latent defect;

    **(3)** Rust;

    **(4)** Corrosion; or

    **(5)** Mechanical breakdown.

  **d.** The most we will pay for loss or damage in any one occurrence is the Limit of Insurance for Outdoor Signs shown in the Declarations.

  **e.** The provisions of this Optional Coverage supersede all other references to outdoor signs in this policy.

**2. Money And Securities**

  **a.** We will pay for loss of "money" and "securities" used in your business while at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee having use and custody of the property, at the described premises, or in transit between any of these places, resulting directly from:

    **(1)** Theft, meaning any act of stealing;

    **(2)** Disappearance; or

    **(3)** Destruction.

  **b.** In addition to the Limitations and Exclusions applicable to Section **I** – Property, we will not pay for loss:

    **(1)** Resulting from accounting or arithmetical errors or omissions;

    **(2)** Due to the giving or surrendering of property in any exchange or purchase; or

    **(3)** Of property contained in any "money"-operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

 © Insurance Services Office, Inc., 2009 BP 00 03 01 10 □

c. The most we will pay for loss in any one occurrence is:

    **(1)** The limit shown in the Declarations for Inside the Premises for "money" and "securities" while:

        **(a)** In or on the described premises; or

        **(b)** Within a bank or savings institution; and

    **(2)** The limit shown in the Declarations for Outside the Premises for "money" and "securities" while anywhere else.

d. All loss:

    **(1)** Caused by one or more persons; or

    **(2)** Involving a single act or series of related acts;

    is considered one occurrence.

e. You must keep records of all "money" and "securities" so we can verify the amount of any loss or damage.

**3. Employee Dishonesty**

a. We will pay for direct loss of or damage to Business Personal Property and "money" and "securities" resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:

    **(1)** Cause you to sustain loss or damage; and also

    **(2)** Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

        **(a)** Any employee; or

        **(b)** Any other person or organization.

b. We will not pay for loss or damage:

    **(1)** Resulting from any dishonest or criminal act that you or any of your partners or "members" commit whether acting alone or in collusion with other persons.

    **(2)** Resulting from any dishonest act committed by any of your employees (except as provided in Paragraph **a.**), "managers" or directors:

        **(a)** Whether acting alone or in collusion with other persons; or

        **(b)** While performing services for you or otherwise.

    **(3)** The only proof of which as to its existence or amount is:

        **(a)** An inventory computation; or

        **(b)** A profit and loss computation.

c. The most we will pay for loss or damage in any one occurrence is the Limit of Insurance for Employee Dishonesty shown in the Declarations.

d. All loss or damage:

    **(1)** Caused by one or more persons; or

    **(2)** Involving a single act or series of acts;

    is considered one occurrence.

e. If any loss is covered:

    **(1)** Partly by this insurance; and

    **(2)** Partly by any prior cancelled or terminated insurance that we or any affiliate had issued to you or any predecessor in interest;

    the most we will pay is the larger of the amount recoverable under this insurance or the prior insurance.

We will pay only for loss or damage you sustain through acts committed or events occurring during the policy period. Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

f. This Optional Coverage is cancelled as to any employee immediately upon discovery by:

    **(1)** You; or

    **(2)** Any of your partners, "members", "managers", officers or directors not in collusion with the employee;

    of any dishonest act committed by that employee before or after being hired by you.

g. We will pay only for covered loss or damage sustained during the policy period and discovered no later than one year from the end of the policy period.

h. If you (or any predecessor in interest) sustained loss or damage during the policy period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Optional Coverage, provided:

    **(1)** This Optional Coverage became effective at the time of cancellation or termination of the prior insurance; and

 © Insurance Services Office, Inc., 2009 ☐

**(2)** The loss or damage would have been covered by this Optional Coverage had it been in effect when the acts or events causing the loss or damage were committed or occurred.

**i.** The insurance under Paragraph **h.** above is part of, not in addition to, the Limit of Insurance applying to this Optional Coverage and is limited to the lesser of the amount recoverable under:

**(1)** This Optional Coverage as of its effective date; or

**(2)** The prior insurance had it remained in effect.

**j.** With respect to the Employee Dishonesty Optional Coverage in Paragraph **G.3.,** employee means:

**(1)** Any natural person:

**(a)** While in your service or for 30 days after termination of service;

**(b)** Who you compensate directly by salary, wages or commissions; and

**(c)** Who you have the right to direct and control while performing services for you;

**(2)** Any natural person who is furnished temporarily to you:

**(a)** To substitute for a permanent employee as defined in Paragraph **(1)** above, who is on leave; or

**(b)** To meet seasonal or short-term workload conditions;

**(3)** Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **(2)** above;

**(4)** Any natural person who is a former employee, director, partner, member, manager, representative or trustee retained as a consultant while performing services for you; or

**(5)** Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside any building you occupy in conducting your business.

But employee does not mean:

**(1)** Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

**(2)** Any "manager", director or trustee except while performing acts coming within the usual duties of an employee.

**4. Equipment Breakdown Protection Coverage**

**a.** We will pay for direct loss of or damage to Covered Property caused by or resulting from a mechanical breakdown or electrical failure to pressure, mechanical or electrical machinery and equipment.

Mechanical breakdown or electrical failure to pressure, mechanical or electrical machinery and equipment does not mean any:

**(1)** Malfunction including but not limited to adjustment, alignment, calibration, cleaning or modification;

**(2)** Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

**(3)** Damage to any vacuum tube, gas tube, or brush; or

**(4)** The functioning of any safety or protective device.

**b.** Paragraphs **A.4.a.(1)** and **A.4.a.(2), Limitations,** do not apply to this Optional Coverage.

**c.** With respect to the coverage provided by this Optional Coverage, the following exclusions in Paragraph **B. Exclusions** do not apply:

**(1)** Paragraph **B.2.a. Electrical Apparatus;**

**(2)** Paragraph **B.2.d. Steam Apparatus;** and

**(3)** Paragraph **B.2.l.(6) Mechanical Breakdown.**

**d.** With respect to the coverage provided by this Optional Coverage, Paragraph **G.1.c.(5)** of the **Outdoor Sign Optional Coverage** does not apply.

**e.** If a dollar deductible is shown in the Declarations for this Optional Coverage, we will first subtract the applicable deductible amount from any loss we would otherwise pay. We will then pay the amount of loss in excess of the applicable deductible up to the applicable limit for this coverage.

If no optional deductible is chosen for this Optional Coverage, the Property Deductible shown in the Declarations applies.

 © Insurance Services Office, Inc., 2009  □

**f.** With respect to **Additional Coverages 5.f. Business Income** and **5.g. Extra Expense**, if the 72-hour time period in the definition of "period of restoration" (hereinafter referred to as time deductible) is amended for this Optional Coverage as shown in the Declarations, we will not pay for any Business Income loss that occurs during the consecutive number of hours shown as the time deductible in the Declarations immediately following a mechanical breakdown or electrical failure. If a time deductible is shown in days, each day shall mean 24 consecutive hours.

As respects the coverage provided by this Optional Coverage, any time deductible shown in the Declarations for Equipment Breakdown Protection Coverage supersedes any time deductible otherwise applicable to the Business Income coverage provided by this policy.

**g.** With respect to the coverage provided by this Optional Coverage, Paragraph **H. Property Definitions** is amended as follows:

**1.** "Computer" means:

**a.** Programmable electronic equipment that is used to store, retrieve and process data; and

**b.** Associated peripheral equipment that provides communication, including input and output functions such as printing and auxiliary functions such as data transmission.

"Computer" includes those used to operate production type machinery or equipment.

**h.** Whenever any covered pressure, mechanical or electrical machinery and equipment is found to be in, or exposed to, a dangerous condition, any of our representatives may suspend coverage provided by this Optional Coverage for loss from a mechanical breakdown or electrical failure to that pressure, mechanical or electrical machinery and equipment.

However, coverage provided by this Optional Coverage may be reinstated for loss from a mechanical breakdown or electrical failure to that pressure, mechanical or electrical machinery and equipment if the reasons for the suspension are found by any of our representatives to no longer exist.

We may suspend or reinstate this Optional coverage by mailing or delivering a written notification regarding the suspension or reinstatement to:

**(1)** Your last known address; or

**(2)** The address where the pressure, mechanical or electrical machinery and equipment is located.

This notification will indicate the effective date of the suspension or reinstatement.

If the coverage provided by this Optional Coverage is not reinstated, you will get a pro rata refund of premium. But the suspension will be effective even if we have not yet made or offered a refund.

**H. Property Definitions**

**1.** "Computer" means:

**a.** Programmable electronic equipment that is used to store, retrieve and process data; and

**b.** Associated peripheral equipment that provides communication, including input and output functions such as printing and auxiliary functions such as data transmission.

"Computer" does not include those used to operate production type machinery or equipment.

**2.** "Counterfeit money" means an imitation of "money" that is intended to deceive and to be taken as genuine.

**3.** "Electronic data" means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a "computer" or device connected to it, which enable the "computer" or device to receive, process, store, retrieve or send data.

**4.** "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**5.** "Manager" means a person serving in a directorial capacity for a limited liability company.

**6.** "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

7. "Money" means:

   a. Currency, coins and bank notes in current use and having a face value; and

   b. Travelers checks, register checks and money orders held for sale to the public.

8. "Operations" means your business activities occurring at the described premises.

9. "Period of restoration":

   a. Means the period of time that:

      (1) Begins:

         (a) 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

         (b) Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

         caused by or resulting from any Covered Cause of Loss at the described premises; and

      (2) Ends on the earlier of:

         (a) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

         (b) The date when business is resumed at a new permanent location.

   b. Does not include any increased period required due to the enforcement of any ordinance or law that:

      (1) Regulates the construction, use or repair, or requires the tearing down of any property; or

      (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants".

   The expiration date of this policy will not cut short the "period of restoration".

10. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

11. "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

   a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

   b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

   but does not include "money".

12. "Specified causes of loss" means the following:

   Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

   a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

      (1) The cost of filling sinkholes; or

      (2) Sinking or collapse of land into man-made underground cavities.

   b. Falling objects does not include loss of or damage to:

      (1) Personal property in the open; or

      (2) The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

   c. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam.

13. "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

14. "Valuable papers and records" means inscribed, printed or written:

   a. Documents;

   b. Manuscripts; and

   c. Records;

   including abstracts, books, deeds, drawings, films, maps or mortgages.

   But "valuable papers and records" does not mean "money" or "securities".

**SECTION II – LIABILITY**

**A. Coverages**

**1. Business Liability**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Paragraph **D.** – Liability And Medical Expenses Limits Of Insurance in Section **II** – Liability; and

(2) Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements or medical expenses.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Paragraph **f.** Coverage Extension – Supplementary Payments.

b. This insurance applies:

(1) To "bodily injury" and "property damage" only if:

(a) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(b) The "bodily injury" or "property damage" occurs during the policy period; and

(c) Prior to the policy period, no insured listed under Paragraph **C.1.** Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known before the policy period.

(2) To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **C.1.** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **C.1.** Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

f. **Coverage Extension – Supplementary Payments**

(1) We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

(a) All expenses we incur.

(b) Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Business Liability Coverage for "bodily injury" applies. We do not have to furnish these bonds.

(c) The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance. We do not have to furnish these bonds.

(d) All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

(e) All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

(f) Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

(g) All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the limit of liability.

(2) If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

(a) The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

(b) This insurance applies to such liability assumed by the insured;

(c) The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

(d) The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

(e) The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

(f) The indemnitee:

(i) Agrees in writing to:

i. Cooperate with us in the investigation, settlement or defense of the "suit";

ii. Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

iii. Notify any other insurer whose coverage is available to the indemnitee; and

iv. Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(ii) Provides us with written authorization to:

i. Obtain records and other information related to the "suit"; and

ii. Conduct and control the defense of the indemnitee in such "suit".

  © Insurance Services Office, Inc., 2009  BP 00 03 01 10  □

**(3)** So long as the conditions in Paragraph **(2)** are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **B.1.b.(2)** Exclusions in Section II – Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the Limits of Insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

**(a)** We have used up the applicable Limit of Insurance in the payment of judgments or settlements; or

**(b)** The conditions set forth above, or the terms of the agreement described in Paragraph **(2)(f)** above are no longer met.

**2. Medical Expenses**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the Limits of Insurance of Section II – Liability. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**B. Exclusions**

**1. Applicable To Business Liability Coverage**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

 © Insurance Services Office, Inc., 2009  ☐

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

   **(i)** Any insured; or

   **(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

   **(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

   **(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

   **(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

   **(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

   **(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

   **(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

   However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

    **(a)** Less than 51 feet long; and

    **(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

    **(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where it is licensed or principally garaged; or

    **(b)** The operation of any of the following machinery or equipment:

        **(i)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

        **(ii)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition or stunting activity.

**i. War**

"Bodily injury", "property damage" or "personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by government authority in hindering or defending against any of these.

**j. Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" caused by the rendering or failure to render any professional service. This includes but is not limited to:

**(1)** Legal, accounting or advertising services;

**(2)** Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;

**(3)** Supervisory, inspection or engineering services;

**(4)** Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;

**(5)** Any health or therapeutic service treatment, advice or instruction;

**(6)** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming;

**(7)** Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**(8)** Body piercing services; and

**(9)** Services in the practice of pharmacy.

© Insurance Services Office, Inc., 2009

This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering or failure to render of any professional service.

**k. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1), (3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate Limit of Insurance applies to Damage To Premises Rented To You as described in Paragraph **D.** Liability And Medical Expenses Limit Of Insurance in Section **II – Liability.**

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**l. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**m. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**n. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**o. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**p. Personal And Advertising Injury**

"Personal and advertising injury":

**(1)** Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

**(2)** Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

**(3)** Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

**(4)** For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

**(5)** Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

**(6)** Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

**(7)** Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

**(8)** Committed by an insured whose business is:

**(a)** Advertising, broadcasting, publishing or telecasting;

**(b)** Designing or determining content of websites for others; or

**(c)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under Paragraph **F.** Liability And Medical Expenses Definitions.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, by itself, is not considered the business of advertising, broadcasting, publishing or telecasting.

**(9)** Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time;

**(10)** With respect to any loss, cost or expense arising out of any:

**(a)** Request, demand or order that any insured or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of, "pollutants".

**(11)** Arising out of an electronic chatroom or bulletin board the insured hosts, owns or over which the insured exercises control;

**(12)** Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**(13)** Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatags, or any other similar tactics to mislead another's potential customers.

**q. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

© Insurance Services Office, Inc., 2009
BP 00 03 01 10    ☐

**r. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**s. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury", "property damage", or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c., d., e., f., g., h., i., k., l., m., n.** and **o.** in Section II – Liability do not apply to damage by fire to premises while rented to you, or temporarily occupied by you with permission of the owner. A separate Damage To Premises Rented To You Limit of Insurance applies to this coverage as described in Paragraph **D.** Liability And Medical Expenses Limits of Insurance in Section II – Liability.

**2. Applicable To Medical Expenses Coverage**

We will not pay expenses for "bodily injury":

**a.** To any insured, except "volunteer workers".

**b.** To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c.** To a person injured on that part of premises you own or rent that the person normally occupies.

**d.** To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e.** To a person injured while practicing, instructing or participating in any physical exercises or games, sports or athletic contests.

**f.** Included within the "products-completed operations hazard".

**g.** Excluded under Business Liability Coverage.

**3. Applicable To Both Business Liability Coverage And Medical Expenses Coverage – Nuclear Energy Liability Exclusion**

This insurance does not apply:

**a.** Under Business Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

**(a)** Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

**(b)** The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**b.** Under Medical Expenses Coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**c.** Under Business Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of the "nuclear material"; if:

**(1)** The "nuclear material":

**(a)** Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

    **(b)** Has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility"; but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**d.** As used in this exclusion:

**(1)** "By-product material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(2)** "Hazardous properties" include radioactive, toxic or explosive properties;

**(3)** "Nuclear facility" means:

    **(a)** Any "nuclear reactor";

    **(b)** Any equipment or device designed or used for:

        **(i)** Separating the isotopes of uranium or plutonium;

        **(ii)** Processing or utilizing "spent fuel"; or

        **(iii)** Handling, processing or packaging "waste";

    **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

**(4)** "Nuclear material" means "source material", "special nuclear material" or "by-product material";

**(5)** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**(6)** "Property damage" includes all forms of radioactive contamination of property;

**(7)** "Source material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(8)** "Special nuclear material" has the meaning given it in the Atomic Energy Act of 1954 or in any law amendatory thereof;

**(9)** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

**(10)** "Waste" means any waste material:

    **(a)** Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

    **(b)** Resulting from the operation by any person or organization of any "nuclear facility" included under Paragraphs **(a)** and **(b)** of the definition of "nuclear facility".

**C. Who Is An Insured**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

    © Insurance Services Office, Inc., 2009    BP 00 03 01 10    □

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(a)** or **(b)**; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**D. Liability And Medical Expenses Limits Of Insurance**

**1.** The Limits of Insurance of Section II – Liability shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The most we will pay for the sum of all damages because of all:

**a.** "Bodily injury", "property damage" and medical expenses arising out of any one "occurrence"; and

**b.** "Personal and advertising injury" sustained by any one person or organization;

is the Liability and Medical Expenses limit shown in the Declarations. But the most we will pay for all medical expenses because of "bodily injury" sustained by any one person is the Medical Expenses limit shown in the Declarations.

3. The most we will pay under Business Liability Coverage for damages because of "property damage" to a premises while rented to you or in the case of fire while rented to you or temporarily occupied by you with permission of the owner is the applicable Damage To Premises Rented To You limit shown for that premises in the Declarations. For a premises temporarily occupied by you, the applicable limit will be the highest Damage To Premises Rented To You limit shown in the Declarations.

4. **Aggregate Limits**

   The most we will pay for:

   **a.** All "bodily injury" and "property damage" that is included in the "products-completed operations hazard" is twice the Liability and Medical Expenses limit.

   **b.** All:

   **(1)** "Bodily injury" and "property damage" except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard";

   **(2)** Plus medical expenses;

   **(3)** Plus all "personal and advertising injury" caused by offenses committed;

   is twice the Liability and Medical Expenses limit.

   Subject to Paragraph **a.** or **b.** above, whichever applies, the Damage To Premises Rented To You Limit is the most we will pay for damages because of "property damage" to any one premises, while rented to you, or in the case of fire, while rented to you or temporarily occupied by you with permission of the owner.

   The Limits of Insurance of Section II – Liability apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

E. **Liability And Medical Expenses General Conditions**

   1. **Bankruptcy**

      Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this policy.

   2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

      **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      **(1)** How, when and where the "occurrence" or offense took place;

      **(2)** The names and addresses of any injured persons and witnesses; and

      **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

      **b.** If a claim is made or "suit" is brought against any insured, you must:

      **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

      **(2)** Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

      **c.** You and any other involved insured must:

      **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      **(2)** Authorize us to obtain records and other information;

      **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

      **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

   3. **Legal Action Against Us**

      No person or organization has a right under this policy:

      **a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

      **b.** To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Separation Of Insureds**

Except with respect to the Limits of Insurance of Section II – Liability, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**F. Liability And Medical Expenses Definitions**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding websites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

provided the insured's responsibility to pay damages is determined in a "suit" on the merits in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

**(1)** The repair, replacement, adjustment or removal of "your product" or "your work"; or

**(2)** Your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(2)** above and supervisory, inspection or engineering services.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, on which are permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

© Insurance Services Office, Inc., 2009

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where they are licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law or motor vehicle registration law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at the job site has been put to its intended use by any other person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

The "bodily injury" or "property damage" must occur away from premises you own or rent, unless your business includes the selling, handling or distribution of "your product" for consumption on premises you own or rent.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;

         (b) Others trading under your name; or

         (c) A person or organization whose business or assets you have acquired; and

      (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

      (2) The providing of or failure to provide warnings or instructions.

   c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

   a. Means:

      (1) Work or operations performed by you or on your behalf; and

      (2) Materials, parts or equipment furnished in connection with such work or operations.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

      (2) The providing of or failure to provide warnings or instructions.

**SECTION III – COMMON POLICY CONDITIONS (APPLICABLE TO SECTION I – PROPERTY AND SECTION II – LIABILITY)**

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. Five days before the effective date of cancellation if any one of the following conditions exists at any building that is Covered Property in this policy;

      (1) The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

         (a) Seasonal unoccupancy; or

         (b) Buildings in the course of construction, renovation or addition.

         Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

      (2) After damage by a Covered Cause of Loss, permanent repairs to the building:

         (a) Have not started, and

         (b) Have not been contracted for,

         within 30 days of initial payment of loss.

      (3) The building has:

         (a) An outstanding order to vacate;

(b) An outstanding demolition order; or

(c) Been declared unsafe by governmental authority.

(4) Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

(5) Failure to:

(a) Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

(b) Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

**b.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium.

**c.** 30 days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This policy;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this policy.

**D. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**E. Inspections And Surveys**

**1.** We have the right to:

**a.** Make inspections and surveys at any time;

**b.** Give you reports on the conditions we find; and

**c.** Recommend changes.

**2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

**a.** Are safe and healthful; or

**b.** Comply with laws, regulations, codes or standards.

**3.** Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**4.** Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**F. Insurance Under Two Or More Coverages**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

### G. Liberalization

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

### H. Other Insurance

1. If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance of Section **I – Property**.

2. Business Liability Coverage is excess over:

   a. Any other insurance that insures for direct physical loss or damage; or

   b. Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

3. When this insurance is excess, we will have no duty under Business Liability Coverage to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

### I. Premiums

1. The first Named Insured shown in the Declarations:

   a. Is responsible for the payment of all premiums; and

   b. Will be the payee for any return premiums we pay.

2. The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

3. With our consent, you may continue this policy in force by paying a continuation premium for each successive one-year period. The premium must be:

   a. Paid to us prior to the anniversary date; and

   b. Determined in accordance with Paragraph **2.** above.

Our forms then in effect will apply. If you do not pay the continuation premium, this policy will expire on the first anniversary date that we have not received the premium.

4. Undeclared exposures or change in your business operation, acquisition or use of locations may occur during the policy period that are not shown in the Declarations. If so, we may require an additional premium. That premium will be determined in accordance with our rates and rules then in effect.

### J. Premium Audit

1. This policy is subject to audit if a premium designated as an advance premium is shown in the Declarations. We will compute the final premium due when we determine your actual exposures.

2. Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

3. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

### K. Transfer Of Rights Of Recovery Against Others To Us

1. Applicable to Businessowners Property Coverage:

   If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

   a. Prior to a loss to your Covered Property.

   b. After a loss to your Covered Property only if, at time of loss, that party is one of the following:

      (1) Someone insured by this insurance;

      (2) A business firm:

         (a) Owned or controlled by you; or

         (b) That owns or controls you; or

      (3) Your tenant.

You may also accept the usual bills of lading or shipping receipts limiting the liability of carriers.

This will not restrict your insurance.

2. Applicable to Businessowners Liability Coverage:

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. This condition does not apply to Medical Expenses Coverage.

**L. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

4CMNO500001070

 **Midwest Family Mutual Insurance Company**

*Insuring Midwest Values Since 1891*

MIDWEST FAMILY MUTUAL
INSURANCE COMPANY
P.O. BOX 9425 Minneapolis, MN 55440-9425

---

## Artisan Contractor Policy

### Renewal Coverage Summary

| Policy Number | Policy Period | | | Agent # |
|---|---|---|---|---|
| | From | To | | |
| 1070 | 09/01/18 | 09/01/19 | 12:01 AM Standard Time | 04598 |

| Named Insured and Address | Agent |
|---|---|
| KREMER & DAVIS, INC<br>9385 HOLLY ST NW<br>COON RAPIDS, MN 55433 | ASSUREDPARTNERS OF MN LLC<br>2361 HIGHWAY 36 WEST<br>SAINT PAUL, MN 55113<br><br>Phone: (651) 644-7200 |

### Commercial Summary Page

Business Description: CONTRACTOR          Form of Business: Corporation

### Coverage Summary

This policy consists of the following coverage parts/policies for which a premium is indicated.
This premium may be subject to adjustment or final audit.

| Coverage Part/Policy Attached | Annual Premium |
|---|---|
| Artisan Contractor | ▮▮▮▮ |
| POLICY FEES/TAXES | $.00 |
| ESTIMATED TOTAL PREMIUM | ▮▮▮▮ |

### End of Summary Declarations

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THE COVERAGE
PARTS/POLICIES ATTACHED, WE AGREE WITH YOU TO PROVIDE THE INSURANCE DESCRIBED THEREIN.

*Date 8/22/2018*



# Midwest Family Mutual Insurance Company

Insuring Midwest Values Since 1891

MIDWEST FAMILY MUTUAL
INSURANCE COMPANY
P.O. BOX 9425 Minneapolis, MN 55440-9425

## Artisan Contractor Policy

### Renewal Coverage Summary

| Policy Number | Policy Period From | To | | Agent # |
|---|---|---|---|---|
| 070 | 09/01/18 | 09/01/19 | 12:01 AM Standard Time | 04598 |

| Named Insured and Address | Agent |
|---|---|
| KREMER & DAVIS, INC<br>9385 HOLLY ST NW<br>COON RAPIDS, MN 55433 | ASSUREDPARTNERS OF MN LLC<br>2361 HIGHWAY 36 WEST<br>SAINT PAUL, MN 55113<br><br>Phone: (651)644-7200 |

### Policy Summary

'X' IF SUPPLEMENTAL DECLARATION [X]    SUPPLEMENTAL DECLARATION

| Business Description:<br><br>**Carpentry - Framing** | Form of Business:<br><br>**Corporation** |
|---|---|

In return for the payment of the premium and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

**DESCRIBED PREMISES** | Forms Applicable: Special

| Premises No. | Bldg. No. | Location | Mortgage Holder Name and Address |
|---|---|---|---|
| SEE ATTACHED SUPPLEMENTAL DECLARATIONS | | | SEE ATTACHED SCHEDULE |

**PROPERTY** | PREM NO. | BLDG NO. | PREM NO. | BLDG NO. | PREM NO. | BLDG NO.

SEE ATTACHED SUPPLEMENTAL DECLARATIONS
Business Income/Extra Expense                           ACTUAL LOSS SUSTAINED
Premium:                                                Included

Deductible s **SEE ATTACHED SUPPLEMENTAL DECLARATIONS**

**OPTIONAL COVERAGES**
SEE ATTACHED SUPPLEMENTAL DECLARATIONS

**LIABILITY AND MEDICAL PAYMENTS**
Except for Damage to Premises Rented to You, each paid claim for the following coverages reduces the amount of insurance we provide during the applicable annual period. Please refer to paragraph D.4 of the Businessowners Coverage Form.

| | Limits of Insurance |
|---|---|
| Liability and Medical Expenses | $2,000,000 Per Occurrence |
| Medical Expense | $5,000 Per Person |
| Damage to Premises Rented to You | $50,000 Any One Premises |
| Other Than Products/Completed Operations Aggregate | $4,000,000 |
| Products/Completed Operations Aggregate | $4,000,000 |
| Deductible (Property Damage Liability) | NONE |

*Date 8/22/2011*

ꞈCMINU3UUUƆ1ʋ7U

| TOTAL PREMIUM | ██████████ |
|---|---|

This policy is subject to audit and based upon 31 full time employees and 0 part time employees.

**FORMS AND ENDORSEMENTS: SEE ATTACHED SCHEDULE**

During the past three years no insurer has canceled any insurance issued to the name insured, similar to that afforded hereunder, unless otherwise stated herein.

*THESE DECLARATIONS, TOGETHER WITH THE COVERAGE FORM(S), COMMON POLICY CONDITIONS AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.*

Includes copyright material of Insurance Service Office, Inc., with its permission.

## Location Address(es)

| Prems. No. | Bldg. No. | Address |
|---|---|---|
| 1 | 1 | 4810 W 129TH ST, ALSIP, IL, 60803 |
| 2 | 1 | 9385 Holly St NW, Coon Rapids, MN, 55433 |

## Description of Premises

| Prems. No. | Bldg. No. | Occupancy | Construction |
|---|---|---|---|
| 1 | 1 | Carpentry - Framing | Frame |
| 2 | 1 | Plumbing | Non-Combustible |

## Coverages

| Prems. No. | Bldg. No. | Coverages | Limit of Insurance | Automatic increase in insurance | Ded |
|---|---|---|---|---|---|
| 1 | 1 | Personal Property/Contents - RC | $20,100 | 6% | $500 |
| 2 | 1 | Personal Property/Contents - RC | $367,400 | 6% | $500 |

## Optional Coverages

| Prems. No. | Bldg. No. | Coverages | Limit | Ded |
|---|---|---|---|---|
| 1 | 1 | Employee Dishonesty | $100,000 | $500 |
| 1 | 1 | Equipment Breakdown deductible ---- total sublimit on: $20,100 expediating expenses perishable good computer equipment hazardous substances | $20,100 | |
| 1 | 1 | Money and Securites | $5,000 | |
| 1 | 1 | BOP/ Contractors Advantage | | |
| 2 | 1 | Equipment Breakdown deductible ---- total sublimit on: $367,400 expediating expenses perishable good computer equipment hazardous substances | $367,400 | $500 |
| 2 | 1 | Explosion-Full Time | $2,000,000 | $500 |
| 2 | 1 | BOP/ Contractors Advantage | | |

## Tool Floater Coverage

| Description | Serial Number | Value | Deductible | Premium |
|---|---|---|---|---|
| MISC TOOLS | | $16,250 | $500 | ■■■ |

## Contractors Equipment Coverage

| Description | Serial Number | Value | Deductible | Premium |
|---|---|---|---|---|
| 2009 KWM PANTHER SEAMLESS GUTTER MACHINE | | $15,000 | $500 | ■■■ |
| SPRAYER MODEL GH 733 HYDRA | GR231-733 | $11,300 | $500 | ■■■ |
| 2009 GRACO SPRAY PUMP, FLOW GUN, HOSE | Model GH 733 | $12,000 | $500 | ■■■ |
| 2009 GRACO SPRAY PUMP, FLOW GUN, HOSE | Model GH 733 | $12,000 | $250 | ■■■ |
| '10 SPRAY EQUIP CO SPRAY PUMP, TANK,HOSE REEL | | $4,500 | $500 | ■■ |
| PROCOR SPRAY EQUIPMENT W/GENERATOR | | $15,000 | $500 | ■■ |
| COMPRESSOR | W566115017 | $3,000 | $500 | ■■ |
| GRAYCO PUMP MODEL 737 | | $10,000 | $500 | ■■ |
| RUBBER MASTER HP 200 | 2P9BH3311BA048203 | $20,200 | $500 | ■■ |
| 2013 A&A MODEL A-380 MOBILE KETTLE UNIT | 2P9EL2216DA048164 | $40,000 | $500 | ■■■ |
| JLG 65 BOOM LIFT | | $117,600 | $500 | ■■■ |
| 2007 SKYJACK SJ45T TELESCOPIC BOOM LIFT | 98000169 | $30,000 | $500 | ■■ |
| NORTH STAR 459382D AIR COMPRESSOR | 03179976 | $2,084 | $500 | ■■ |
| 2007 PROCOR PUMP AND TRAILER | | $26,000 | $500 | ■■ |
| 2005 GRACO PUMP MDL GH733 BARE-EXP | BA3615 | $4,400 | $500 | ■■ |
| 2008 ASPHALT MELTER MODEL R-230 | LG92M15248M119080 | $36,500 | $500 | ■■ |
| 2000 HYSTER MODEL S50XM | D187V19064X | $9,053 | $500 | ■■ |
| SARNAMATIC WELDER MODEL 661 SPEED-WELD | | $10,000 | $500 | ■■■ |
| 1999 KOMATSU FORKLIFT MODEL F0255 | | $6,400 | $500 | ■■ |
| LEASED AND RENTED EQUIPMENT | | $100,000 | $500 | ■■■ |
| 2007GRACO PUMP | | $8,000 | $500 | ■■■ |
| 2006 POLY WALL SPRAY RIG | | $6,000 | $500 | ■■■ |

## Special Interest

| | | | Unit |
|---|---|---|---|

**Additional Insured**

| 1 | | VENTURE BANK<br>6210 WAYZATA BLVD<br>Golden Valley, MN 55416 | Unit 1 |

**Additional Insured**

| 2 | | INDUSTRIAL DOOR CO INC<br>360 COON RAPIDS BLVD NW<br>Coon Rapids, MN 55433 | Unit 2 |

**Loss Payee**

| 1 | JLG 65 BOOM LIFT | ALTORFER RENTS<br>6605 6TH ST SW<br>Cedar Rapids, IA 52404 | ALL |

**Loss Payee**

| 2 | 2008 MELTER #119080 | DIRECT CAPITAL<br>ISAOA<br>155 COMMERCE WAY<br>Portsmouth, NH 03801 | Unit 1 |

**Loss Payee**

| 3 | LENDERS LOSS PAYEE | VENTURE BANK<br>6210 WAYZATA BLVD<br>Minneapolis, MN 55416 | Unit 1 |

**Loss Payee**

| 4 | 2007 BOOM LIFT SJ45T | WELLS FARGO BANK NA<br>300 TRI-STATE INTERNATIONAL, ST<br>Lincolnshire, IL 60069 | Unit 1 |

**Loss Payee**

| 5 | KYOCERA COPIER | US BANK EQUIPMENT FINANCE<br>1310 MADRID ST<br>Marshall, MN 56258 | Unit 2 |

## Form Schedule

*Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:*

FORMS APPLICABLE TO ALL PREMISES AND COVERAGES

| Form | Edition | Description | Loc Item | Ded | Limit | Premium |
|---|---|---|---|---|---|---|
| MFM ML1 | 04-05 | Amendatory Endorsement #1 | | | | |
| MFM ML2 | 04-05 | Amendatory Endorsement #2 | | | | |
| MFM ML3 | 04-05 | Amendatory Endorsement #3 | | | | |
| MFM ML6 | 04-05 | Amendatory Endorsement #6 | | | | |

| Form | Edition | Description | Loc Item | Ded | Limit | Premium |
|------|---------|-------------|----------|-----|-------|---------|
| 000-ART | 07-15 | Artisan Contractor Forms | | | | |
| BOP05 15 | 01-15 | Disclosure Pursuant to Terrorism Risk Ins Act | | | | |
| BP0417 | 01-10 | Employment-Related Practices Exclusion | | | | |
| BP0418 | 06-89 | Amendment-Liquor Liability Exclusion | | | | |
| BP0517 | 01-06 | Exclusion - Silica or Silica-Related Dust | | | | |
| BP1408 | 01-10 | Excl - Exterior Insulation and Finish Systems | | | | |
| BP 00 03 | 01-10 | Businessowners Coverage Form | | | | |
| BP 01 25 | 07-13 | Minnesota Changes | | | | |
| BP 01 54 | 09-11 | Illinois Changes | | | | |
| BP 05 01 | 07-02 | Calculation of Premium | | | | |
| BP 05 23 | 01-15 | Cap Losses from Certified Acts of Terrorism | | | | |
| BP 05 77 | 01-06 | Fungi or Bacteria Exclusion (Liability) | | | | |
| BP 06 43 | 04-06 | Illinois Changes - Defense Costs | | | | |
| BP 15 04 | 05-14 | Excl - Access/Disclosure of Confidential Info | | | | |
| BP0526M | 01-16 | Excl of Certified Acts of Terrorism Inv N/B/C | | | | |
| IL 01 47 | 09-11 | Illinois Changes - Civil Union | | | | |
| MFM 001 | 05-18 | Policyholder Notice | | | | |
| MFMAC017 | 03-16 | Limited Exclusion - Wrap-Up Insurance Program | | | | |
| MFMBP-02 | 09-15 | Asbestos Exclusion | | | | |
| PRIV NTC | 03-18 | Privacy Policy Notice | | | | |
| ART 0020 | 08-16 | Contractors Advantage Endorsement | | | | |
| BOP0026 | 01-16 | Equipment Breakdown Coverage | | | | |
| BP0416 | 07-13 | Additional Insured-Lessor of Leased Equipment | | | | |

VENTURE BANK 6210 WAYZATA BLVD GOLDEN VALLEY, MN 55416

| Form | Edition | Description | Loc Item | Ded | Limit | Premium |
|------|---------|-------------|----------|-----|-------|---------|
| BP1203 | 01-10 | Loss Payable Clauses | | | | |
| BP 07 02 | 07-02 | Amendment - Agg Limits of Ins (Per Project) | | | | ███ |
| BP1483M | 01-16 | Employee Dishonesty Coverage | | | | |
| MFMAC009 | 01-15 | Blanket Addl Insured - Primary and Non-Cont | | | | ███ |
| MFMAC010 | 01-16 | Blanket Waiver of Subrogation | | | | ███ |
| MFMAC016 | 01-16 | Contractors Tools and Equipment Coverage | | | | |
| MFMIL005 | 09-15 | Business Income/Extra Expense Limit | | | | |
| ART 0020 | 08-16 | Contractors Advantage Endorsement | | | | |
| ART-0007 | 01-16 | Work Performed Exclusion | | | | |
| BOP0026 | 01-16 | Equipment Breakdown Coverage | | | | |

RCMN000081070

| Form | Edition | Description | Loc Item | Ded | Limit | Premium |
|------|---------|-------------|----------|-----|-------|---------|
| BP1231 | 01-10 | Additional Insured - Building Owner | | | | ████ |
| | | **INDUSTRIAL DOOR CO INC., 360 COON RAPIDS BLVD NW, COON RAPIDS, MN, 55433** | | | | |
| MFM CL00 | 04-15 | Cyber Liability - MFM NetGuard Plus | | | 50,000 | ████ |
| IR 08 84 | 03-18 | Commercial (BOP/Garage) Identity Recovery Cov | LOC 2 | $500 | 25,000 | ████ |

AC 00 00 01-18

MFM ML1 04-05

**Amendatory Endorsement #1**

MIDWEST FAMILY MUTUAL INSURANCE COMPANY
INSURED: KREMER & DAVIS INC
POLICY NUMBER: ██████████1070

"It is hereby agreed and understood for an additional premium of ███ Money & Securities
coverage is amended to $50,000 on and off premise"

*Date 8/22/201l*

MFMV00000101070

MFM ML2 04-05

**Amendatory Endorsement #2**

MIDWEST FAMILY MUTUAL INSURANCE COMPANY
INSURED: KREMER & DAVIS INC
POLICY NUMBER: ████████1070

"It is hereby agreed and understood that for an additional premium charge of $500 that Employee dishonesty is amended to $300,000 in coverage."

MFM ML3 04-05

**Amendatory Endorsement #3**

MIDWEST FAMILY MUTUAL INSURANCE COMPANY
INSURED: KREMER & DAVIS INC
POLICY NUMBER: ███████1070

PLEASE READ THIS ENDORSEMENT CAREFULLY. IT MAY CHANGE THE POLICY

"It is hereby agreed and understood for an additional premium of $500 We will amend the wording on Business owners Form BP 00 03. The following statement is being removed from 3.F.9.C;

Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad.

4CMIVUJUUU61U/U

MFM ML6 04-05

**Amendatory Endorsement #6**

MIDWEST FAMILY MUTUAL
NAMED INSURED; KREMER & DAVIS, INC.
POLICY NUMBER; ██████1070

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

It is hereby agreed and understood that an occurrence limit of $2,000,000 applies to the project at 1136 S Wabash, Chicago IL.

MIDWEST FAMILY MUTUAL                                      MFMAC010 01-16

# BLANKET WAIVER OF SUBROGATION

The endorsement modifies Insurance provided under the Businessowners Coverage Form. Please read it carefully.

**Section III, K.2. Transfer of Rights Of Recovery Against Others To Us** applicable to Businessowners Coverage is modified with the following:

2. Applicable to Businessowners Liability Coverage:
   If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. This condition does not apply to Medical Expenses Coverage.

   We waive any Right of Recovery we may have against any additional Insured as required in a written agreement because of payments we make for injury or damage arising out of your ongoing operations or your work done under contract with that person or organization.

MIDWEST FAMILY MUTUAL INSURANCE COMPANY
INSURED: KREMER & DAVIS INC
POLICY NUMBER: ▮▮▮▮▮▮▮▮1070

## BLANKET ADDITIONAL INSURED-
### PRIMARY AND NON-CONTRIBUTORY

This endorsement modifies insurance provided under the Commercial Liability Coverage Section of the Contractors Special Policy.

A.  Additional Definitions 7. Insured is amended to include as any insured on this policy under a written contract or a written agreement, but only with respect to liability for bodily injury, property damage or personal and advertising injury cause arising out of:
   1.  Your acts or omissions; or
   2.  The acts or omissions of those acting on your behalf; and resulting from;
      a.  Your ongoing operations performed for the additional insured
      b.  Your work completed as included in the products completed operations hazard performed for the additional insured.

B.  However, regarding of provisions A above:
   1.  We will not extend insurance coverage to any additional insured or organization
      a.  That is not provided to you in this policy; or
      b.  That is any broader coverage than you are required to provide to the additional insured person or organization in the written contract or written agreement.
   2.  We will not provide Limits of Insurance to any additional insured or organization that exceed the lower of:
      a.  The Limits of Insurance provided to you in this policy; or
      b.  The Limits of Insurance you are required to provide in the written contract or written agreement.

C.  The insurance provided to the additional insured person or organization does not apply: Bodily injury, property damage, or personal and advertising injury arising out of our rendering of, or the failure to render, any professional architectural, engineering or surveying services including:
   1.  The preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change of orders or drawings and specifications; and
   2.  Supervisory inspection, architectural or engineering activities

D.  For the coverage provided by this endorsement:
   1.  The insurance is primary insurance as respects our coverage for the additional insured person or organization where the written contract or written agreement requires this insurance by primary and non contributory.  In that event, we will not seek contribution from any other insurance policy available to the additional insured on which the additional insured person or organization is a Named Insured.
   2.  This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis, available to an additional insured, in which the additional insured on our policy is also covered as an additional insured by attachment of an endorsement to another policy providing coverage for the same occurrence, claim or suit. This provision does not apply to any policy which the additional insured is a Named Insured on such other policy and where our policy is required by written contract or written agreement to provide coverage to the additional insured on a primary and non-contributory basis.

Kremer & Davis

1070

"It is hereby agreed and understood that Blanket Additional Insured-Primary and Non-Contributory Endorsement MFMAC009 01-15 is amended to read as follows:

B 2. is amended to read:

We will not provide Limits of Insurance to any additional Insured or Organization the exceeds;

    a.   The Limits of the Policy.

    b  is deleted

BUSINESSOWNERS
BP 07 02 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT – AGGREGATE LIMITS OF INSURANCE (PER PROJECT)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**Section II – Liability** is amended as follows:

Under Paragraph **D.4.b Liability And Medical Expenses Limits Of Insurance**, the aggregate limit for all "bodily injury" and "property damage" other than "bodily injury" or "property damage" included in the "products-completed operations hazard" applies separately to each of your projects away from premises owned by or rented to you. A separate aggregate will apply for projects at premises owned by or rented to you.

 © ISO Properties, Inc., 2001 ☐

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# IDENTITY RECOVERY COVERAGE
## IDENTITY THEFT CASE MANAGEMENT SERVICE AND EXPENSE REIMBURSEMENT

The following is added as an Additional Coverage to the Property section:

### IDENTITY RECOVERY COVERAGE

We will provide the Case Management Service and Expense Reimbursement Coverage indicated below if all of the following requirements are met:

1. There has been an "identity theft" involving the personal identity of an "identity recovery insured" under this policy; and

2. Such "identity theft" is first discovered by the "identity recovery insured" during the policy period for which this Identity Theft Expense coverage is applicable; and

3. Such "identity theft" is reported to us within 60 days after it is first discovered by the "identity recovery insured."

If all three of the requirements listed above have been met, then we will provide the following to the "identity recovery insured":

1. **Case Management Service**

   Services of an "identity recovery case manager" as needed to respond to the "identity theft"; and

2. **Expense Reimbursement**

   Reimbursement of necessary and reasonable "identity theft expenses" incurred as a direct result of the "identity theft."

This coverage is additional insurance.

### EXCLUSIONS

The following additional exclusions apply to this coverage:

We do not cover:

1. "Identity theft expenses" incurred to restore a professional or business identity.

2. "Identity theft expenses" incurred due to any fraudulent, dishonest or criminal act by an "identity recovery insured" or any person aiding or abetting an "identity recovery insured", or by any authorized representative of an "identity recovery insured", whether acting alone or in collusion with others.

3. Loss other than "identity theft expenses".

4. "Identity theft expenses" arising from any "identity theft" by or with the knowledge of any relative or former relative of the "identity recovery insured."

5. Loss arising from an "identity theft" that is first discovered by the "identity recovery insured" prior to the policy period or after the policy period, whether or not such "identity theft" began or continued during the policy period.

6. Loss arising from an "identity theft" that is not reported to us within 60 days after it is first discovered by the "identity recovery insured."

7. Loss arising from an "identity theft" that is not reported in writing to the police.

### LIMITS

Case Management Service is available as needed for any one "identity theft" for up to 12 consecutive months from the inception of the service. Expenses we incur to provide Case Management Service do not reduce the amount of limit available for Expense Reimbursement coverage.

Expense Reimbursement coverage is subject to a limit of $25,000 annual aggregate per "identity recovery insured." Regardless of the number of claims, this limit is the most we will pay for the total of all loss or expense arising out of all "identity thefts" to any one "identity recovery insured" which are first discovered by the "identity recovery insured" during a 12-month period starting with the beginning of the present annual policy period. If an "identity theft" is first discovered in one policy period and continues into other policy periods, all loss and expense arising from such "identity theft" will be subject to the aggregate limit applicable to the policy period when the "identity theft" was first discovered.

Legal costs as provided under item d. of the definition of "identity theft expenses" are part of, and not in addition to, the Expense Reimbursement coverage limit.

### DEDUCTIBLE

Case Management Service is not subject to a deductible.

Expense Reimbursement coverage is subject to an annual aggregate deductible per "identity recovery insured" of $500. Any one "identity recovery insured" shall be responsible for only one deductible under this Identity Recovery Coverage during any one policy period.

### CONDITIONS

The following additional conditions apply to this coverage:

**A. Assistance and Claims**

For assistance, the "identity recovery insured" should call **Midwest Family Mutual at 1-800-225-5636.**

**Midwest Family Mutual** can provide the "identity recovery insured" with:

1. Information and advice for how to respond to a possible "identity theft"; and

2. Instructions for how to submit a service request for Case Management Service and/or a claim form for Expense Reimbursement Coverage.

IR 08 84  03-18

The "identity recovery insured" must submit the applicable form to request Case Management Service or Expense Reimbursement Coverage.

As respects Expense Reimbursement Coverage, the "identity recovery insured" must send to us, within 60 days after our request, receipts, bills or other records that support his or her claim for "identity theft expenses."

**B. Computer Security**

It is the responsibility of each "identity recovery insured" to use and maintain his or her computer system security, including personal firewalls, anti-virus software and proper disposal of used hard drives.

**C. Services**

The following conditions apply as respects any services provided by us or our designees to any "identity recovery insured" under this endorsement:.

1. Our ability to provide helpful services in the event of an "identity theft" depends on the cooperation, permission and assistance of the "identity recovery insured."

2. We do not warrant or guarantee that our services will end or eliminate all problems associated with an "identity theft" or prevent future "identity thefts."

**DEFINITIONS**

With respect to the provisions of this endorsement only, the following definitions are added:

1. **"Identity Recovery Case Manager"** means one or more individuals assigned by us to assist an "identity recovery insured" with communications we deem necessary for re-establishing the integrity of the personal identity of the "identity recovery insured." This includes, with the permission and cooperation of the "identity recovery insured," written and telephone communications with law enforcement authorities, governmental agencies, credit agencies and individual creditors and businesses.

2. **"Identity Theft"** means the fraudulent use of the social security number or other method of identifying an "identity recovery insured." This includes fraudulently using the personal identity of an "identity recovery insured" to establish credit accounts, secure loans, enter into contracts or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

"Identity theft" does not include the unauthorized use of a valid credit card, credit account or bank account. However, "identity theft" does include the fraudulent alteration of account profile information, such as the address to which statements are sent.

3. **"Identity Theft Expenses"** means the following when they are reasonable and necessary expenses that are incurred in the United States or Canada as a direct result of an "identity theft":

a. Costs for re-filing applications for loans, grants or other credit instruments that are rejected solely as a result of an "identity theft."

b. Costs for notarizing affidavits or other similar documents, long distance telephone calls and postage solely as a result of your efforts to report an "identity theft" or amend or rectify records as to your true name or identity as a result of an "identity theft."

c. Costs for up to six credit reports from established credit bureaus (with no more than two reports from

any one credit bureau) dated within 12 months after your knowledge or discovery of an "identity theft."

d. Fees and expenses for an attorney appointed by us for:

(1) Defending any civil suit brought against an "identity recovery insured" by a creditor or collection agency or entity acting on behalf of a creditor for non-payment of goods or services or default on a loan as a result of an "identity theft"; and

(2) Removing any civil judgment wrongfully entered against an "identity recovery insured" as a result of the "identity theft."

4. **"Identity Recovery Insured"** means the following:

a. When the business insured under this policy is a sole proprietorship, the "identity recovery insured" is the individual person who is the sole proprietor of the insured business.

b. When the business insured under this policy is a partnership, the "identity recovery insureds" are all partners listed on this policy as insureds.

c. When the business insured under this policy is a corporation or other organization, the "identity recovery insureds" are all individuals having an ownership position of 20% or more of the insured business. However, if and only if there is no one who has such an ownership position, then the "identity recovery insured" shall be the chief executive of the insured entity.

An "identity recovery insured" must always be an individual person. The business insured under this policy is not an "identity recovery insured."

All other provisions of this policy apply.



**MIDWEST FAMILY GROUP**
MIDWEST FAMILY MUTUAL INSURANCE COMPANY
MIDWEST FAMILY ADVANTAGE INSURANCE COMPANY

# Welcome to Midwest Family's Insured Portal!

Visit our secure website today at https://midwestfamily.com to get registered on the Midwest Family Insured Portal, specifically designed for your convenience to make online payments, print proof-of-insurance cards, review your policy, and much more!

### ✓ GET REGISTERED
- What you will need:  Your policy number(s) and policy ZIP code
- Go to **https://midwestfamily.com**
- Click on the "Register" tab located along the top right of the Home webpage

### ✓ REGISTRATION CONFIRMATION
- Upon successful Registration, the website will bring you to a "Site Registration" web page.
- An email will be sent to the email address that was provided when you registered. This email is required in order to complete the registration process.
- Once your email account is verified, you will be able to sign in to the Insured Portal website.

### ✓ SIGN IN
- Go to Midwest Family website at **https://midwestfamily.com/**
- Click on the "Sign In" link found under the MAIN MENU located on the left margin or by clicking on the "Sign In" tab.
- Enter your Username and Password that you created.  Remember to record this information for future use.  Click on the "Sign In" button.

### ✓ SET UP MIDWEST FAMILY ID SHIELD
- The ID Shield feature is an extra layer of security to ensure that you are accessing the website of Midwest Family and not a fake or an imposter website.

### ✓ OTHER FEATURES
- My Account Profile and Settings – ID Shield, password changes
- Proof of Insurance – Print ID Cards
- Make a Payment – Online payments with Credit Card or Electronic Check
- Payment History – View payments

# POLICYHOLDER NOTICE

Meeting Notice:  Midwest Family Mutual Insurance Company is a "Mutual" form of insurance company.  As a Policyholder, you are a "Member" of the company and have the right to influence the business of the company.  Each Policyholder "member" is entitled to one vote regarding any company business conducted at this Annual Meeting.

The Company's annual meeting is held at its Home Office located at 4401 Westown Parkway, West Des Moines, Iowa at 10 a.m. on the third Monday in August each year.  Attendance and participation via video-teleconferencing service will also be made available at Midwest Family Mutual Insurance Company's Regional Office at 3033 Campus Drive, Plymouth, Minnesota.

President                                    Secretary

# Midwest Family Mutual Insurance Company

## *Privacy Policy Notice*

To Our Customers:

Midwest Family Mutual values you as a customer and has always safeguarded the information that is collected in order to provide you with the best possible products and services. Federal legislation, the Gramm-Leach-Bliley Financial Modernization Act of 1999, now requires that we formally advise of this.

You provide us with most of the information about you that we use in evaluating your application and servicing your insurance policy. We may collect non-public personal information about you from any of the following sources: Information from you on application or other forms or in other transactions with us; our agents; or information we receive from a consumer reporting agency. Depending on the nature of your coverage, we may collect information about you from third parties, such as other persons proposed for coverage under your policy or the State Motor Vehicle Department concerning your driving record.

We do not disclose any non-public information about our customers or former customers to anyone, except as permitted by law. In some cases this may mean information can be disclosed to third parties without your authorization. This is only done within the law and with parties that facilitate the underwriting of risk, settlement of claims, reinsurance of these functions or to comply with regulatory requirements. We do not release information for any marketing purpose.

We restrict access to information about you to employees or agents to allow them to provide you with products or to provide you benefits or services under them. We maintain physical, electronic and procedural safeguards that comply with state and federal regulations to guard your non-public personal information.

You have the right to obtain access to certain items of information we have collected about you, and you have the further right to request correction of information if you feel it is inaccurate.

We would also be pleased to tell you about our policies and procedures for the privacy of your information. For a copy of our privacy policy or to access your information, please contact us in one of the following ways:

Midwest Family Mutual Insurance Company
4401 Westown Parkway, Suite 305
West Des Moines, IA 50266
Tel: 763-951-7000
Toll Free: 1-800-225-5636
Fax: 763-951-7092
Email: Service@midwestfamily.com

PRIV NTC 03-18

HBMN0000033419

 **Midwest Family Mutual Insurance Company**

*Insuring Midwest Values Since 1891*

MIDWEST FAMILY MUTUAL
INSURANCE COMPANY
P.O. BOX 9425 Minneapolis,MN 55440-9425

| Account Bill |
|---|

## Account Summary

| Policy Number | Policy Period | | | Agent # |
|---|---|---|---|---|
| | From | To | | |
| 3419 | 09/01/18 | 09/01/19 | 12:01 AM Standard Time | 04598 |

| Named Insured and Address | Agent |
|---|---|
| KREMER & DAVIS, INC<br>9385 HOLLY ST NW<br>COON RAPIDS, MN 55433 | ASSUREDPARTNERS OF MN LLC<br>2361 HIGHWAY 36 WEST<br>SAINT PAUL, MN 55113<br><br>Phone: (651)644-7200 |

## Account Summary

We are very pleased to introduce our new commercial account billing program. In the past, you have received a separate bill for each Midwest Family policy. Now, you can select a payment option and pay all your premiums by one check. Following is a summary of all your commercial premiums:

Contractors

Commercial Auto - Standard

Comm'l Umbrella

Worker's Compensation

Worker's Compensation

**Total Account Premium**

Your billing is enclosed. Thank you for continuing your insurance with Midwest Family Mutual. We appreciate your business.

*Date 8/22/2018*

MIDWEST FAMILY MUTUAL                                      ART 0020 08-16

# CONTRACTORS ADVANTAGE ENDORSEMENT

This endorsement modifies coverage under the Businessowners Coverage Form.

In consideration of the additional premium charged on this endorsement, the following additional coverage applies in addition to any other limits for similar coverage shown elsewhere in the policy.

All coverages listed below are subject to a $250 Deductible.

- ➤ $2,000 Miscellaneous Tools
- ➤ $5,000 Accounts Receivable
- ➤ $1,000 Mobile Equipment
- ➤ $2,000 Contents at Principal Residence
- ➤ $2,000 Medical Payments
- ➤ $2,000 Computer Coverage
- ➤ Contractual Liability Equal to Liability Policy Limit
- ➤ $50,000 Damage to Premises Rented to You

MIDWEST FAMILY MUTUAL                                    ART 0020 08-16

## A. Miscellaneous Tools

1. **Covered Property**
   We will pay for direct physical loss of or damage to miscellaneous tools and equipment, including their:
   a. Accessories, whether or not attached; and
   b. Spare parts, that are specifically designed and intended for use in maintenance and operation of Covered Property;

   That you own, or that you do not own but that are property of others in your care, custody or control.

2. **Coverage**
   The property covered under this endorsement may be covered on a blanket basis for tools and equipment you own that are not individually described in the Schedule or in the Declarations and are not in excess of $500 on any one item. The maximum benefit we will pay under this endorsement is $2,000.

3. **Property Not Covered**
   Covered property does not include the following:
   a. Aircraft, watercraft, their equipment or parts; automobiles; dealers' demonstration equipment, machinery and vehicles; dirt bikes, house trailers, mobile homes, mopeds, motorcycles, motorized bicycles, tricycles or four-wheel all terrain vehicles; snowmobiles, trucks and vehicles primarily designed and licensed for road use;
   b. Property while in caissons or underwater, or while being used in underground mining, tunneling or similar operations;
   c. Property you have loaned, rented or leased to others;
   d. Property that is or will become a permanent part of any building or structure;
   e. Property held for sale;

   f. Non-owned tools and equipment leased or rented from others that are in your care, custody or control, but this does not apply to non-owned tools and equipment you lease for a term of six months or more;
   g. Your employees' (including temporary or leased employees') tools; or
   h. Loss of or damage to property caused by the "specified causes of loss", theft or building glass breakage.

   All other policy provisions, limitations, and exclusions in the Businessowners Coverage Form apply.

## B. Accounts Receivable

We will pay an additional $5,000 for Account Receivable coverage. All other policy provisions, limitations, and exclusions in the Businessowners Coverage Form, **Section I – Property, A.6.f.** apply.

## C. Mobile Equipment

We will pay up to $1,000 for direct physical loss of or damage to "Mobile Equipment". "Mobile Equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

1. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;
2. Vehicles maintained for use solely on or next to premises you own or rent;
3. Vehicles that travel on crawler treads;
4. Vehicles, whether self-propelled or not, on which are permanently mounted:
   a. Power cranes, shovels, loaders, diggers or drills; or
   b. Road construction or resurfacing equipment such as graders, scrapers or rollers;
5. Vehicles not described in Paragraph 1, 2, 3, or 4 above that are not self-propelled and are maintained primarily to provide mobility to permanently

MIDWEST FAMILY MUTUAL                                    ART 0020 08-16

attached equipment of the following types:

    **a.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    **b.** Cherry pickers and similar devices used to raise or lower workers;

**6.** Vehicles not described in Paragraph 1, 2, 3, or 4 above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not Mobile Equipment but will be considered "autos":

    **a.** Equipment designed primarily for:
      **(1)** Snow removal;
      **(2)** Road maintenance, but not construction or resurfacing; or
      **(3)** Street cleaning;

    **b.** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    **c.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance or motor vehicle registration law where they are licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law or motor vehicle registration law are considered "autos".

All other policy provisions, limitations, and exclusions in the Businessowners Coverage Form apply.

**D. Contents at Principal Residence**

We will pay up to $2,000 for direct physical loss of or damage to contents at your principal residence, including:

**1.** Property you own that is used in your business;

**2.** Property of others that is in your care, custody or control, except as otherwise provided in Loss Payment Property Loss Condition Paragraph E.5.d.(3)(b) of the Businessowners Coverage Form;

**3.** Tenant's improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

    **a.** Made a part of the building or structure you occupy but do not own; and

    **b.** You acquired or made at your expense but cannot legally remove;

**4.** Leased personal property which you have a contractual responsibility to insure, unless otherwise provided for under Paragraph 1.b.(2) of the Businessowners Coverage Form; and

**5.** Exterior building glass, if you are a tenant and no Limit of Insurance is shown in the Declarations for Building property. The glass must be owned by you or in your care, custody or control.

Covered property does not include:

**1.** Aircraft, automobiles, motortrucks and other vehicles subject to motor vehicle registration;

**2.** Money or securities;

**3.** Contraband or property in the course of illegal transportation or trade;

**4.** Land (including land on which the property is located), water, growing crops or lawns;

**5.** Outdoor fences, radio or television antennas (including satellite dishes), and their lead-in wiring, masts or towers, signs (other than signed attached to buildings), trees, shrubs or plants;

**6.** Watercraft (including motors, equipment and accessories);

MIDWEST FAMILY MUTUAL                                      ART 0020 08-16

7. Accounts, bills, food stamps, other evidences of debt, accounts receivable or valuable papers and records;

8. Computer(s) which are permanently installed or designed to be permanently installed in any aircraft, watercraft, motortruck or other vehicle subject to motor vehicle registration;

9. Electronic data;

All other policy provisions, limitations, and exclusions in the Businessowners Coverage Form apply.

### E. Medical Payments

We will pay an additional $2,000 for medical expenses as described below for "bodily injury" caused by an accident:

1. On premises you own or rent;

2. On ways next to premises you own or rent; or

3. Because of your operations; provided that:

   a. The accident takes place in the "coverage territory" and during the policy period;

   b. The expenses are incurred and reported to us within one year of the date of the accident; and

   c. The injured person submitted to examination, at our expense, by physicians of our choice as often as we reasonably require.

We will make these payments regardless of fault.  We will pay reasonable expenses for:

1. First aid administered at the time of an accident;

2. Medical, surgical, x-ray and dental services, including prosthetic devices; and

3. Necessary ambulance, hospital, professional nursing and funeral services.

All other policy provisions, limitations, and exclusions in the Businessowners Coverage Form apply.

### F. Computer Coverage

We will pay up to $2,000 for direct physical loss of or damage to computer systems, including:

1. Computer equipment, data and media owned by you; and

2. Similar property of others in your care, custody or control.

Covered property does not include:

1. Property leased or rented to others while away from your premises described in the Declarations;

2. Accounts, bills, evidences of debt, valuable papers, abstracts, records, deeds, manuscripts or other documents, unless converted to "data" and then only in that form;

3. Portable computers, including but not limited to, laptops, notebooks and tablets;

4. Contraband, or property in the course of illegal transportation or trade; or

5. Stock in trade.

Covered Causes of Loss means Direct Physical Loss or Damage to Covered Property except the following Exclusions:

1. Governmental Action

2. Nuclear Hazard

3. War and Military Action

4. Delay, loss of use, loss of market or any other consequential loss;

5. Dishonest or criminal act (including theft);

6. Unauthorized instructions to transfer property to any person or to any place;

7. Virus, harmful code or similar instruction introduced into or enacted on a computer system (including "data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation;

8. Work upon the property.  But if the work upon the property results in fire or explosion, we will pay for direct loss or damage caused by that fire or explosion if the fire or explosion would be covered

MIDWEST FAMILY MUTUAL                                         ART 0020 08-16

under the Businessowners Coverage Form.

9. Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss;

10. Theft by any person (except carriers for hire) to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party;

11. Wear and tear, depreciation;

12. Any quality in the property that causes it to damage or destroy itself, hidden or latent defect, gradual deterioration;

13. Insects, vermin or rodents;

14. Corrosion or rust;

15. Programming errors; or

16. Incorrect instructions.

All other policy provisions, limitations, and exclusions in the Businessowners Coverage Form apply.

## G. Contractual Liability

Paragraph 9. Under F. Liability and Medical Expenses Definitions in the Businessowners Coverage Form is replaced by the following:

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f. does not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

   (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

      (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2)

MIDWEST FAMILY MUTUAL                                            ART 0020 08-16

above and supervisory,
inspection, architectural or
engineering activities.

**H. Damage to Premises Rented to You**

We will pay an additional $50,000 under
Business Liability Coverage for damages
because of "property damage" to a
premises while rented to you or in the case
of fire while rented to you or temporarily
occupied by you with permission of the
owner.

All other policy provisions, limitations, and
exclusions in the Businessowners Coverage
Form apply.

EXHIBIT B

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

# IMPORTANT NOTICE

Please execute the contract via DocuSign.  Please DO NOT fax, email, or mail the document back to us.

The process is simple:
1. Click View Documents and Agree to Sign Electronically
2. Type in: Your name, Title, Date
3. For contracts $10,000 or more, complete ALL FIELDS in Exhibit A-Note if all fields are not complete, you cannot submit your signature for the document.  For fields you will not be putting information or a dollar amount in, use "-", "N/A", or something of that nature.
4. For contracts under $10,000, Exhibit A requires only a signature and date.
5. Click Complete Signature

The Project Manager will then sign the contract and a fully executed copy will be emailed automatically to everyone.  Our process is that ALL documents must be signed through DocuSign.  Please submit PDF copies of your insurance as well, via email, to the Project Assistant, Leslie Haddon (lhaddon@arcomurray.com) in order to be compliant for payment.  If you are not compliant, you cannot receive payment.

Contracts **will not** be considered executed if your Certificate of Insurance is not submitted at the time of signature!

All contracts must be executed and received by ARCO/Murray **prior** to starting any work.

Thank you.

Have an address change?

Email: lhaddon@arcomurray.com

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

Manager ☐
Subcontractor ☐
Superintendent ☐

## ARCO/Murray National Construction Company, Inc.

3110 Woodcreek Drive
Downers Grove, IL  60515
Phone: 331-251-2726, Fax:

### SUBCONTRACT AGREEMENT

**E & O Req'd:** ☐ YES or ☒ NO

| | | | |
|---|---|---|---|
| Job No: | C207- Centrum 606 | Proj. Mgr.: | Andrew Smiles |
| Subcontract No: | C207-1007 | Job Sup't: | Andrew Zamora |
| Job Phone: | 331-251-2726 | Sup't Cell: | 331.302.3182 |
| Job Fax: | 331-251-2727 | Sup't Email: | azamora@arcomurray.com |
| Contractor's Accountant: | Helene Longino hlongino@arcomurray.com | Job Location: | 1767 N Milwaukee Ave Chicago, IL  60647 |
| Contractor License #: | | Subcontractor License #: | |
| | | Sub License Holder: | |
| Subcontractor PM: | Jim Johnson jim@kremerdavis.com | Sub Accountant: | Kathy Stuefen kathy@kremerdavis.com |
| Subcontractor: | Kremer Davis, Inc. 9385 Holly Street NW Coon Rapids, MN  55433 | Vendor #: | 51159 |
| Subcontractor Phone: | 763-788-5835 | | |
| Subcontractor Fax: | 763-788-8485 | Date: | 06/20/2016 |

| CSI No: | Description: |
|---|---|
| 07-1000- | Below Grade Waterproofing |

This agreement ("Subcontract") is made and entered into between ARCO/Murray National Construction Company, Inc. ("Contractor") and Kremer, Davis Inc. ("Subcontractor") as of 06/20/2016 concerning the following project:  C207- Centrum 606, Chicago, IL the "Project"):

    (a)  Project Description:  95,000 SF  New Construction Multi-Family

    (b)  Owner:  Milwaukee Leavitt Owner, LLC

    (c)  Architect: Forum Studio

    (d)  Location of Project:      1767 N Milwaukee Ave

                              Chicago, IL  60647

    (e)  SUBCONTRACT SUM: $154,000.00

1

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

**TERMS & CONDITIONS**

**Article 1**
**SUBCONTRACTOR'S WORK & THE CONTRACT DOCUMENTS**

1.1     <u>Subcontractor's Work</u>:  Subcontractor hereby agrees to perform and furnish all of the labor, services and materials required for the construction and completion of Subcontractor's portion of the Project, as defined in, and in accordance with, the terms and conditions of this Subcontract and the terms, specifications and conditions set forth in the Contract Documents identified in Paragraph 1.2 herein ("Subcontractor's Work").

1.2     <u>Contract Documents</u>:   The Contract Documents shall mean and consist of this Subcontract and all exhibits and addenda now or subsequently attached hereto, the **List of Subcontractors and Suppliers** for the Subcontractor's Work, prepared by Subcontractor and approved by Contractor as set forth in the attached **Exhibit A**; the **Insurance Requirements & Indemnity** attached hereto as **Exhibit B**; the **Additional Safety Requirements** attached hereto as **Exhibit C**; the Application for Payment Form attached hereto as **Exhibit D**; and the **Scope of Work,** including plans, drawings and specifications as to particular elements of the Project, attached hereto **as Exhibit E**, the **Drawing Log**, attached hereto as **Exhibit F;** and the **Crane Operation Requirements for Subcontractors,** attached hereto as **Exhibit G**; all of which are incorporated herein by this reference; all Change Orders and written modifications to this Subcontract executed after the date of this Subcontract by both Contractor and Subcontractor; and any bonds required to be furnished by Subcontractor pursuant hereto. The Contract Documents are complementary and what is required by any one shall be as binding as if required by all. In the event of a conflict between Contract Documents or an internal conflict within a Contract Document, the better quality and greater quantity of work provided for shall govern in accordance with the Contractor's interpretation and no adjustment shall be made to the Contract Sum as a result of such conflicts or interpretations. If there is a conflict between the information referenced in this Agreement or Bid Instruction Amendments and/or Drawing Log, and the information provided in the Bid Instructions, this Agreement and/or the Bid Instruction Amendments and/or Drawing Log shall control. An approval of shop drawings containing deviations from the Contract Documents shall not constitute an approval of such deviations. Subcontractor is solely responsible for notifying Contractor of all such deviations, and such deviations will only be deemed accepted by Contractor to the extent approved in writing by Contractor that specifically identifies the deviation and notes approval thereof.  Should added labor, materials, services or other elements not shown in the Contract Documents, but reasonably inferable from the Contract Documents, be necessary to complete Subcontractor's Work, Subcontractor will furnish the same without any change in the Contract Sum (as defined in Paragraph 2.1 herein).

1.3     <u>Performance of Subcontractor's Work</u>:  Subcontractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Contractor to utilize the Subcontractor's best skill, efforts and judgment in furthering the interests of the Contractor; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers; and to perform the Work in the best way and most expeditious and economical manner consistent with the requirements of this Subcontract. Subcontractor shall perform and complete Subcontractor's Work in accordance with the following standards and requirements: (a) Subcontractor's Work shall be in strict accordance with all applicable state, federal and local laws and regulations;  (b) Subcontractor's Work shall be performed in a good and workmanlike manner, consistent with best practices within the industry, free of any and all liens and claims of any nature, including claims or liens of laborers, labor unions, suppliers and Subcontractor's subcontractors, etc.; (c) All materials and labor to be furnished by Subcontractor shall conform strictly to the requirements of the Contract Documents; (d) Subcontractor shall be responsible for obtaining and shall pay for all necessary certificates, permits, inspections and tests necessary for completing Subcontractor's Work on a timely basis, (provided however, Subcontractor shall not be responsible for obtaining or paying for the Project building permit); (e) Subcontractor's Work shall be completed at Subcontractor's expense in accordance with applicable laws and regulations, including but not limited to the Occupational Safety and Health Act of 1970, all requirements set forth on Exhibit C, and all applicable state and federal environmental laws, as well as with Contractor's standards and requirements, to the extent more stringent; (f) Subcontractor shall furnish all scaffolding, tools and equipment (including equipment for hoisting) that may be necessary to do Subcontractor's Work properly and expeditiously; (g) Subcontractor will inspect the conditions at the Project which may impact Subcontractor's Work in order to confirm that the Project is in proper condition to receive Subcontractor's Work, and shall immediately verbally report to the Contractor and confirm in writing any discrepancy or errors it discovers in the drawings, specifications, Project or Work; (h) the installation and/or construction of Subcontractor's Work shall be deemed as Subcontractor's acceptance that conditions at the Project and the Plans and Specs are as they need to be for Subcontractor to perform its Work; (i) Subcontractor assumes the risk of ascertaining proper dimensions for prefabrication, as well as the risk of installing any of Subcontractor's Work where there are on-site conditions or discrepancies or errors in the Contract Documents not caused by Subcontractor but which nevertheless are known or should be known by Subcontractor and which adversely impact such installation; (j) Subcontractor shall employ labor under conditions satisfactory to the Contractor and shall discontinue the employment of any employee or employees unsatisfactory to the Contractor; (k)  Subcontractor shall provide and shall cause its subcontractors to provide, a competent and well trained on-site supervisor acceptable to Contractor and who is fluent in spoken and written English, for performance of Subcontractor's Work at all times when Subcontractor's Work is being performed; such on-site supervisor shall not be reassigned to a different project without Contractor's prior written consent; (l) Subcontractor shall pay when due for all supplies, fuel, equipment, machinery, repairs, transportation, material, labor, insurance premiums of any kind or description including workers' compensation insurance premiums, sales taxes, salaries, federal and state employment taxes, any similar payroll taxes relating to employees of Subcontractor, union costs and dues, and all other expenses whatsoever incurred in or as a result of, the performance of Subcontractor's Work; (m) Subcontractor shall be solely responsible to contact all appropriate sources in order to accurately determine the location of all underground wiring, plumbing, utilities, telecommunications systems and other similar items, and to have all such items clearly marked prior to commencement of any excavation ( if applicable); (n) Subcontractor shall perform Subcontractor's Work during normal working hours of normal working days unless otherwise specifically set forth in this Agreement or directed by Contractor; (o) to ensure the safety of all persons on the Project in course of and with respect to Subcontractor's operations; (p) to keep the Project free from accumulation of water, material or rubbish caused by Subcontractor's operations; (q)  that Subcontractor and its employees and subcontractors shall be in compliance with all license requirements imposed under applicable law; (r) that Subcontractor and its employees and subcontractors shall not encroach upon property adjacent to the Project for storage of material, nor shall they be permitted on such adjacent properties without the permission of the Contractor and such adjacent property owners; (s) to repair at its expense any and all damage to adjacent

2

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

property caused by Subcontractor's Work, and to indemnify and hold harmless Contractor from any liability or responsibility for any claims due to such damage or injury and shall defend any action brought by reason thereof at its cost; and (t) to update and supplement as necessary, the list of sub-subcontractors and suppliers listed on Exhibit A in order to insure that Contractor always has complete and accurate information concerning the identity of who is supplying materials and/or labor for the Project.

1.4    Time for Performance of Subcontractor's Work:  Subcontractor shall commence Subcontractor's Work upon: ☒ full execution of this Subcontract, and/or ☒ Contractor's notice to proceed ("Commencement"), and shall proceed with sufficient labor and equipment continuously to completion of Subcontractor's Work within the Subcontract Completion Time, as updated from time-to-time by Contractor. Subcontractor hereby agrees to perform the Subcontractor's Work within ☐ _____ days after Commencement or ☒ within the time period specified in the Scope of Work ("Subcontract Completion Time").   Subcontractor shall adjust its scheduling from time-to-time as directed by Contractor, including performing certain parts of the Subcontractor Work before other parts. The Subcontract Completion Time shall not be extended for any reason unless Subcontractor can demonstrate that the Subcontractor's Work was delayed due to: a) the willful misconduct of Contractor; b) abnormal and unforeseeable weather which prevents Subcontractor from carrying out the Subcontractor's Work; or c) any other cause which Contractor agrees is beyond the control of Subcontractor, in which case the Subcontract Completion Time shall be extended for a period equal to the number of days of such delay, but only if (i) Contractor receives, at a minimum, the same number of delay days under the General Contract; and (ii) Subcontractor requests in writing to Contractor additional time outlining the cause of delay within three (3) days after the commencement of such delay. Under no circumstances will Subcontractor be entitled to damages or any increase in the Contract Sum due to delay, regardless of the cause of such delay.

1.5    Manufacturer's Warranties.  Subcontractor hereby assigns to Contractor and Owner all manufacturer's warranties and guarantees for any and all equipment and fixtures to be installed at or attached to the Project site pursuant to this Subcontractor Agreement.  Upon final completion of the Subcontractor Work, and before Contractor will be obligated to make final payment hereunder. Subcontractor shall deliver to Contractor: (i) originals or copies of all warranty and guarantee documents and all cut sheets and instructions and operating manuals of all equipment and fixtures; and (ii) a final listing of serial numbers, if applicable, for all such equipment and fixtures along with the names and addresses of the manufacturers and suppliers of such equipment and fixtures; (iii) final as-built drawings, if applicable, in hard-copy and electronic format shall be delivered by Subcontractor.

**Article 2**
**SUBCONTRACT SUM & PROGRESS PAYMENTS**

2.1    Subcontract Sum:  Subject to the full and complete performance by Subcontractor as and when required hereunder, of its obligations as specified herein, Contractor shall pay the sum of **ONE HUNDRED FIFTY-FOUR THOUSAND AND 00/100 $154,000.00.**  It is understood and agreed that the Subcontract Sum is a lump sum amount and is not subject to increase under any circumstances unless both Contractor and Subcontractor execute a Change Order increasing the Subcontract Sum.

2.2    Required Submittals for Payments: Subcontractor shall not be entitled to any payment for Subcontractor's Work unless and until the following are submitted to Contractor on or before the 20th of the calendar month:

   a)  Application for Payment:  Subcontractor shall complete the Application for Payment, to be based upon the schedule of values (shown on Exhibit A), either in the format shown on Exhibit D, and attaching AIA Form G703, or as may be otherwise specified by Contractor; and

   b)  Lien Waivers:  Subcontractor must furnish unconditional lien waivers from itself and all its material suppliers and subcontractors for material and labor, before progress or final payments are due to Subcontractor. Lien waivers provided by Subcontractor and its subcontractors will be in such form as Contractor and/or Owner shall require.

   c)  Other Documents:  Contractor may require other documents, in which case Subcontractor shall furnish invoices, statements and other documentation in order to substantiate the amounts claimed due in any Application for Payment.

   d)  Final Payment:  Prior to final payment hereunder, Subcontractor shall deliver all items specified in Section 1.5 herein in addition to all other requirements hereunder, including completion of all punch list items in accordance with all Subcontract requirements.

2.3    Joint Checks:  Contractor reserves the right to issue joint checks to Subcontractor and its subcontractors and suppliers, or to pay such subcontractors and suppliers directly, but this shall not obligate Contractor to see to the proper disposition or application of any money advanced to or on behalf of Subcontractor.

2.4    Processing of Payment:  Following timely submittal of an Application for Payment, with all other documents as required hereunder or as requested by Contractor, Contractor will process such application for payment on the 20th of the following month to the extent that such payments are made to Contractor under the General Contract.  Payment may be delayed to the following month to the extent that any Application for Payment is received by Contractor in an incomplete form, without required documentation (including but not limited to required insurance) and/or later than the 20th of the prior month.

2.5    Retention:  Contractor shall retain 10.00% of each payment otherwise due Subcontractor until the later to occur of (i) Contractor's acceptance of Subcontractor's Work; and (ii) Contractor is paid its retention withheld by Owner for Subcontractor's Work. The retention shall be due within 15 days thereafter upon a separate billing by Subcontractor after satisfaction of the foregoing conditions in (i) and (ii), and satisfaction of all obligations of Subcontractor in Section 2.2 herein.

2.6    Right to Withhold Payment & Other Remedies:  Contractor shall be entitled to terminate this Subcontract, withhold payment of all or any part of an Application for Payment or nullify all or any part of a previous Application for Payment and withhold that amount, on account of defective work, default by Subcontractor under this Agreement or any other agreement between Subcontractor and Contractor or Contractor's affiliates, liens, claims or reasonable evidence indicating the probable filing thereof, reasonable evidence that the Subcontractor's Work will not be completed within the Subcontract Completion Time, Owner's objection to the payment of the Subcontractor, bankruptcy or insolvency of Subcontractor, or any other reasonable cause. In addition to withholding payment, Contractor shall have the right to exercise any other remedy available hereunder, at law or equity, including but not limited to requiring Subcontractor to remove and/or replace any defective materials or work on notice from Contractor, and at Subcontractor's sole cost and expense removing Subcontractor from the Project, taking possession of all

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

equipment, materials and tools at the job site for purposes of completing the Subcontractor's Work, and offsetting costs resulting from Subcontractor's breach(es) of this Subcontractor Agreement or any other agreement between Subcontractor and Contractor or its affiliates against any amounts otherwise due from Contractor to Subcontractor, requiring Subcontractor to add extra manpower or furnish overtime labor in order to comply with the Project Schedule, without any increase in the Contract Sum. Subcontractor agrees that Contractor and Owner shall have the benefit of all rights, remedies, and redress against Subcontractor that Owner has against Contractor under the General Contract. Subcontractor further agrees to obligate its subcontractors, if any, to the same extent, and Subcontractor shall indemnify and hold harmless Contractor and Owner should it fail to do so.

2.7    Taxes, etc.: Subcontractor hereby certifies that the Subcontract Sum includes all sales, use, franchise, excise and other taxes, and is not subject to any addition on account of taxes now or hereafter levied. Subcontractor agrees that it shall be exclusively responsible for the payment of any such additional tax.

2.8    Changes: No change in the Subcontractor Work, whether by way of alteration or addition to the Subcontractor Work, shall be the basis for any increase to the Subcontract Sum or change in the Subcontract Completion Time, unless and until such alteration or addition has been authorized in writing by Contractor or by Change Order executed by Contractor and Subcontractor. Accordingly, no course of conduct or dealings between the parties, nor express or implied acceptance of alteration of the Subcontractor Work, or claim that the Owner or Contractor has been unjustly enriched by the alteration of the Subcontractor Work, whether or not there is in fact any such unjust enrichment, shall be the basis for any claim to increase the Subcontract Sum or change the Subcontract Completion Time.

### Article 3
### INSURANCE & BONDS

Subcontractor shall furnish such insurance and evidence of such insurance as may be required by Contractor or Owner, the minimum of which shall be as set forth on Exhibit B. All insurance furnished by Subcontractor shall be on a primary and non-contributory basis. If required by Contractor, Subcontractor shall furnish a performance and/or payment bond at Subcontractor's expense.

### Article 4
### MISCELLANEOUS

4.1    The parties acknowledge and agree that the Subcontractor is an independent contractor within the purview of the Internal Revenue Code, the Federal Social Security Act and any and all unemployment insurance and worker's compensation laws, both State and Federal, and is solely responsible to the Federal and State Governments for all payroll taxes, deductions, withholdings and contributions under such laws.

4.2    Subcontractor acknowledges its understanding that this Subcontract is an agreement under a General Contract concerning the Project, both of which include drawings and specifications and details illustrative thereof, between the Owner and the Contractor, and that Subcontractor is fully bound by and is familiar with those terms and provisions of the General Contract that pertain to the Work of this Subcontract. The Subcontractor hereby expressly assumes and promises to perform for the benefit of the Contractor, Owner and Owner's lenders (as their interests may appear) all of the obligations undertaken by the Contractor towards the Owner in the General Contract, to the extent relevant to the Subcontractor's Work.

4.3    Subcontractor may not assign this Subcontract without the prior written consent of Contractor. Contractor may assign this Subcontract in the event it is required to do so under its General Contract.

4.4    Subcontractor shall not install, use, generate, store, dispose of or treat on or about the Project any Hazardous Substance (as defined below) other than those Hazardous Substances commonly required in the industry for the performance of the Subcontractor Work. Such Hazardous Substances associated with the Subcontractor Work must be stored, used and disposed of in accordance with all applicable environmental laws and regulations and Subcontractor must provide the appropriate Material Safety Data Sheets to Contractor prior to commencement of the Subcontractor Work. As used in this Subcontractor Agreement, "Hazardous Substance" means any hazardous, toxic, or radioactive substance, material, waste, pollutant or contaminant as defined, listed or regulated by any federal, state or local law, regulation or order. If any portion of the Subcontractor Work requires the removal and disposal of any preexisting Hazardous Substance, including without limitation creosote treated wood, Subcontractor shall comply with all federal, state and local laws, ordinances and regulations relating to the disposal of such Hazardous Substance, and shall exercise extra care in site clean-up each day during the removal and disposal of such Hazardous Substance.

4.5    Subcontractor guarantees that the Subcontractor's Work, when completed, will be completed in accordance with the Contract Documents, that the completed Work will incorporate all Change Orders relative to Subcontractor's Work, that the completed Subcontractor's Work complies (to the extent applicable to Subcontractor's Work) with all land use requirements (deed restrictions, building codes, zoning restrictions and environmental laws) relating to the Project, that the Subcontractor's Work has been constructed in a good and workmanlike manner, using quality materials as specified in the Contract Documents, and that the Subcontractor's Work is free from any defects or deficiencies resulting from improper design, materials, construction or workmanship ("Defect"). In the event a Defect is found to exist in violation of this Warranty within one year following the date of final acceptance of the Work of the General Contract by the Owner, then Subcontractor shall, at its sole expense, promptly repair and/or replace non-conforming work or materials ("Corrective Action") and any other part of the Project damaged in connection therewith, and shall pay all costs and expenses incurred by Owner or Contractor in connection with such Defect and Corrective Action. Following any Corrective Action, Subcontractor shall, for an additional one-year period thereafter, have a duty to repair or replace such corrective Work. If Subcontractor fails to commence and complete Corrective Action within twenty (20) days after notice from Contractor, then Contractor shall have the right to correct such Defect and Subcontractor shall be liable to Contractor for all direct, indirect, special, consequential and other damages, including lost profits and revenue, incurred due to or in connection with such Defect and the curing of such Defect. Any special, extended or other warranties given by the Contractor to the Owner in the General Contract that pertain to Subcontractor's Work are hereby expressly assumed and undertaken by the Subcontractor.

4.6    Time is of the essence of this Agreement in all respects, including but not limited to delivery, installation, erection and otherwise. This Subcontract Agreement may be executed in any number of counterparts, each of which will, for all purposes, be deemed an original, and all of

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

which are identical. The facsimile transmission of any signed original document, and retransmission of any signed facsimile transmission, shall be the same as the delivery of an original. At the request of either party, the parties will confirm facsimile transmitted signatures by signing an original document. All of Subcontractor's obligations hereunder shall apply to all or any part of the Subcontractor Work performed before and after full execution of the Subcontract.

4.7      During a period in which any dispute is outstanding between Contractor and Subcontractor, Subcontractor shall continue to perform Subcontractor's Work and otherwise comply with the Subcontract, and Contractor shall pay undisputed amounts otherwise due Subcontractor hereunder.

4.8      Contractor may reduce or adjust the scope of the Subcontract Work (with corresponding adjustment in Subcontract Sum) by written directive, or terminate the Subcontract Agreement, anytime for any reason without liability for any lost profits or other damages, except that Contractor shall pay Subcontractor for all authorized, accepted and completed Subcontract Work through the date of such termination.

4.9      <u>Indemnity</u>: Subcontractor hereby agrees to indemnify, defend and hold Contractor, Owner, all subsidiary and affiliated entities of Contractor and Owner, any lender with a security interest in the Project, and each of their respective members, managers, partners, agents, representative, trustees, directors, officers, shareholders and employees, and each of them (collectively, "Indemnified Parties") harmless from and against any and all demands, claims, suits and causes of action, liability, costs, incidental and consequential damages, expenses, settlements, and judgments, including without limitation court costs and attorney's fees whether arising at law or equity, in connection with or arising out of: (i) the performance by Subcontractor or any of its employees, subcontractors, suppliers or anyone else for whom Subcontractor is responsible ("Subcontractor Parties") of Subcontractor's Work; (ii) any breach by Subcontractor of this Agreement; or (iii) the failure by Subcontractor or any Subcontractor Parties to comply with all applicable laws; or (iv) any liens or other encumbrances on the Work or Contractor's or Owner's property, arising out of Subcontractor's failure to pay any of its subcontractors or suppliers; (v) any alleged violation or infringement of patent, copyright or other intellectual property rights by Subcontractor or any Subcontractor Party (collectively or individually, "Claims"); or (vi) property damage or destruction (including loss of use resulting therefrom), bodily injury, sickness, disease, or death.  Notwithstanding anything contained herein to the contrary: (i) Subcontractor shall be liable for Claims in connection with consequential damages only to the extent Contractor is held liable for or actually incurs such damages; (ii) Subcontractor's duty to defend shall not apply with respect to Claims that arise exclusively from the performance of professional services that are insured only through the Subcontractor's professional liability insurance policy; and (iii) whenever a duty to defend applies as to any Claim, such duty shall be triggered when any one or more of the Indemnified Parties tenders their defense to Subcontractor or its insurer.

If any provision of this contract is found to be unenforceable or invalid in its entirety, such provision will be severed from this contract, but will not affect the enforceability or validity of any other term or condition.

Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be finally resolved by arbitration administered by the American Arbitration Association under its Construction Industry Arbitration Rules, and judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The arbitration will be conducted in the city or county of St. Louis, Missouri in accordance with the United States Arbitration Act. The arbitrators shall decide the dispute in accordance with the laws of the state where the Project is located. Consistent with the expedited nature of arbitration, each party will, upon the written request of the other party, promptly provide the other with copies of documents (relevant to the issues raised by any claim or counterclaim). Any dispute regarding discovery, or the relevance or scope thereof, shall be determined by the arbitrators, which determination shall be conclusive. All discovery shall be completed within forty-five (45) days following the appointment of the arbitrators. Notwithstanding the foregoing, if Subcontractor is joined by Contractor or any other party in any judicial proceeding initiated by the Owner, then Contractor and Subcontractor agree that such judicial proceeding shall preclude any arbitration hereunder concerning all claims and/or counterclaims related to the judicial proceeding. In the absence of any such judicial proceeding initiated by the Owner, the Contractor, Subcontractor and any other subcontractors or sub-subcontractors or suppliers shall be joined as necessary, as an additional party, to any arbitration. In the event of any judicial, arbitration or other adversarial proceeding between Contractor and Subcontractor concerning this Subcontract Agreement, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other costs in addition to any other relief to which it may be entitled.  IF ANY CLAIM HEREUNDER IS LITIGATED FOR ANY REASON, CONTRACTOR AND SUBCONTRACTOR HEREBY AGREE TO WAIVE ANY RIGHTS THEY MAY HAVE TO A JURY TRIAL AND INSTEAD HAVE SUCH CLAIM HEARD BY A JUDGE.

THIS SUBCONTRACT AGREEMENT IS ACCEPTED upon terms and conditions above stated. The above Subcontract Agreement is a full and complete expression of the parties' agreement and there are no other terms and conditions except as expressly set forth herein. The Agreement of the parties hereto may not be modified or amended except by a written agreement signed by a duly authorized agent of both parties hereto.

| Kremer, Davis Inc. | | ARCO/Murray National Construction Company, Inc. | |
|---|---|---|---|
| DocuSigned by: | | DocuSigned by: | |
| by: *James Johnson* | 6/27/2016 \| 2:02 PM PD | by: *Andrew Smiles* | 6/28/2016 \| 4:33 PM |
| Subcontractor 1C28D74494... | Date | Contractor 51CB4F2FB9429... | Date |
| VP Chicago Operations | | Project Manager | |
| Title | | Title | |

5

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

**DESIGN/BUILD ADDENDUM**
(applies when Subcontractor is furnishing any design services)

The parties acknowledge and agree that the Subcontractor's Work includes the furnishing of certain design elements in connection with this Subcontract that are required in the Subcontract and exhibits attached hereto (the "Design Elements"). Subcontractor shall provide Contractor with complete and detailed plans and specifications of the Design Elements (the "Design Plans and Specs") that are consistent with: (i) all applicable codes, laws and regulations; (ii) the Contract Documents; and (iii) the performance and other specifications included in the bid instructions attached to the Subcontract ("Specifications"). All design work shall be performed only by qualified architects, engineers and other design professionals duly licensed, as necessary, in the jurisdictions in which the Project is located. All Design Plans and Specs shall be stamped or sealed by a duly licensed or registered design professional, and, when approved by Contractor, shall become part of the Contract Documents. Any engineers retained by Subcontractor shall be subject to Contractor's reasonable approval. Subcontractor agrees that it shall correct any errors, omissions or other defects in the Design Plans and Specs (either through revised drawings or through written or field modifications or clarifications, as appropriate) with the level of promptness required in order to comply with Construction Schedule, and at no additional cost to Contractor or Owner. At no additional cost to Owner and Contractor, Subcontractor shall pay all royalties and license fees arising from the Design Plans and Specs, and shall defend any suits or claims for infringement of patent rights or other intellectual property rights, and shall save Contractor and Owner harmless from loss on account thereof.

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

## EXHIBIT A
## SUB-SUBCONTRACTORS/SUPPLIERS

ARCO/Murray National Construction Company, Inc.

Job Number:          C207- Centrum 606

Date:                06/20/2016

Subcontractor:       Kremer, Davis Inc.

Address:             9385 Holly Street NW

City, State, and Zip:  Coon Rapids, MN  55433

Please list all material suppliers and sub-subcontractors.

| ITEM | MATERIAL SUPPLIER | SUB-CONTRACTOR | COST |
|---|---|---|---|
| Waterproofing | Glen Rock Co | ******* | $ 21,000 |
| Waterproofing | McCann Ind | ******* | $ 28,000 |
| ******* | ******* | ******* | $ ******* |
| ** | ** | ** | $ ** |
| ** | ** | ** | $ ** |
| ** | ** | ** | $ ** |
| ** | ** | ** | $ ** |
| ** | ** | ** | $ ** |
| ** | ** | ** | $ ** |
| ** | ** | ** | $ ** |
| Subcontractor Stock Material | ** | ** | $ ** |
| Subcontractor In-House Labor | ** | ** | $ ** |
| **TOTAL CONTRACT AMOUNT** | | | $ 49,000 |

Kremer, Davis Inc. certifies that the above information is correct and any changes in the above information will be submitted to ARCO/Murray National Construction Company, Inc. in writing.  Subcontractor will supply ARCO/Murray National Construction Company, Inc. with all proper material and/or sub-subcontractor affidavits or lien waivers before progress or final payments are due to subcontractor.

DocuSigned by:

*James Johnson*

———D3D305C28D74494—Subcontractor

6/27/2016 | 2:02 PM PDT
———————————————————
Date

NOTE: ALL Subcontractors are required to sign this form with the signing of the subcontract agreement.  If the subcontract amount is in excess of $10,000 ALL subcontractors are required to <u>complete</u> this form with the signing of the subcontract Agreement.

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

## EXHIBIT B
## INSURANCE REQUIREMENTS

<u>Worker's Compensation:</u>    Employers Liability, whether required by statute or not, for a limit of not less than $500,000 bodily injury by accident, each accident/ $500,000 bodily injury by disease, policy limit/$500,000 bodily injury by disease, each employee, or if greater, in the amounts required by statute.

<u>Commercial General Liability</u> (occurrence format), (including Completed Operations, Broad Form Property Damage and Contractual Liability for the indemnification agreements of this Subcontract on a per Project basis):

$1,000,000..........................................Bodily Injury
$1,000,000..........................................Property Damage

<u>Automobile Liability:</u>    $1,000,000 per accident

<u>Excess Umbrella Policy:</u>    $1,000,000

<u>Pollution Liability:</u>  $1,000,000 per Project (required if Subcontractor or its sub-subcontractor/consultant is providing earthwork, demolition, concrete, plumbing, pile driving, dynamic compaction, drilling services (drillers, geopiers, etc.) and/or electrical services)

<u>Professional Liability:</u> (required if Subcontractor or its sub-subcontractor is providing design services):

$1,000,000 each claim
$1,000,000 annual aggregate

The above policies shall not include self-insured retentions.

<u>Additional Insureds:</u> Subcontractor shall endorse Commercial General Liability, Auto Liability, Pollution Liability, and Umbrella Excess Liability policies to name the following as additional insureds:

- Contractor: **(ARCO/Murray National Construction Company, Inc.),**

- Owner: **(Milwaukee Leavitt Owner, LLC), and**

- Other additional insureds:  **Milwaukee Leavitt Owner, LLC; Centrum Partners, LLC**.

The above-listed entities should be added on a primary and non-contributory basis for current, ongoing, and completed operations for three (3) years after Final Completion of the Project.

<u>Subrogation:</u> Subcontractor and its insurance carrier(s) waive all rights of subrogation against the Owner, Contractor and their officers, directors, shareholders, employees, agents, or appointed representatives unless restricted by state statutes.

<u>Subcontractors:</u>  Subcontractor agrees to obligate its subcontractors and design consultants, if any, to maintain the same types, levels and terms of insurance coverage as required of Subcontractor, including but not limited to the waiver of subrogation in favor of Contractor and Owner, and Subcontractor shall indemnify and hold harmless Contractor and Owner should it fail to do so.

Form of Policies:  All policies shall be written on the ISO form, CG0001, July 1998 or newer edition.

**INSURANCE CERTIFICATE MUST SPECIFY JOB NAME AND NUMBER.**

**Job Number:  C207-**

**Job Name:  Centrum 606**

8

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

# EXHIBIT C
## ADDITIONAL SAFETY REQUIREMENTS

Subcontractors shall comply with the most stringent, to the extent inconsistent, safety and health requirements listed in the Contractor's Safety and Health program, the Subcontractor's Safety and Health Program, as well as regulations mandated by Title 29 – Code of Federal Regulations, including but not limited to the following list, to the fullest extent applicable to all or any part of Subcontractor's Work.

1.  Any OSHA citations received by the contractor due to a subcontractor violation of safety and health requirements will be paid by the subcontractor.

2.  All employee accidents, near misses, or hazardous incidents must be reported to the Contractor as soon as possible, but no later than the end of that work shift. If a Contractor associate is not present, the Subcontractor shall call 314-963-0715, and ask to speak to the Safety Department or someone in charge of that project. A formal written report shall follow within 24 hours of the incident.

3.  Subcontractor shall submit a written safety program and HAZCOM Program, including all site specific Safety Data Sheets, prior to beginning Subcontractor's work.

4.  Subcontractor shall perform at least one documented weekly safety talk and submit a copy to the Contractor's superintendent on a weekly basis.

5.  All Personal Protective Equipment (PPE) must comply with OSHA and ANSI standards. PPE shall include, at a minimum: Hard hat, safety glasses, high-visibility shirts or vests, minimum 4" sleeves, long pants, and hard-soled boots or shoes.

6.  Subcontractor shall have at least one English speaking 'competent person' available on site during the performance of Subcontractor's work activities to facilitate communication and help identify and discuss safety and health related issues, as necessary.

7.  Subcontractor shall be responsible for daily housekeeping. If housekeeping becomes a hazard, Contractor may perform the task and back charge the Subcontractor.

8.  Subcontractor shall provide adequate first-aid and medical supplies for Subcontractor's employees.

9.  All temporary power utilized by Subcontractor shall be equipped with Ground Fault Circuit Interrupters (GFCI). All generators shall be equipped with GFCIs.

10. Prior to mobilizing a crane, Subcontractor shall submit annual inspection records, load charts, lifting plan, operator certifications, and any additional documentation related to crane operations.

11. Subcontractors engaged in rigging and/or signaling operations shall submit rigger/signalperson qualifications prior to beginning work.

12. Subcontractor personnel who are working or present at heights in excess of 6 feet shall be provided, by Subcontractor, and use adequate fall protection.

13. All flammable liquids shall be stored in approved metal safety cans.

14. Subcontractor is responsible for provided adequate temporary lighting for their scope of work. Lighting levels must be in accordance OSHA 1926.56 Table D-3

15. Subcontractor employees required to operate equipment must be trained and qualified. Documentation of qualifications must be submitted to Contractor prior to employees being allowed to operate equipment.

16. Drugs and alcohol are strictly prohibited. Working under the influence of drugs or alcohol is strictly prohibited.

**All subcontractors shall comply with federal, state, and local safety standards, the ARCO/Murray National Construction Company, Inc. safety and health program, which is available for review at http://manual.arcosafe.com, as well as the individual subcontractor safety and health program.**

9

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

**EXHIBIT D**
**REQUEST FOR PAYMENT**

To:   ARCO/Murray National Construction Company, Inc.        Date: _____
      3110 Woodcreek Drive
      Downers Grove, IL  60515                               Invoice No: _____
      hlongino@arcomurray.com

From:  Kremer, Davis Inc.                                    Contractor Job:  C207-  Centrum 606
       9385 Holly Street NW
       Coon Rapids, MN  55433
       Kathy Stuefen  kathy@kremerdavis.com

| | |
|---|---|
| 1 Amount of Subcontract | $_____ |
| 2 Approved Change Orders | $_____ |
| 3 Total Subcontract Amount (Line 1 + Line 2) | $_____ |
| 4 Total Work Completed to Date | $_____ |
| 5 Less 10.00% Retention (Line 4 x 10.00%) | $_____ |
| 6 Total Billable Amount (Line 4 - Line 5) | $_____ |
| 7 Billable Amount (= Line 6) | $_____ |
| 8 Less Previous Payment Request | $_____ |
| 9 Net Amount Due This Invoice (Line 7 - Line 8) | $_____ |

I have received and incorporated in this project this month, materials and/or services from the following material suppliers and/or subcontractors for the respective amounts:

| Subcontractor/Material Supplier | Item | Contract Schedule of Value | Paid to Date | To Be Paid This Period |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | $_____ |
| _____ | _____ | _____ | _____ | $_____ |
| _____ | _____ | _____ | _____ | $_____ |
| _____ | _____ | _____ | _____ | $_____ |
| _____ | _____ | $_____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ | $_____ |

Please indicate here if joint checks are requested:   YES \ NO

_____
(Subcontractor)

_____
(Title)

_____
(Date)

DO NOT WRITE IN THIS BOX

Vendor#   51159

Job/W.O.  C207-

CSI #   _____

SL#    C207-1007

G/L #      5060   _____

Approved _____

NOTE TO THE SUBCONTRACTOR

1.   All Subcontracts over $10,000.00 shall submit a breakdown for invoices per Paragraph 1, Section 3 of the Bid Instructions in a format similar to AIA-G703

2.   Please DO NOT revise this form.

3.   Failure to use this form will result in delay of payment.

4.   ALL PAYMENT REQUESTS MUST BE RECEIVED BY THE 20TH OF THE MONTH

10

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

**EXHIBIT E**
**SCOPE OF WORK**

**JOB NAME:  Centrum 606**

**JOB NO.:  C207**

**DATE:  June 20, 2016**

**SUBCONTRACTOR:  Kremer Davis, Inc.**

**Scope of Work:**

Subcontractor shall provide all labor, materials, equipment, supervision as required to complete all scope-of-work items of this **Waterproofing** Subcontract and related work, in accordance with the Drawings, Specifications and the Contract Documents ("Work").

**General Items:**

A.  Provide for the cleaning, preparation, patching and bonding as needed for the proper installation of waterproofing materials, including the air barrier installation for the building façade. This Subcontractor shall be responsible to reasonably clean debris and minor contamination from relevant surfaces prior to installations.  Subcontractor shall receive areas in a broom clean condition.  Starting work implies acceptance of the substrate.

B.  Provide all necessary waterproofing details at all construction joints, contraction joints, expansion joints and movement joints, and at membrane terminations as required by the manufacturer for this scope of work, including the façade air barrier installation.

C.  Subcontractor is responsible for the integrity of any waterproofing details used at all sleeves, pipes, curbs, walls, depressions, box-outs, etc., which interface with the waterproofing system.  Details for typical conditions must be submitted and approved by the design professional prior to installations.

D.  This Subcontractor to provide all sealants, rubber flashings, termination bars, and metal counter finishing if required by others as recommended by the manufacturer and dictated by the drawings.

E.  This Subcontractor will notify ARCO of any non-compatible specified items (i.e. concrete finish sealers vs. waterproofing/traffic coating)

F.  This Subcontractor is to provide all temporary protection of materials and mats as required for Subcontractors' equipment and Scope of Work.  Protection must be able to withstand weather conditions, and ensure that manufacturer's warranty is maintained.

G.  Prior to commencement of the work, this Subcontractor shall provide one submittal for review of each system and its variances used for this Scope of Work, to include shop drawings and cut sheets, etc.

H.  Subcontractor to provide an onsite mockup of the pedestrian traffic coating that is to be installed at unit balconies, for the architect's approval.

I.  All field installation inspections by product manufacturers as required to maintain product warranties are included and shall be coordinated by this Subcontractor.  Subcontractor will be held responsible for maintaining all warranties for work and materials furnished under this Subcontract.

J.  Subcontractor shall furnish and install all waterproofing systems in accordance with the manufacturer's specifications and warranties.

11

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

**K.**    Subcontractor to perform and warrant the below Scope of Work as long as temperatures are 20 degrees Fahrenheit or higher.  In the event that the temperature drops below 20 degrees Fahrenheit, this Subcontractor will stop work until the temperature rises back to 20 degrees.

## Definition of Work:

Subcontractor is to provide all labor, material, equipment, freight, supervision, taxes, etc. required to complete the below work:

A.    Basement Walls Waterproofing

1.    Subcontractor to furnish and install Tremco Tremproof 250GC cold fluid applied waterproofing at the exterior below grade basement foundation walls. This system is to include composite drain board which will also serve as the protection course.

2.    This Subcontractor will be responsible for installing the full height of the Basement Wall Waterproofing prior to the completion of any backfill.

B.    Building Façade

1.    Subcontractor to furnish and install a fluid applied air barrier (BASF Enershield HP) at building façade, including at areas with brick, CMU, wood cladding, metal panels, slab edge covers, etc.
  i.    Thickness of air barrier as well as preparation and flashing to be done per the manufacturer guidelines.

C.    Storm Water Detention Vault

1.    Furnish and install Tremco TREMproof 250GC on the interior side and bottom of the storm water detention vault.
2.    This Subcontractor will perform this work before the detention vault is capped and thus will not need to use the confined space protocol (see Exclusions below).  This Subcontractor is responsible for any means of access needed to get labor, materials, and equipment into the detention vault.

D.   Elevator Pits

1.    Furnish and install Tremco TREMproof 250GC and drainage board at the elevator pit walls and sump pit.

2.    Furnish and install Tremco Paraseal LG Dual Membrane Bentonite at underslab.

E.    First Level Nook

1.    Subcontractor to furnish and install Tremco Tremproof 250GC High Build (120 mils) and composite drainage board between column lines K11 and A10, where the extents of the lower level parking goes beyond the first level above.

F.    Pedestrian Traffic Coating

1.    Subcontractor to furnish and install BASF MasterSeal at all  (16) elevated concrete balconies on the 2nd, 3rd, 4th, and 5th floors.

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

    i.    To include cove joints at slab/curb/wall junctions and rubber aggregate surface.

G.    Exclusions

1.    Insulation at perimeter foundations walls and basement walls to be furnished by others.

2.    Drainage board and insulation excluded at storm detention vault.

3.    Confined space protocol for storm water detention vault scope of work is not included in base bid.

4.    All hoisting and swing stages to be provided by others.

**5.**    Patching of form tie holes and scrape fins from foundation walls

**Submittals**

This Subcontractor to provide the following submittals within one week of being awarded.

| Description | Duration |
| --- | --- |
| Basement Waterproofing<br>*Tremco Tremproof 250GC* | Product Data Sheets |
| Building Façade Air Barrier<br>*BASF ENERSHIELD* | Product Data Sheets |
| Storm Water Detention Vault Waterproofing<br>*TREMCO Tremproof 250GC* | Product Data Sheets |
| Elevator Pit Waterproofing<br>*Walls – Tremco Tremproof 250GC*<br>*Slab – Tremco Paraseal LG Dual Membrane* | Product Data Sheets<br>Product Data Sheets |
| First Level Nook Horizontal Waterproofing<br>*Tremco Tremproof 250GC (120mils)* | Product Data Sheets |
| Pedestrian Traffic Coating | Product Data Sheets |

**Durations**

Subcontractor will start July 5th, 2016. This Subcontractor will adhere to the below durations. If missing these durations begins to affect the schedule of the rest of the project schedule and upon being notified by the Contractor, this Subcontractor will immediately issue a recovery plan acceptable to the Contractor.

The following durations are presented as an approximate schedule. Reasonable variation from these dates shall not cause any changes to the Subcontract amount:

| Description | Duration |
| --- | --- |
| Basement Waterproofing | 4 weeks, to be done in 3 mobilizations |
| Building Façade Air Barrier | 8 to 10 weeks |
| Storm Water Detention Vault Waterproofing (includes deduct for not needing confined space protocol and add for the vault being 10 feet tall) | 1 week |
| Elevator Pit Waterproofing | 1 to 2 days |
| First Level Nook Horizontal Waterproofing | 2 days |
| Pedestrian Traffic Coating | 4 to 5 days |

13

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

## Warranties

Subcontractor to ensure the installation of this scope of work is installed per the manufacturer's recommendations and will uphold the following warranties:

| Description | Warranty |
|---|---|
| Basement Waterproofing<br>*Tremco Tremproof 250GC* | 5 years |
| Building Façade Air Barrier<br>*BASF Enershield* | 5 years |
| Storm Water Detention Vault Waterproofing<br>*Tremco Tremproof 250GC* | 5 years |
| Elevator Pit Waterproofing<br>*Walls – Tremco Tremproof 250GC*<br>*Slab – Tremco Paraseal LG Dual Membrane* | 5 years<br>5 years |
| First Level Nook Horizontal Waterproofing<br>*Tremco Tremproof 250GC (120mils)* | 10 years |
| Pedestrian Traffic Coating<br>*BASF MasterSeal* | 5 years |

## Cost of Work

### Base Bid Cost Breakdown

| Description | Cost of Work |
|---|---|
| Basement Waterproofing | $38,900.00 |
| Building Façade Air Barrier | $85,700.00 |
| Storm Water Detention Vault Waterproofing (includes deduct for not needing confined space protocol and add for the vault being 10 feet tall) | $17,900.00 |
| Elevator Pit Waterproofing | $3,600.00 |
| First Level Nook Horizontal Waterproofing | $2,000.00 |
| Pedestrian Traffic Coating | $5,900.00 |
| **Cost of Work** | **$154,000.00** |

### Alternates Cost Breakdown (not included in original contract amount).

| Description | Cost of Work |
|---|---|
| Furnish and install 2" rigid insulation at level 1 foundation walls | $3,750.00 |
| Furnish and install Tremco Tremproof 250GC (120 mils) at level 2, 3, and 6 terraces, including flashing per manufacturer guidelines and composite drainage board. | $94,800.00 |
| Cost to furnish and install 6" of 25 PSI rigid insulation, root barrier, and filter fabric at terraces. Hoist provided by others. | $81,900 |
| Cost to increase 250GC warranty at terrace waterproofing from 15 years to 20 years | $9,950.00 |
| Cost to provide EFVM testing for terrace | $6,400.00 |

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

| | |
|---|---|
| waterproofing (3 mobilizations) | Each additional mobilization: $950.00 |
| Furnish and install 2'x2'x2" pavers and pedestals at levels 2 and 6. Hoist provided by others. | $55,900.00 |
| Furnish and install vehicular traffic coating at level 1 drive aisle, between column lines 2 to 3, and B to F. One mobilization for shot blasting preparation is included. | $8,100.00<br>If required, crack sealing to be done at $2.50/LF<br>If required, grouting cracks prior to sealing to be done at $3.50/LF. |
| Furnish and install vehicular traffic coating at lower level parking ramp. One mobilization for shot blasting preparation is included. | $8,000.00<br>If required, crack sealing to be done at $2.50/LF<br>If required, grouting cracks prior to sealing to be done at $3.50/LF. |
| Furnish and install Tremco Tremproof 250GC (120 mils) at level 1 drive aisle, between column lines 2 to 3, and B to F. Includes all flashing per manufacturer's guidelines and composite drainage board. | $14,000.00 |

**Hourly Rates:**

| Description | Unit Price – Foreman | Unit Price - Journeyman |
|---|---|---|
| Additional work, as verified by signed tickets, straight time | $112.34/hr | $106.80/hr |
| Additional work, as verified by signed tickets, overtime | $142.64/hr | $135.07/hr |
| Additional work, as verified by signed tickets, double time | $172.94/hr | $163.33/hr |

**General Requirements:**

A. Claim any extras within 20 calendar days from date of occurrence. No extras can be approved later. Extras must be approved in writing by ARCO/Murray National Construction Company, Inc. representative before work begins.

B. Conform to all OSHA, hazardous communications, and other applicable safety requirements, including but not necessarily limited to the following:

1. GFI and Assured Grounding of Electrical Outlets

   All extension cords shall have either a GFI receptacle or be routinely checked as part of a written and recorded assured grounding program.

2. Hazardous Communications Program:

   Each subcontractor on ARCO/Murray National Construction Company, Inc.'s job sites must maintain a hazardous materials file for his own employees. Each file shall contain Material Safety Data Sheets (MSDS) on all material used in that specific project's construction.

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

It is the subcontractor's responsibility to notify other Contractor's on the job site of any hazardous materials to which their employees may be exposed.

3.   Any fines or penalties imposed by OSHA for work relating to subcontractor's scope shall be deducted from the subcontractor's compensation.

4.   All workers shall dress in accordance with OSHA regulations and professional standards. Hard hats, long pants and safety shoes will be required of everyone on the project.

5.   Excavations that are four feet or more in depth shall be either slopped or shored according to the specifications set aside in subpart P of the occupational safety and health standards for construction.

6.   Provide backup alarms on all equipment.

7.   It is the subcontractor's responsibility to insure that all equipment utilized to complete its scope of work is inspected and properly maintained per the equipment manufacturers and OSHA's standard. In addition, this subcontractor is responsible for properly training all employees who are operating said equipment including but not limited to lifts, excavation equipment, cranes, fork lifts, welders, etc.

C.   If subcontractor's employee(s) arrives at the job site without a hard hat, the employee(s) will be issued a hard hat by ARCO/Murray National Construction Company, Inc. The hard hat will become property of the subcontractor and the subcontractor will be charged $50.00 for each hard hat issued to their employee(s). At no time will a subcontractor's employee be allowed to work at the site without a hard hat.

D.   Subcontractor will perform all cleanup associated with subcontractor's work. ARCO/Murray National Construction Company, Inc. will provide dumpsters.

E.   No exclusions or changes from the drawings, specifications or bid instructions will be permitted without written approval from ARCO/Murray National Construction Company, Inc. project manager or superintendent.

F.   ARCO/Murray National Construction Company, Inc. will allow the Subcontractor progress payments at monthly intervals, in the ratio and to the extent of this Subcontractor's completed work. Ten percent (10%) retention will be withheld from each progress payment. Retention withheld may be invoiced thirty (30) days after the completion of the subcontract work. The retention will be released upon completion of the project and after ARCO/Murray National Construction Company, Inc. receives the retention payment from the Owner. All requests by the Subcontractor for progress payments and retention must be originals (faxed copies are unacceptable) delivered to ARCO/Murray National Construction Company, Inc. at its principal office on or before the 25th day of the month in order to be processed for payment on or after the 20th day of the succeeding month. All payment requests should be made on the Contractor payment request form.

G.   Insurance Requirements – See Exhibit B.

H.   It is the Subcontractor's responsibility to visit the job site prior to bidding to familiarize himself with actual job site conditions.

I.   All materials used shall be new and first quality, and shall be installed in accordance with manufacturer's recommendations.

16

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

J.  On contracts over $60,000, the successful Subcontractor will be required to submit a schedule of values to be approved. Monthly invoices shall be prepared according to the schedule of values. Breakdowns shall include columns showing (1) item (2) value (3) percent completed to date (4) the amount previously invoiced and (5) the amount being invoiced. Breakdowns must be submitted to ARCO/Murray National Construction Company, Inc. for approval within ten (10) days of the date of award.

K.  Subcontractor shall include all applicable taxes, fees, permits, freight, hoisting and/or temporary elevator, scaffolding, clean up, supervision, overhead, etc., to perform his work.

L.  The initial lead foreman will not be replaced for the duration of the project unless directed otherwise by ARCO/Murray National Construction Company, Inc.

M.  This Subcontractor will be responsible for all layout, lines and grade and coordination required to complete his scope of work unless specifically excluded in these Bid Instructions.

N.  All lifts to be used for this subcontractor's work must have grey (or another non-marking color) tires. No black tired lifts will be allowed.

O.  The subcontractor shall attend weekly jobsite coordination meetings at the jobsite as required by ARCO/Murray National Construction Company, Inc. superintendent. The subcontractor's project manager and jobsite foreman will be required to attend this meeting. If the project manager does not attend these meetings, then subcontractor may be subject to back charges for schedule coordination and project delay.

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

**EXHIBIT F**
**DRAWING LOG**

**Job Name:**  Centrum 606
**Job #:**  C207

| Drawing No. | Description | Original Date | Current Date | Architect/Engineer |
|---|---|---|---|---|
| **Cover Index** | | | | |
| G00-00 | Cover Sheet | 2/19/16 | 6/1/16 | FORUM |
| G00-01 | Sheet Index | 2/19/16 | 6/9/16 | FORUM |
| **Civil** | | | | |
| C1 | Title Sheet | 2/19/16 | 6/9/16 | FORUM |
| C2 | Existing Conditions | 2/23/16 | 6/9/16 | FORUM |
| C3 | Demolition Plan | 2/23/16 | 6/9/16 | FORUM |
| C4 | Site Dimensional and Paving Plan | 2/23/16 | 6/9/16 | FORUM |
| C5 | Grading and Soil Erosion and Sediment Control Plan | 2/19/16 | 6/9/16 | FORUM |
| C6 | Grading Detail | 2/19/16 | 6/9/16 | FORUM |
| C7 | Utility Plan | 2/23/16 | 6/9/16 | FORUM |
| C8 | Operations and Maintenance Plan | 2/19/16 | 6/9/16 | FORUM |
| C9 | Construction Details | 2/19/16 | 6/9/16 | FORUM |
| C10 | Construction Details | 2/19/16 | 6/9/16 | FORUM |
| C11 | Construction Details | 2/19/16 | 6/9/16 | FORUM |
| C12 | Construction Specifications | 2/19/16 | 6/9/16 | FORUM |
| **LANDSCAPE** | | | | |
| L0.01 | SHEET INDEX | 2/19/16 | 6/9/16 | FORUM |
| L2.00 | SOILS AND DRAINAGE PLAN GROUND LEVEL | 2/19/16 | 6/9/16 | FORUM |
| L2.10 | SOILS AND DRAINAGE PLAN LEVEL 2 | 2/19/16 | 6/9/16 | FORUM |
| L2.20 | SOILS AND DRAINAGE PLAN LEVEL 3 | 2/19/16 | 6/9/16 | FORUM |
| L2.30 | SOILS AND DRAINAGE PLAN LEVEL 6 | 2/19/16 | 6/9/16 | FORUM |
| L2.40 | SOILS AND DRAINAGE PLAN LEVEL 7 | 2/19/16 | 2/19/16 | FORUM |
| L4.00 | HARDSCAPE PLAN GROUND LEVEL | 2/19/16 | 6/9/16 | FORUM |
| L4.10 | HARDSCAPE PLAN LEVEL 2 | 2/19/16 | 6/9/16 | FORUM |
| L4.20 | HARDSCAPE PLAN LEVEL 3 | 2/19/16 | 6/9/16 | FORUM |
| L4.21 | HARDSCAPE PLAN LEVEL 3 ENLARGEMENT | 2/19/16 | 6/9/16 | FORUM |
| L4.22 | HARDSCAPE PLAN LEVEL 3 ENLARGEMENT | 2/19/16 | 6/9/16 | FORUM |
| L4.23 | HARDSCAPE PLAN LEVEL 3 ENLARGEMENT | | 6/9/16 | FORUM |
| L4.30 | HARDSCAPE PLAN LEVEL 6 | 2/19/16 | 6/9/16 | FORUM |

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

| L4.40 | HARDSCAPE PLAN LEVEL 7 | 2/19/16 | 2/19/16 | FORUM |
|---|---|---|---|---|
| L4.50 | HARDSCAPE MATERIALS SCHEDULE | 2/19/16 | 6/9/16 | FORUM |
| L4.51 | SITE FURNISHINGS SCHEDULE | 2/19/16 | 6/9/16 | FORUM |
| L5.00 | PLANTING PLAN GROUND LEVEL | 2/19/16 | 6/9/16 | FORUM |
| L5.01 | PLANTING PLAN GROUND LEVEL ENLARGEMENT | 2/19/16 | 6/9/16 | FORUM |
| L5.02 | PLANTING PLAN GROUND LEVEL ENLARGEMENT | 2/19/16 | 6/9/16 | FORUM |
| L5.10 | PLANTING PLAN LEVEL 2 | 2/19/16 | 6/9/16 | FORUM |
| L5.11 | PLANTING PLAN LEVEL 2 ENLARGEMENT | 2/19/16 | 2/19/16 | FORUM |
| L5.20 | PLANTING PLAN LEVEL 3 | 2/19/16 | 6/9/16 | FORUM |
| L5.21 | PLANTING PLAN LEVEL 3 ENLARGEMENT | 2/19/16 | 6/9/16 | FORUM |
| L5.30 | PLANTING PLAN LEVEL 6 | 2/19/16 | 6/9/16 | FORUM |
| L5.40 | PLANTING PLAN LEVEL 7 | 2/19/16 | 2/19/16 | FORUM |
| L5.50 | PLANTING SCHEDULE | 2/19/16 | 6/9/16 | FORUM |
| L6.00 | SITE SECTIONS/ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| L6.01 | SITE SECTIONS/ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| L6.02 | SITE SECTIONS/ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| L7.00 | HARDSCAPE DETAILS - SITE | 2/19/16 | 6/9/16 | FORUM |
| L7.01 | HARDSCAPE DETAILS - SITE | 2/19/16 | 6/9/16 | FORUM |
| L7.02 | HARDSCAPE DETAILS - SITE | | 6/9/16 | FORUM |
| L7.03 | HARDSCAPE DETAILS - SITE | 2/19/16 | 2/19/16 | FORUM |
| L7.04 | HARDSCAPE DETAILS - SITE | 2/19/16 | 2/19/16 | FORUM |
| L7.10 | HARDSCAPE DETAILS - ON STRUCTURE | 2/19/16 | 6/9/16 | FORUM |
| L7.11 | HARDSCAPE DETAILS - ON STRUCTURE | 2/19/16 | 6/9/16 | FORUM |
| L7.12 | HARDSCAPE DETAILS - ON STRUCTURE | 2/19/16 | 6/9/16 | FORUM |
| L7.20 | MASONRY DETAILS - ON STRUCTURE | 2/19/16 | 6/9/16 | FORUM |
| L7.21 | MASONRY DETAILS - ON STRUCTURE | 2/19/16 | 6/9/16 | FORUM |
| L7.22 | METAL AND WOOD DETAILS | 2/19/16 | 2/19/16 | FORUM |
| L7.30 | WOOD DETAILS - SITE | 2/19/16 | 6/9/16 | FORUM |
| L7.31 | WOOD DETAILS - SITE | 2/19/16 | 6/9/16 | FORUM |
| L7.50 | PLANTING DETAILS - SITE | 2/19/16 | 6/9/16 | FORUM |
| L7.60 | PLANTING DETAILS - ON STRUCTURE | 2/19/16 | 6/9/16 | FORUM |
| L7.61 | PLANTING DETAILS - ON STRUCTURE | 2/19/16 | 6/9/16 | FORUM |
| L8.00 | IRRIGATION PLAN GROUND LEVEL | 2/19/16 | 6/9/16 | FORUM |
| L8.10 | IRRIGATION PLAN LEVEL 2 | 2/19/16 | 6/9/16 | FORUM |
| L8.20 | IRRIGATION PLAN LEVEL 3 | 2/19/16 | 6/9/16 | FORUM |
| L8.30 | IRRIGATION PLAN LEVEL 6 | 2/19/16 | 6/9/16 | FORUM |
| L8.40 | IRRIGATION PLAN LEVEL 7 | 2/19/16 | 2/19/16 | FORUM |
| **Architectural** | | | | |
| A00-00 | GENERAL NOTES & CODE MATRIX | 2/19/16 | 6/9/16 | FORUM |
| A00-01 | LIFE SAFETY PLANS | 2/19/16 | 6/9/16 | FORUM |
| A00-02 | LIGHT & VENT SCHEDULE, MEETING MINUTES | 2/19/16 | 6/9/16 | FORUM |
| A00-03 | ACCESSIBLE UNIT MATRIX & DISTRIBUTION | 2/19/16 | 6/9/16 | FORUM |
| A01-01 | ARCHITECTURAL SITE PLAN | 2/19/16 | 6/9/16 | FORUM |
| A01-11 | SITE DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A02-01 | LOWER LEVEL PLAN | 2/19/16 | 6/9/16 | FORUM |
| A02-02 | LOWER LEVEL PLAN A | 2/19/16 | 6/9/16 | FORUM |

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

| A02-03 | LOWER LEVEL PLAN B | 2/19/16 | 6/9/16 | FORUM |
|---|---|---|---|---|
| A02-11 | LEVEL 01 PLAN | 2/19/16 | 6/9/16 | FORUM |
| A02-12 | LEVEL 01 PLAN A | 2/19/16 | 6/9/16 | FORUM |
| A02-13 | LEVEL 01 PLAN B | 2/19/16 | 6/9/16 | FORUM |
| A02-21 | LEVEL 02 PLAN | 2/19/16 | 6/9/16 | FORUM |
| A02-22 | LEVEL 02 PLAN A | 2/19/16 | 6/9/16 | FORUM |
| A02-23 | LEVEL 02 PLAN B | 2/19/16 | 6/9/16 | FORUM |
| A02-31 | LEVELS 03, 04 PLANS | 2/19/16 | 6/9/16 | FORUM |
| A02-32 | LEVELS 03, 04, 05 PLAN A | 2/19/16 | 6/9/16 | FORUM |
| A02-33 | LEVELS 03, 04, 05 PLAN B | 2/19/16 | 6/9/16 | FORUM |
| A02-41 | LEVELS 05, 06 PLANS | 2/19/16 | 6/9/16 | FORUM |
| A02-42 | LEVEL 06 PLAN A | 2/19/16 | 6/9/16 | FORUM |
| A02-43 | LEVEL 06 PLAN B | 2/19/16 | 6/9/16 | FORUM |
| A02-51 | ROOF PLAN | 2/19/16 | 6/9/16 | FORUM |
| A02-52 | ROOF PLAN A | 2/19/16 | 6/9/16 | FORUM |
| A02-53 | ROOF PLAN B | 2/19/16 | 6/9/16 | FORUM |
| A02-61 | LEVEL 06 PLAN | | 6/9/16 | FORUM |
| A02-62 | LEVEL 06 PLAN A | | 6/9/16 | FORUM |
| A02-63 | LEVEL 06 PLAN B | | 6/9/16 | FORUM |
| A02-71 | ROOF PLAN | | 6/9/16 | FORUM |
| A02-72 | ROOF PLAN A | | 6/9/16 | FORUM |
| A02-73 | ROOF PLAN B | | 6/9/16 | FORUM |
| A03-01 | BUILDING ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| A03-11 | BUILDING SECTIONS | 2/19/16 | 6/9/16 | FORUM |
| A03-12 | BUILDING SECTIONS | | 6/9/16 | FORUM |
| A03-13 | BUILDING SECTIONS | | 6/9/16 | FORUM |
| A03-21 | ENLARGED ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| A03-22 | ENLARGED ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| A03-23 | ENLARGED ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| A03-24 | ENLARGED ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| A03-25 | ENLARGED EXT GLAZING TYPE ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| A03-26 | ENLARGED EXT GLAZING TYPE ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| A03-41 | WALL SECTIONS | 2/19/16 | 6/9/16 | FORUM |
| A03-42 | WALL SECTIONS | 2/19/16 | 6/9/16 | FORUM |
| A03-43 | WALL SECTIONS | 2/19/16 | 6/9/16 | FORUM |
| A03-44 | WALL SECTIONS | 2/19/16 | 6/9/16 | FORUM |
| A03-51 | LEVEL 02 EXT GLAZING TYPES | 2/19/16 | 6/9/16 | FORUM |
| A03-52 | LEVELS 03, 04, 05 EXT GLAZING TYPES | 2/19/16 | 6/9/16 | FORUM |
| A03-53 | LEVEL 06 EXT GLAZING TYPES | 2/19/16 | 6/9/16 | FORUM |
| A04-01 | ENLARGED FLOOR PLANS | 2/19/16 | 6/9/16 | FORUM |
| A04-02 | ENLARGED FLOOR PLANS | 2/19/16 | 6/9/16 | FORUM |
| A04-03 | ENLARGED FLOOR PLANS | 2/19/16 | 6/9/16 | FORUM |
| A04-21 | ENLARGED UNIT PLANS | 2/19/16 | 6/9/16 | FORUM |
| A04-22 | ENLARGED UNIT PLANS | 2/19/16 | 6/9/16 | FORUM |
| A04-23 | ENLARGED UNIT PLANS | 2/19/16 | 6/9/16 | FORUM |
| A04-24 | ENLARGED UNIT PLANS | 2/19/16 | 6/9/16 | FORUM |

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

| A04-25 | ENLARGED UNIT PLANS | | 6/9/16 | FORUM |
|---|---|---|---|---|
| A04-31 | BATHROOMS TYPE A | 2/19/16 | 6/9/16 | FORUM |
| A04-32 | BATHROOMS TYPE B | 2/19/16 | 6/9/16 | FORUM |
| A04-33 | KITCHEN PLANS AND ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| A04-34 | KITCHEN PLANS AND ELEVATIONS | | 6/9/16 | FORUM |
| A05-01 | INTERIOR ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| A05-02 | INTERIOR ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| A05-03 | INTERIOR ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| A05-04 | INTERIOR ELEVATIONS | | 6/9/16 | FORUM |
| A05-51 | CASEWORK DETAILS | 2/19/16 | 2/19/16 | FORUM |
| A06-01 | LOWER LEVEL CEILING PLAN | 2/19/16 | 6/9/16 | FORUM |
| A06-01A | PARTIAL CEILING PLAN - LEVEL 01 AREA A | 2/19/16 | 2/19/16 | FORUM |
| A06-01B | PARTIAL CEILING PLAN - LEVEL 01 AREA B | 2/19/16 | 2/19/16 | FORUM |
| A06-02 | LEVEL 01 CEILING PLAN | 2/19/16 | 6/9/16 | FORUM |
| A06-03 | LEVEL 02 CEILING PLAN | 2/19/16 | 6/9/16 | FORUM |
| A06-04 | LEVELS 03, 04 CEILING PLAN | 2/19/16 | 6/9/16 | FORUM |
| A06-05 | LEVELS 05, 06 CEILING PLAN | 2/19/16 | 6/9/16 | FORUM |
| A06-10 | ENLARGED CEILING PLANS | | 6/9/16 | FORUM |
| A06-11 | ENLARGED CEILING PLANS | 2/19/16 | 2/19/16 | FORUM |
| A06-12 | ENLARGED CEILING PLANS | | 6/9/16 | FORUM |
| A06-13 | ENLARGED CEILING PLANS | | 6/9/16 | FORUM |
| A06-14 | ENLARGED CEILING PLANS | | 6/9/16 | FORUM |
| A06-15 | ENLARGED CEILING PLANS | | 6/9/16 | FORUM |
| A06-16 | ENLARGED CEILING PLANS | | 6/9/16 | FORUM |
| A06-21 | ENLARGED UNIT CEILING PLANS | 2/19/16 | 6/9/16 | FORUM |
| A06-22 | ENLARGED UNIT CEILING PLANS | 2/19/16 | 6/9/16 | FORUM |
| A06-23 | ENLARGED UNIT CEILING PLANS | 2/19/16 | 6/9/16 | FORUM |
| A06-24 | ENLARGED UNIT CEILING PLANS | 2/19/16 | 6/9/16 | FORUM |
| A06-25 | ENLARGED UNIT CEILING PLANS | | 6/9/16 | FORUM |
| A07-01 | CORE PLANS & SECTIONS | 2/19/16 | 6/9/16 | FORUM |
| A07-02 | STAIR PLANS & SECTIONS | 2/19/16 | 6/9/16 | FORUM |
| A07-03 | STAIR PLANS & SECTIONS | 2/19/16 | 6/9/16 | FORUM |
| A07-11 | STAIR DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A08-10 | VERTICAL DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A08-11 | VERTICAL DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A08-12 | VERTICAL DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A08-13 | VERTICAL DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A08-14 | VERTICAL DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A08-15 | VERTICAL WINDOW DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A08-16 | VERICAL DETAILS | | 6/9/16 | FORUM |
| A08-20 | PLAN DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A08-21 | PLAN DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A08-22 | PLAN DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A08-23 | PLAN DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A08-24 | PLAN DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A09-01 | PARTITION TYPES & TYPICAL DETAILS | 2/19/16 | 6/9/16 | FORUM |

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

| A09-10 | DOORS, FRAME TYPES & DETAILS | 2/19/16 | 6/9/16 | FORUM |
|---|---|---|---|---|
| A09-15 | OVERHEAD DOORS, FRAME TYPES & DETAILS | 2/19/16 | 6/9/16 | FORUM |
| A10-01 | CASEWORK DETAILS | | 6/9/16 | FORUM |
| A10-02 | CASEWORK DETAILS | | 6/9/16 | FORUM |
| A10-10 | INTERIOR PLAN DETAILS | | 6/9/16 | FORUM |
| A10-15 | ENLARGED INTERIOR VERTICAL DETAIL | | 6/9/16 | FORUM |
| A10-20 | INTERIOR SECTION DETAILS | | 6/9/16 | FORUM |
| A10-30 | INTERIOR CEILING DETAILS | | 6/9/16 | FORUM |
| A11-00 | FINISH LEGEND | 2/19/16 | 6/9/16 | FORUM |
| A11-01 | FINISH PLAN - LEVEL 01 PLAN A | | 6/9/16 | FORUM |
| A11-02 | FINISH PLAN - LEVEL 01 PLAN B | | 6/9/16 | FORUM |
| A11-03 | FINISH PLAN - LEVEL 02 PLAN A | | 6/9/16 | FORUM |
| A11-04 | FINISH PLAN - LEVEL 02 PLAN B | | 6/9/16 | FORUM |
| A11-05 | FINISH PLAN - LEVEL 03 PLAN A | | 6/9/16 | FORUM |
| A11-06 | FINISH PLAN - LEVEL 03 PLAN B | | 6/9/16 | FORUM |
| A11-10 | ENLARGED CORRIDOR FLOOR FINISH PLAN | | 6/9/16 | FORUM |
| **Structural** | | | | |
| S01-01 | GENERAL NOTES | 2/19/16 | 6/9/16 | FORUM |
| S01-02 | GENERAL NOTES | 2/19/16 | 6/9/16 | FORUM |
| S01-03 | GENERAL NOTES, LEGEND AND ABBREVIATIONS | 2/19/16 | 6/9/16 | FORUM |
| S01-04 | SNOW LOADING PLAN | 2/19/16 | 6/9/16 | FORUM |
| S01-05 | ISOMETRIC VIEW | 2/19/16 | 6/9/16 | FORUM |
| S01-06 | ISOMETRIC VIEW | 2/19/16 | 6/9/16 | FORUM |
| S02-00 | OVERALL PLAN - LOWER LEVEL | 2/19/16 | 6/9/16 | FORUM |
| S02-00A | LOWER LEVEL FOUNDATION PLAN WEST | 2/19/16 | 6/9/16 | FORUM |
| S02-00B | LOWER LEVEL FOUNDATION PLAN EAST | 2/19/16 | 6/9/16 | FORUM |
| S02-01 | OVERALL PLAN - LEVEL 1 | 2/19/16 | 6/9/16 | FORUM |
| S02-01A | LEVEL 1 FRAMING PLAN WEST | 2/19/16 | 6/9/16 | FORUM |
| S02-01B | LEVEL 1 FRAMING PLAN EAST | 2/19/16 | 6/9/16 | FORUM |
| S02-02 | OVERALL PLAN - LEVEL 2 | 2/19/16 | 6/9/16 | FORUM |
| S02-02A | LEVEL 2 FRAMING PLAN WEST | 2/19/16 | 6/9/16 | FORUM |
| S02-02B | LEVEL 2 FRAMING PLAN EAST | 2/19/16 | 6/9/16 | FORUM |
| S02-03 | OVERALL PLAN - LEVEL 3 | 2/19/16 | 6/9/16 | FORUM |
| S02-03A | LEVEL 3 FRAMING PLAN WEST | 2/19/16 | 6/9/16 | FORUM |
| S02-03B | LEVEL 3 FRAMING PLAN EAST | 2/19/16 | 6/9/16 | FORUM |
| S02-04 | OVERALL PLAN - LEVEL 4 | 2/19/16 | 6/9/16 | FORUM |
| S02-04A | LEVEL 4 FRAMING PLAN WEST | 2/19/16 | 6/9/16 | FORUM |
| S02-04B | LEVEL 4 FRAMING PLAN EAST | 2/19/16 | 6/9/16 | FORUM |
| S02-05 | OVERALL PLAN - LEVEL 5 | 2/19/16 | 6/9/16 | FORUM |
| S02-05A | LEVEL 5 FRAMING PLAN WEST | 2/19/16 | 6/9/16 | FORUM |
| S02-05B | LEVEL 5 FRAMING PLAN EAST | 2/19/16 | 6/9/16 | FORUM |
| S02-06 | OVERALL PLAN - LEVEL 6 | 2/19/16 | 6/9/16 | FORUM |
| S02-06A | LEVEL 6 FRAMING PLAN WEST | 2/19/16 | 6/9/16 | FORUM |
| S02-06B | LEVEL 6 FRAMING PLAN EAST | 2/19/16 | 6/9/16 | FORUM |
| S02-07 | OVERALL PLAN - ROOF | 2/19/16 | 6/9/16 | FORUM |
| S02-07A | ROOF FRAMING PLAN WEST | 2/19/16 | 6/9/16 | FORUM |

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

| S02-07B | ROOF FRAMING PLAN EAST | 2/19/16 | 6/9/16 | FORUM |
|---|---|---|---|---|
| S02-08 | HIGH ROOF FRAMING PLAN WEST | 2/19/16 | 6/9/16 | FORUM |
| S03-01 | BRACE ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| S03-02 | BRACE ELEVATIONS | 2/19/16 | 6/9/16 | FORUM |
| S04-01 | FOUNDATION DETAILS | 2/19/16 | 6/9/16 | FORUM |
| S04-02 | FOUNDATION DETAILS | 2/19/16 | 6/9/16 | FORUM |
| S04-03 | FOUNDATION DETAILS | 2/19/16 | 6/9/16 | FORUM |
| S04-04 | FOUNDATION DETAILS | 2/19/16 | 6/9/16 | FORUM |
| S05-01 | CMU DETAILS | 2/19/16 | 6/9/16 | FORUM |
| S06-01 | DIVERSAKORE COLUMN SCHEDULE | 2/19/16 | 6/9/16 | FORUM |
| S06-02 | TYPICAL KOREFLEX COLUMN DETAILS | 2/19/16 | 6/9/16 | FORUM |
| S06-03 | STEEL DETAILS | | 6/9/16 | FORUM |
| S06-04 | STEEL DETAILS | | 6/9/16 | FORUM |
| S07-01 | TYPICAL DIVERSAKORE BEAM SCHEDULE AND DETAILS | 2/19/16 | 6/9/16 | FORUM |
| S07-02 | TYPICAL DIVERSAKORE BEAM DETAILS | 2/19/16 | 6/9/16 | FORUM |
| S07-03 | TYPICAL DIVERSAKORE BEAM DETAILS | 2/19/16 | 2/19/16 | FORUM |
| S08-01 | TYPICAL STEEL DETAILS | 2/19/16 | 2/19/16 | FORUM |
| S08-02 | STEEL DETAILS | 2/19/16 | 2/19/16 | FORUM |
| **Mechanical** | | | | |
| M-0 | HVAC COVER SHEET | 2/19/16 | 2/19/16 | FORUM |
| M-0.1 | SCHEDULES HVAC VENTILATION | 2/19/16 | 2/19/16 | FORUM |
| M-0.2 | SCHEDULES HVAC VENTILATION | 2/19/16 | 2/19/16 | FORUM |
| M-0.3 | DETAILS HVAC EQUIPMENT | 2/19/16 | 2/19/16 | FORUM |
| M-0.4 | DIAGRAM REFRIGERANT RISER | 2/19/16 | 2/19/16 | FORUM |
| M-1 | HVAC PLAN OVERALL 1ST FLOOR | 2/19/16 | 2/19/16 | FORUM |
| M-1A | PLAN - AREA A 1ST FLOOR HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-1B | PLAN - AREA B 1ST FLOOR HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-2 | HVAC PLAN OVERALL 2ND FLOOR | 2/19/16 | 2/19/16 | FORUM |
| M-2A | PLAN - AREA A 2ND FLOOR HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-2B | PLAN - AREA B 2ND FLOOR HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-3 | HVAC PLAN OVERALL 3RD FLOOR | 2/19/16 | 2/19/16 | FORUM |
| M-3A | PLAN - AREA A 3RD FLOOR HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-3B | PLAN - AREA B 3RD FLOOR HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-4 | HVAC PLAN OVERALL 4TH FLOOR | 2/19/16 | 2/19/16 | FORUM |
| M-4A | PLAN - AREA A 4TH FLOOR HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-4B | PLAN - AREA B 4TH FLOOR HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-5 | HVAC PLAN OVERALL 5TH FLOOR | 2/19/16 | 2/19/16 | FORUM |
| M-5A | PLAN - AREA A 5TH FLOOR HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-5B | PLAN - AREA B 5TH FLOOR HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-6 | HVAC PLAN OVERALL 6TH FLOOR | 2/19/16 | 2/19/16 | FORUM |
| M-6A | PLAN - AREA A 6TH FLOOR HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-6B | PLAN - AREA B 6TH FLOOR HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-B | HVAC PLAN OVERALL BASEMENT | 2/19/16 | 2/19/16 | FORUM |
| M-BA | PLAN - AREA A BASEMENT HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-BB | PLAN - AREA B BASEMENT HVAC | 2/19/16 | 2/19/16 | FORUM |
| M-R | HVAC PLAN OVERALL ROOF | 2/19/16 | 2/19/16 | FORUM |

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

| M-RA | PLAN - AREA A ROOF HVAC | 2/19/16 | 2/19/16 | FORUM |
|------|-------------------------|---------|---------|-------|
| M-RB | PLAN - AREA B ROOF HVAC | 2/19/16 | 2/19/16 | FORUM |
| **Electrical** | | | | |
| E0-00 | CODE MATRIX AND COMCHECK COMPLIANCE STATEMENT | 2/19/16 | 2/19/16 | FORUM |
| E0-01 | OVERALL FIRST FLOOR PLAN LIGHTING - POWER | 2/19/16 | 6/1/16 | FORUM |
| E1-00 | PARTIAL BASEMENT FLOOR PLAN POWER | 2/19/16 | 6/1/16 | FORUM |
| E1-01 | PARTIAL BASEMENT FLOOR PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E1-10 | PARTIAL FIRST FLOOR PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E1-11 | PARTIAL FIRST FLOOR PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E1-20 | PARTIAL SECOND FLOOR PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E1-21 | PARTIAL SECOND FLOOR PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E1-30 | PARTIAL THIRD FLOOR PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E1-31 | PARTIAL THIRD FLOOR PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E1-40 | PARTIAL FOURTH FLOOR PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E1-41 | PARTIAL FOURTH FLOOR PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E1-50 | PARTIAL FIFTH FLOOR PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E1-51 | PARTIAL FIFTH FLOOR PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E1-60 | PARTIAL SIXTH FLOOR PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E1-61 | PARTIAL SIXTH FLOOR PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E1-70 | PARTIAL ROOF PLANS POWER AND LIGHTING | 2/19/16 | 6/1/16 | FORUM |
| E1-71 | PARTIAL ROOF PLAN POWER | 2/19/16 | 2/19/16 | FORUM |
| E2-00 | PARTIAL BASEMENT FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
| E2-00EM | PARTIAL BASEMENT FLOOR PLAN LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |
| E2-01 | PARTIAL BASEMENT FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
| E2-01EM | PARTIAL BASEMENT FLOOR PLAN LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |
| E2-10 | PARTIAL FIRST FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
| E2-10EM | PARTIAL FIRST FLOOR PLAN LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |
| E2-11 | PARTIAL FIRST FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
| E2-11EM | PARTIAL FIRST FLOOR PLAN LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |
| E2-20 | PARTIAL SECOND FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
| E2-20EM | PARTIAL SECOND FLOOR PLAN LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |
| E2-21 | PARTIAL SECOND FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
| E2-21EM | PARTIAL SECOND FLOOR PLAN LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |
| E2-30 | PARTIAL THIRD FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
| E2-30EM | PARTIAL THIRD FLOOR PLAN LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |
| E2-31 | PARTIAL THIRD FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
| E2-31EM | PARTIAL THIRD FLOOR PLAN LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |
| E2-40 | PARTIAL FOURTH FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
| E2-40EM | PARTIAL FOURTH FLOOR PLAN LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |
| E2-41 | PARTIAL FOURTH FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
| E2-41EM | PARTIAL FOURTH FLOOR PLAN LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |
| E2-50 | PARTIAL FIFTH FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
| E2-50EM | PARTIAL FIFTH FLOOR PLAN LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |
| E2-51 | PARTIAL FIFTH FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
| EW-51EM | PARTIAL FIFTH FLOOR PLAN LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

| E2-60 | PARTIAL SIXTH FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
|---|---|---|---|---|
| E2-60EM | PARTIAL SIXTH FLOOR AND ROOF PLANS LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |
| E2-61 | PARTIAL SIXTH FLOOR PLAN LIGHTING | 2/19/16 | 2/19/16 | FORUM |
| E2-61EM | PARTIAL SIXTH FLOOR PLAN LIGHTING EMERGENCY | 2/19/16 | 2/19/16 | FORUM |
| E3-00 | TYPICAL UNIT FLOOR PLANS LIGHTING AND POWER | 2/19/16 | 2/19/16 | FORUM |
| E3-01 | TYPICAL UNIT FLOOR PLANS LIGHTING AND POWER | 2/19/16 | 2/19/16 | FORUM |
| E3-02 | TYPICAL UNIT FLOOR PLANS LIGHTING AND POWER | 2/19/16 | 2/19/16 | FORUM |
| E3-03 | TYPICAL UNIT FLOOR PLANS LIGHTING AND POWER | 2/19/16 | 2/19/16 | FORUM |
| E3-04 | TYPICAL UNIT FLOOR PLANS LIGHTING AND POWER | 2/19/16 | 2/19/16 | FORUM |
| E4-00 | SYMBOL LIST, SCHEDULES, DETAILS AND NOTES | 2/19/16 | 2/19/16 | FORUM |
| E4-01 | MECHANICAL SCHEDULES | 2/19/16 | 2/19/16 | FORUM |
| E4-10 | DETAILS AND SYSTEM RISER | 2/19/16 | 2/19/16 | FORUM |
| E4-11 | DETAILS AND SYSTEM RISER | 2/19/16 | 2/19/16 | FORUM |
| E4-12 | DETAILS AND SYSTEM RISER | 2/19/16 | 2/19/16 | FORUM |
| E5-00 | SERVICE RISER DIAGRAM | 2/19/16 | 2/19/16 | FORUM |
| E5-01 | SERVICE RISER DIAGRAM AND SWITCHBOARD ELEVATIONS | 2/19/16 | 2/19/16 | FORUM |
| E5-10 | PANEL SCHEDULES | 2/19/16 | 6/1/16 | FORUM |
| E5-11 | PANEL SCHEDULES | 2/19/16 | 2/19/16 | FORUM |
| E5-20 | LOAD SUMMARIES | 2/19/16 | 2/19/16 | FORUM |
| E5-21 | LOAD SUMMARIES | 2/19/16 | 2/19/16 | FORUM |
| E6-00 | GENERAL NOTES AND SPECIFICATIONS | 2/19/16 | 2/19/16 | FORUM |
| EF0-00 | BASEMENT FLOOR PLAN FOUNDATION POWER | 2/19/16 | 4/29/16 | FORUM |
| EF0-01 | FIRST FLOOR PLAN FOUNDATION POWER | 2/19/16 | 4/29/16 | FORUM |
| **Plumbing** | | | | |
| P0-00 | PLUMBING NOTES, SYMBOLS, ABBREV. SCHEDULES & DETAILS | 2/19/16 | 4/29/16 | FORUM |
| P2-0.1 | UNDERGROUND PLUMBING PLAN - WEST | 2/19/16 | 4/29/16 | FORUM |
| P2-0.2 | UNDERGROUND PLUMBING PLAN - EAST | 2/19/16 | 4/29/16 | FORUM |
| P2-1.1 | LOWER LEVEL PLUMBING PLAN - WEST | 2/19/16 | 4/29/16 | FORUM |
| P2-1.2 | LOWER LEVEL PLUMBING PLAN - EAST | 2/19/16 | 4/29/16 | FORUM |
| P2-2.1 | LEVEL 01 PLUMBING PLAN - WEST | 2/19/16 | 4/29/16 | FORUM |
| P2-2.2 | LEVEL 01 PLUMBING PLAN - EAST | 2/19/16 | 4/29/16 | FORUM |
| P2-3.2 | LEVEL 02 PLUMBING PLAN - WEST | 2/19/16 | 2/19/16 | FORUM |
| P2-3.3 | LEVEL 02 PLUMBING PLAN - EAST | 2/19/16 | 2/19/16 | FORUM |
| P2-4.1 | LEVEL 03 PLUMBING PLAN - WEST | 2/19/16 | 2/19/16 | FORUM |
| P2-4.2 | LEVEL 03 PLUMBING PLAN - EAST | 2/19/16 | 2/19/16 | FORUM |
| P2-5.1 | LEVEL 04 PLUMBING PLAN - WEST | 2/19/16 | 2/19/16 | FORUM |
| P2-5.2 | LEVEL 04 PLUMBING PLAN - EAST | 2/19/16 | 2/19/16 | FORUM |
| P2-6.1 | LEVEL 05 PLUMBING PLAN - WEST | 2/19/16 | 2/19/16 | FORUM |
| P2-6.2 | LEVEL 05 PLUMBING PLAN - EAST | 2/19/16 | 2/19/16 | FORUM |
| P2-7.1 | LEVEL 06 PLUMBING PLAN - WEST | 2/19/16 | 2/19/16 | FORUM |
| P2-7.2 | LEVEL 06 PLUMBING PLAN - EAST | 2/19/16 | 2/19/16 | FORUM |
| P2-8.1 | ROOF PLUMBING PLAN - WEST | 2/19/16 | 2/19/16 | FORUM |
| P2-8.2 | ROOF PLUMBING PLAN - EAST | 2/19/16 | 2/19/16 | FORUM |
| P4-01 | PLUMBING SCHEDULE | 2/19/16 | 4/29/16 | FORUM |

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

| P4-02 | WASTE AND VENT RISER DIAGRAM | 2/19/16 | 2/19/16 | FORUM |
|-------|------------------------------|---------|---------|-------|
| P4-03 | HOT AND COLD WATER RISER DIAGRAM | 2/19/16 | 2/19/16 | FORUM |
| P4-04 | HOT AND COLD WATER RISER DIAGRAM | 2/19/16 | 2/19/16 | FORUM |
| P5-01 | PLUMBING DETAILS | 2/19/16 | 2/19/16 | FORUM |

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

**EXHIBIT G**
**CRANE OPERATION REQUIREMENTS FOR SUBCONTRACTORS**
**(1926.1400 SUBPART CC)**

A.   All designated operators and subcontractors involved with project crane operations, whether the crane equipment is owned, rented or subcontracted, shall meet all prescribed Occupational Safety and Health Administration regulations and protocols described in 29 CFR 1926.1400 Subpart CC.

B.   All designated operators and subcontractors involved with project crane operations shall meet all prescribed health and safety regulations and protocols required by any state run occupational and health agency and administration and any municipality occupational and health agency and administration.

C.   All crane operators shall provide a valid "Certified Crane Operator" certification to Contractor project management.  The certification shall be specific to the designated crane model and type utilized at the project.  The certification shall meet all additional requirements described in 29 CFR 1926.1427.

D.   Subcontractors involved with rigging operations shall provide documentation for the designated Qualified Rigger qualifications to Contractor project management.  The qualifications shall meet all additional requirements described in 29 CFR 1926.1425.

E.   Subcontractors involved with crane operations shall provide documentation of the designated Qualified Signal Person's qualification to Contractor project management.  The qualifications shall meet all additional requirements described in 29 CFR 1926.1419 and 29 CFR 1926.1428.

F.   All crane operators or subcontractors involved with crane operations shall provide a valid Annual Crane Certification to Contractor project management.  The certification shall be specific to the designated crane model and type utilized at the project.  The annual crane certification shall meet all requirements described in 29 CFR 1926.1400 Subpart CC.

G.   The designated Assembly/Disassembly Supervisor (A/D Supervisor) shall provide documentation to Contractor project management which certifies that the designated project crane has been assembled to its manufacturer's specifications as described in 29 CFR 1926.1404.

H.   The Subcontractor involved with any project crane operations, including the assembly/disassembly, shall determine if any part of the crane equipment could get within 20 feet of a power line (in any direction), at any time during crane operations. Subcontractors shall meet all requirements for power line safety as described in 1926.1407, 1926.1408, 1926.1409 (Power Line Safety Over 350 kV), 1926.1410. 1926.1411.

27

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
XX/XX/XX

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|

INSURANCE COMPANY

| INSURED | INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|---|
| COMPANY NAME | INSURER A: | |
| ADDRESS | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| X | | **GENERAL LIABILITY** | XX XXXXXXX | XX/XX/XX | XX/XX/XX | EACH OCCURRENCE | $ 1,000,000 |
| | | COMMERCIAL GENERAL LIABILITY | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | CLAIMS MADE ☐ OCCUR | | | | MED EXP (Any one person) | $ |
| | | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | | GENERAL AGGREGATE | $ |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | PRODUCTS - COMP/OP AGG | $ |
| | | POLICY ☐ PRO-JECT ☐ LOC | | | | | |
| X | | **AUTOMOBILE LIABILITY** | XX XXXXXX | XX/XX/XX | XX/XX/XX | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | ANY AUTO | | | | | |
| | | ALL OWNED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | | SCHEDULED AUTOS | | | | | |
| | | HIRED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | | NON-OWNED AUTOS | | | | | |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | ANY AUTO | | | | OTHER THAN EA ACC AUTO ONLY: AGG | $ |
| X | | **EXCESS/UMBRELLA LIABILITY** | XX XXXXXX | XX/XX/XX | XX/XX/XX | EACH OCCURRENCE | $ 1,000,000 |
| | X | OCCUR ☐ CLAIMS MADE | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | DEDUCTIBLE | | | | | $ |
| | | RETENTION | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** | XX XXXXXX | XX/XX/XX | XX/XX/XX | X WC STATU-TORY LIMITS ☐ OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | If yes, describe under SPECIAL PROVISIONS below | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | **OTHER** | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS**

JOB NAME MUST BE LISTED
CONTRACTOR MUST BE LISTED AS ADDITIONAL INSURED
OWNER MUST BE LISTED AS ADDITIONAL INSURED
ARCO/MURRAY MUST BE LISTED AS ADDITIONAL INSURED
We require waiver of subrogation

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| ARCO/MURRAY ___contract___  ___ IL 60515 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. AUTHORIZED REPRESENTATIVE SIGNED BY REPRESENTATIVE |

ACORD 25 (2001/08)                                         © ACORD CORPORATION 1988

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

# Request for Payment Example Packet

Please review the examples provided.  If you have any questions, please feel free to contact your project accountant at 331-251-2726.  You can also email the Project Accountant, Helene Longino, for an Excel copy of the Request for Payment sheet to submit via email (hlongino@arcomurray.com).

Contracts under $10,000 do not require the supplier section to be filled out.

**Don't forget!  ARCO/Murray must receive all payment requests by the 20th of each month.**

ARCO/Murray
Attn:  Accounting Department
3110 Woodcreek Drive
Downers Grove, IL 60515

**Please keep this packet with your Request for Payment forms.**

Thank you!

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

# REQUEST FOR PAYMENT

**ARCO/Murray**

To:                                                                    Date : 04/03/2013

From:   Subcontractors R Us                          Invoice No:   EXAMPLE3
        12345 Abc Street                      ARCO/Murray's Job #   C3000
        Downers Grove, IL 60515                       Job Name   XYZ Chicago



Amount of Subcontract          $   500,000.00
Approved Change Orders         $    50,000.00
Total Subcontract Amount       $   550,000.00

Work Completed To Date         $   550,000.00
Less 10% Retention             $    55,000.00
Total Amount Billable          $   495,000.00

Billable Amount                $   495,000.00
Less Previous Payment Request  $   270,000.00
Net Amount Due This Invoice    $   225,000.00

I have received and incorporated in this project this month, materials and/or services from the following material suppliers and or subcontractors for the respective amounts:

| Subcontractor/Material Supplier | Item | Contract Schedule of Value | Paid to Date | To Be Paid This Period |
|---|---|---|---|---|
| United Rentals | Lift | $ 100,000.00 | $ 65,000.00 | $ 35,000.00 |
| ABC Concrete | Concrete | $ 135,000.00 | $ 90,000.00 | $ 45,000.00 |
| ABC Rebar | Rebar | $ 100,000.00 | $ 75,000.00 | $ 25,000.00 |
| Labor | Labor | $ 215,000.00 | $ 40,000.00 | $ 120,000.00 |
| | | $ 550,000.00 | $ 270,000.00 | $ 225,000.00 |
| | | $ | $ | |
| | | $ | | |

Please indicate here if joint checks are requested:  YES \ NO

(Signature)

(Title)

(Date)

## DO NOT WRITE IN THIS BOX

Vendor# _____
Job/W.O. _____
CSI # _____
G/L # _____5060_____
Approved _____
Date _____
CK.# _____TRX.# _____

## #Note to the Subcontractor

1. Please do not revise this form
2. Failure to use this form will result in delay of payment
3. All payment requests must be received by the 20th.

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

# REQUEST FOR PAYMENT

## Retention Invoice

**ARCO/Murray**

To:

Date : 04/03/2013

From:  Subcontractors R Us
12345 Abc Street
Downers Grove, IL 60515

*Retention must always be billed separately.*

Invoice No: EXAMPLE4
ARCO/Murray's Job # C3000
Job Name XYZ Chicago

*Take the Amount of Subcontract; add your approved change orders to reach your Total Subcontract Amount.*

| | | |
|---|---|---|
| Amount of Subcontract | $ | 500,000.00 |
| Approved Change Orders | $ | 50,000.00 |
| Total Subcontract Amount | $ | 550,000.00 |
| Work Completed To Date | $ | 550,000.00 |
| Less 10% Retention | $ | 0 |
| Total Amount Billable | $ | 550,000.00 |
| Billable Amount | $ | 550,000.00 |
| Less Previous Payment Request | $ | 495,000.00 |
| Net Amount Due This Invoice | $ | 55,000.00 |

*Zero out to bill retention.*

*Take the billable amount and subtract your previous pay amounts to reach Net amount due this invoice.*

I have received and incorporated in this project this month, materials and/or services from the following material suppliers and or subcontractors for the respective amounts:

| Subcontractor/Material Supplier | Item | Contract Schedule of Value | Paid to Date | To Be Paid This Period |
|---|---|---|---|---|
| United Rentals | Lift | $ 100,000.00 | $ 100,000.00 | $ 0.00 |
| ABC Concrete | Concrete | $ 135,000.00 | $ 135,000.00 | $ 0.00 |
| ABC Rebar | Rebar | $ 100,000.00 | $ 100,000.00 | $ 0.00 |
| Labor | Labor | $ 215,000.00 | $ 160,000.00 | $ 55,000.00 |
| | | $ 550,000.00 | $ 495,000.00 | $ 55,000.00 |
| | | $ | $ | $ |
| | | $ | | |

*Lien Waiver not needed for Labor*

*This shows the total you have paid to date to your subs/material suppliers on your previous pay apps.*

*The total amount of this column should equal your Net Amount Due This Invoice.*

Please indicate here if joint checks are requested:  YES \ NO

***Final** Supplier waivers are due before we can release your check for retention!*

_____
(Signature)

_____
(Title)

_____
(Date)

### DO NOT WRITE IN THIS BOX

| | |
|---|---|
| Vendor# | _____ |
| Job/W.O. | _____ |
| CSI # | _____ |
| G/L # | 5060 _____ |
| Approved | _____ |
| Date | _____ |
| CK.# | _____TRX.#_____ |

### #Note to the Subcontractor

1. Please do not revise this form
2. Failure to use this form will result in delay of payment
3. All payment requests must be received by the 20th.

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF

## REQUEST FOR PAYMENT

To:    ARCO/Murray                                      Date:  _____

From:  _____            Invoice No:  _____

        _____      ARCO/Murray Job #:  _____

        _____      Job Name:  _____

1  Amount of Subcontract $ _____

2  Approved Change Orders $ _____

3  Total Subcontract Amount    (Line 1 + Line 2) $ _____

4  Total Work Completed to Date $ _____

5  Less 10% Retention (Line 4 x 10%) $ _____

6  Total Billable Amount (Line 4 - Line 5) $ _____

7  Billable Amount ( = Line 6) $ _____

8  Less Previous Payment Request $ _____

9  Net Amount Due This Invoice (Line 7 - Line 8) $ _____

I have received and incorporated in this project this month, materials and/or services from the following material suppliers and/or subcontractors for the respective amounts:

| Subcontractor/Material Supplier | Item | Contract Schedule of Value | Paid to Date | To Be Paid This Period |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | $ _____ |
| _____ | _____ | _____ | _____ | $ _____ |
| _____ | _____ | _____ | _____ | $ _____ |
| _____ | _____ | _____ | _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | _____ | _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |

Please indicate here if joint checks are requested:   YES \ NO   _____

REMINDER:  Subcontractors are to furnish  ALL
Unconditional  suppliers'/sub lien waivers BEFORE
progress or final payments  are due to Subcontractor.

_____
(Signature)

_____
(Title)

_____
(Date)

### DO NOT WRITE IN THIS BOX

Vendor# _____

Job/W.O. _____

CSI # _____

G/L # _____

Approved _____

Date

CK.# _____ TRX.# _____

◆  NOTE TO THE SUBCONTRACTOR

1. Please DO NOT revise this form
2. Failure to use this form will result in
   delay of payment
3. ALL PAYMENT REQUESTS  MUST BE
   RECEIVED BY THE 20TH OF THE MONTH

Please remit completed forms to:
ARCO/Murray
3110 Woodcreek Drive Downers Grove, IL 60515
P: (331) 251-2726   F: (331) 251-2727

DocuSign Envelope ID: 32347EE4-CAF9-4024-A8CF-0E230A11CADF



### Insurance Requirements
*PLEASE FORWARD TO YOUR INSURANCE AGENT*

Job Name:  Centrum 606
Job Address:  1767 N Milwaukee
               Chicago, IL  60647

Contract #:  C207
*Reference number on insurance certificate*

- Additional insured must read:
  ARCO/Murray National Construction Company, Inc., Milwaukee Leavitt Owner, LLC; Centrum Partners, LLC

- Certificate Holder must read as follows:
  ARCO/Murray National Construction Company, Inc.
  3110 Woodcreek Drive
  Downers Grove, IL 60515

- Insurance Certificate is expired; please send updated Certificate for our records.

- Job Name/Job Number must be referenced in the description section of the Certificate.

- Endorse Commercial General Liability, Auto Liability, and Umbrella Excess Liability policies to name ARCO/Murray National Construction Company, Inc., Milwaukee Leavitt Owner, LLC; and Centrum Partners, LLC  as additional insureds on a primary and non-contributory basis for current, ongoing, and completed operations for three (3) years after final completion of the project.

- Owner must be listed as additional insured.

- Certificate must show the following coverage:
  **Worker's Compensation:**  Employers Liability, whether required by statute or not, for a limit of not less than $500,000 bodily injury by accident, each accident/ $500,000 bodily injury by disease, policy limit/$500,000 bodily injury by disease, each employee, or if greater, in the amounts required by statute.

  **Commercial General Liability:**  (occurrence format), (including Completed Operations, Broad Form Property Damage and Contractual Liability for the indemnification agreements of this Subcontract):
      $1,000,000 Bodily Injury                 $1,000,000 Property Damage

  **Automobile Liability:**  $1,000,000 per accident

  **Excess Umbrella Policy:**  $1,000,000

  **Professional Liability:**  (required if Subcontractor is providing design services):
      $1,000,000 each claim                 $1,000,000 annual aggregate

  $2,000,000 combined single limit liability to cover comprehensive general liability and commercial automobile liability will be acceptable.

- Subrogation:  Subcontractor and its insurance carrier(s) waive all rights of subrogation against the Owner, Design/Builder, and their officers, directors, shareholders, employees, agents, or appointed representatives unless restricted by state statutes.

**Note: Payment will not be released if insurance is not issued and/or not in compliance.**

EXHIBIT C

FILED
5/25/2021 4:27 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020L009537

13459170

FILED DATE: 5/25/2021 4:27 PM    2020L009537

**12-Person Jury**

## IN THE CIRCUIT COURT OF COOK COUNTY,
## COUNTY DEPARTMENT LAW DIVISION

|  |  |  |
|---|---|---|
| ZERO COUPON LLC, a Delaware Limited Liability Company; SECOND CITY EQUITIES LLC, a Delaware Limited Liability Company; and BUCKTOWN EQUITIES LLC, a Delaware Limited Liability Company, | ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Case No. 2020L009537 |
| NORTHERN GLASS, INC., an Illinois Corporation; ARCO/MURRAY NATIONAL CONSTRUCTION COMPANY, INC., a Delaware Corporation; MILWAUKEE LEAVITT OWNER LLC, an Illinois Limited Liability Company; and CHICAGO TITLE INSURANCE COMPANY, a Florida Corporation. | ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED AS TO COUNTS I, II, and III** |
| Defendants. | ) |  |

## SECOND AMENDED COMPLAINT

NOW COMES the Plaintiffs, ZERO COUPON LLC, a Delaware Limited Liability Company; SECOND CITY EQUITIES LLC, a Delaware Limited Liability Company; and BUCKTOWN EQUITIES LLC, a Delaware Limited Liability Company (together "Owners" or "Plaintiffs"), by and through their attorneys, FUKSA KHORSHID, LLC, and for their Second Amended Complaint against the Defendants, NORTHERN GLASS, INC., an Illinois Corporation ("Northern Glass"); ARCO/MURRAY NATIONAL CONSTRUCTION COMPANY, INC., a Delaware Corporation ("ARCO/Murray"); MILWAUKEE LEAVITT OWNER LLC, an Illinois Limited Liability Company ("Milwaukee Leavitt Seller"); and CHICAGO TITLE INSURANCE

1

FILED DATE: 5/25/2021 4:27 PM   2020.009537

COMPANY, a Florida Corporation ("Chicago Title Escrow Agent") (collectively, "Defendants"), in support thereof states and alleges as follows:

### NATURE OF THE ACTION

1.     This is a breach of contract and warranty, and declaratory judgment case brought by Owners related to work done by Defendants Northern Glass and ARCO/Murray at 1743 N. Leavitt St., Chicago, Illinois 60647 (the "Property"). The work, which included windows, aluminum envelope / cladding, roofing and other building envelope, and HVAC, was covered by warranties given by two of the Defendants. A true and correct copy of the Northern Glass Warranty, dated September 12, 2018, is attached hereto as **Exhibit A**.  A true and correct copy of the ARCO/Murray Warranty, dated October 31, 2018, is attached hereto as **Exhibit B**. By means of a subcontract with ARCO/Murray, Northern Glass also assumed and [undertook]" the Warranties ARCO/Murray gave to Plaintiffs/Owners, as set out in **Exhibit F**, attached hereto. The Northern Glass Warranty and the ARCO/Murray Warranty are collectively the "Warranties".

2.     Also at issue is breach of a Real Estate Sale Agreement ("Sale Agreement") between Owners and Defendant Milwaukee Leavitt Seller, the pertinent amendment of which is dated August 9, 2018, that held back $400,000 in funds from Plaintiffs' purchase of the Property from Milwaukee Leavitt, to address leaks and related work involving the Property which were not performed by ARCO/Murray. A true and correct copy of the Sale Agreement is attached hereto as **Exhibit C**. The hold-back funds were deposited with Chicago Title Escrow Agent. A true and correct copy of a Hold-Back Funds Escrow Agreement ("Escrow Agreement") between Plaintiffs and Defendants Milwaukee Leavitt Seller and Chicago Title Escrow Agent, dated October 21, 2018, is attached hereto as **Exhibit D**.

3.     Defects in the products, materials and workmanship warranted have emerged, in

2

FILED DATE: 5/25/2021 4:27 PM    2020L009537

every instance within the applicable warranty periods. These include warranty-covered defects in windows, aluminum envelope/cladding and HVAC. Owners have made timely and repeated demands upon Defendants Northern Glass and ARCO/Murray under their respective Warranties, to no avail.

4.    Owners have also demanded that Defendant Milwaukee Leavitt Seller honor the terms of the Sale Agreement and authorize disbursements from the $400,000 escrow to address the leaks and other problems, but disagreements have arisen and Owners fear that Milwaukee Leavitt Seller will attempt to take back the $400,000 and accordingly pay nothing under its Sale Agreement obligations. Chicago Title Escrow Agent has resigned as escrow agent effective September 7, 2020 but as of this filing there has been no replacement escrow agent named. A true and correct copy of Chicago Title Escrow Agent's resignation dated August 6, 2020 is attached hereto as **Exhibit E**.

5.    Owners have been forced to bring this lawsuit for breach of warranty and resultant damages, breach of the Sale Agreement and resultant damages, and for a declaratory judgment for the Court to declare the respective rights and obligations of the parties concerning the escrow. Plaintiffs also request that the funds in escrow with Chicago Title Escrow Agent be ordered deposited with the Clerk of Court, 735 ILCS § 2-1011, pending final disposition of this matter.

## THE PARTIES

6.    Owners are all Delaware Limited Liability Companies, and they together are the Owners of the Property, an apartment building at 1743 N. Leavitt St., Chicago, Cook County, Illinois 60647.

7.    Owners occupy a management office at the Property and manage and occupy the common elements of the Property, as related to their management and other duties concerning the

FILED DATE: 5/25/2021 4:27 PM    2020L009537

Property.

8.      Defendant Northern Glass, Inc. is an Illinois Corporation with an office located at 1400 E. Higgins Ave., Elk Grove Village, Illinois 60007.

9.      Defendant ARCO/Murray National Construction Company, Inc. is a Delaware Corporation, registered to do business in Illinois with the Illinois Secretary of State, and maintaining an office at 3110 Woodcreek Drive, Downers Grove, Illinois 60515.

10.      Defendant Milwaukee Leavitt Owner, LLC is an Illinois Limited Liability Company with an office located at 225 W. Hubbard Street, Suite 501, Chicago, Illinois 60654.

11.      Defendant Chicago Title Insurance Company is a Florida Corporation, registered to do business in Illinois with the Illinois Secretary of State, and maintaining an office at 10 S. LaSalle Street, Suite 3100, Chicago, Illinois 60606

## JURISDICTION AND VENUE

12.      This Court has personal jurisdiction over the parties pursuant to 735 ILCS 5/2-209 because the transactions and conduct at issue and complained of occurred within this State and the dispute concerns work on Property located in Chicago, Cook County, Illinois.

13.      Venue is proper in Cook County under 735 ILCS 5/2-101 because the actions and events giving rise to this controversy occurred in Cook County, Illinois and concern the purchase of and work on Property located in Chicago, Cook County, Illinois.

## FACTS

14.      Plaintiffs purchased the Property from the prior owner, Milwaukee Leavitt Owner, LLC, closing on November 1, 2018.  The Sale Agreement (Exhibit C) is the pertinent part of the real estate sales agreement at issue in this matter, and it provides an independent or collateral

FILED DATE: 5/25/2021 4:27 PM   2020L009537

undertaking, apart from the purposes of the deed that transferred ownership from Milwaukee Leavitt Seller to Plaintiffs.

15.     The Property was newly-built (with certain work continuing), and accordingly still under Warranties at the time of purchase. The Warranties at issue here were given by Defendants Northern Glass and ARCO/Murray.

16.     As a condition of their purchase of the Property, Plaintiffs were granted Warranties / Warranty extensions by Defendants Northern Glass and ARCO/Murray, making Owners agreed-upon parties, successors-in-interest and/or beneficiaries of the Warranties made by the Defendants Northern Glass and ARCO/Murray.

17.     ARCO/Murray entered into a subcontract agreement with Northern Glass on July 19, 2016 for Northern Glass to furnish and install exterior glass and glazing for the Property for a sum of $2,974,900.00 (the "Subcontract"). A true and correct copy of the Subcontract is attached hereto as **Exhibit F**.

18.     In Section 4.5 of the Subcontract, Defendant Northern Glass specifically agreed to itself assume all of the warranties given to the Property Owners by ARCO/Murray:

> Subcontractor guarantees that the Subcontractor's Work, when completed will be completed in accordance with the Contract Documents, that the completed Work will incorporate all Change Orders relative to Subcontractor's Work that the completed Subcontractor's Work complies (to the extent applicable to Subcontractor's Work) with all land use requirements (deed restrictions, building codes, zoning restrictions and environmental laws) relating to the Project, that the Subcontractor's Work has been constructed in a good and workmanlike manner, using quality materials as specified in the Contract Documents, and that the Subcontractor's Work is free from any defects or deficiencies resulting from improper design, materials, construction or workmanship ("Defect"). In the event a Defect is found to exist in violation of this Warranty within one year following the final acceptance of the Work of the General Contract by the Owner, then the Subcontractor shall, at its sole expense, promptly repair and/or

5

FILED DATE: 5/25/2021 4:27 PM   2020L009537

> replace non-conforming work or materials ("Corrective Action") and any other part of the Project damaged in connection therewith, and shall pay all costs and expenses incurred by Owner or Contractor in connection with such Defect and Corrective Action. Following any Corrective Action, Subcontractor shall, for an additional one-year period thereafter, have a duty to repair or replace such corrective Work. If Subcontractor fails to commence and complete Corrective Action within twenty (20) days after notice from Contractor, then Contractor shall have the right to correct such Defect and Subcontractor shall be liable to Contractor for all direct, indirect, special, consequential and other damages, including lost profits and revenue, incurred due to or in connection with such Defect and the curing of such Defect. Any special, extended or other warranties given by Contractor to the Owner in the General Contract that pertain to Subcontractor's Work are hereby expressly assumed and undertaken by Subcontractor.

(Exhibit F) (emphasis added).

19.    During and prior to 2018, Northern Glass did window work at the Property. On September 12, 2018, Northern Glass submitted its letter warranty broadly addressed "To Whom It May Concern" and sent to ARCO/Murray stating in relevant part:

> Beginning with the substantial completion date, August 15, 2018 Northern Glass warranties that the products and materials provided and installed by Northern Glass shall be free from material defects in workmanship and materials for a period of two (2) year. This warranty is limited to defects appearing within that two (2) year period from the date of substantial completion provided that a written notification defining such defects is received from the occupant or general contractor within that two (2) year period.
>
> During that warranty period, Northern Glass will cover all parts and labor required to correct any defects, provided that the defects are due to, or caused by, the services provided by Northern Glass. . . .
>
> (Exhibit A).

20.    The Northern Glass Warranty letter was addressed to "To Whom It May Concern" and it stated that the "occupant" or "general contractor" may provide notification of defects under the warranty within the two-year period.

FILED DATE: 5/25/2021 4:27 PM   2020L009537

21.     The Northern Glass Warranty did not prohibit assignments.

22.     During and prior to 2018 ARCO/Murray did window work, aluminum envelope / cladding work, roofing and envelope work, and HVAC work at the Property. In connection with that work, ARCO/Murray on October 31, 2018 provided its warranty to Milwaukee Leavitt Owner, LLC covering the following:

> ARCO Murray National Construction, Inc. insures and warrants that all work performed whether it be movable, adjustable or fixed, performed under that certain Standard Form of Agreement (Document A102-2007) dated as of July 22, 2016 (the "Contract") between Seller and ARCO Murray National Construction, Inc., including, but not limited to, all workmanship, materials, machinery, equipment and hardware shall be free of any defects, shrinkages, warpages, defective materials or workmanship; ordinary wear and tear expected, all in accordance with terms and conditions of the Contract. ARCO Murray National Construction Inc. further warrant to repair or replace, at their own expense, such defective materials or workmanship for a period of one (1) year from the Date of Substantial Completion.
>
> .  .  .
>
> The warranty requirements noted above shall be adjusted by the following extensions of warranty obligations for items specifically listed below:
>
> - Heating, ventilation and air conditions [sic] systems:  one (1) year starting 3/1/2018
> - Arco Murray National Construction Inc. shall extend warranty for leaking of building envelope members including roofing, windows, waterproofing and corresponding flashings until October 1, 2020
>
> (Exhibit B).

23.     The ARCO/Murray Warranty further stated:

> Pursuant to that certain Bill of Sale dated as of the date hereof by and between Seller and BUCKTOWN EQUITIES, LLC, a Delaware limited liability company, and SECOND CITY EQUITIES, LLC, a Delaware limited liability company (collectively "Purchaser"), Seller has assigned and Purchaser has assumed all rights in and to

FILED DATE: 5/25/2021 4:27 PM    2020L009537

> this Standard One-Year Warranty and the Building Construction Warranty Job No C207 (the "Assignment"). ARCO Murray National Construction, Inc. hereby acknowledges and approves of the Assignment.
>
> (Exhibit B).

24.    Defendants' work on the Property fell far short of the promises made in their respective Warranties, as to workmanship, installation, materials, machinery, equipment, hardware, and other relevant aspects covered by their respective Warranties.

25.    Defects and problems emerged with respect to: 1) windows (warranted by Northern Glass and ARCO/Murray); 2) aluminum envelope / cladding / roofing and other building envelope (warranted by ARCO/Murray); and HVAC (warranted by ARCO/Murray).

26.    Defendant Milwaukee Leavitt Seller has refused to allow payment out of the escrow to cover ARCO/Murray's failures.

27.    Also as a condition of the purchase of the Property, Plaintiffs and Milwaukee Leavitt Seller entered into the Sale Agreement providing that $400,000 would be held by Chicago Title Escrow Agent. The purpose of the escrow was to hold funds to fix leaks and perform related work involving the Property's building envelope which were not performed by ARCO/Murray. The escrowed funds are to be available to Plaintiffs if ARCO/Murray fails to complete the corrective work at issue. (Exhibit C). The following is the operative language of the Sale Agreement:

> **2. Hold-Back Funds.** Seller shall, at Closing, deposit with the Title Insurer, as escrow agent, the sum of Four Hundred Thousand and 00/100 Dollars ($400,000.00) (the "Hold-Back Funds"), which Hold-Back Funds shall be held by the Title Insurer, for a period of two (2) years after the Closing Date, pursuant to the terms of a written escrow agreement signed by Purchaser, Seller, and Title Insurer at Closing (the "Hold-Back Funds Escrow Agreement"). Notwithstanding any provision in Section 9(b) of the Agreement, the Hold-Back Funds Escrow Agreement shall permit Purchaser to,

FILED DATE: 5/25/2021 4:27 PM   2020L009537

upon written demand, draw funds from the Hold-Back Funds: (i) to fix leaks and perform related repair work involving the Building envelope that are not performed by the General Contractor pursuant to the GC Warranty Extension; and/or, (ii) reimburse Purchaser for up to $50,000 in the aggregate for rent concessions related to any leaks during the two (2) year post-Closing Date period as follows: Purchaser shall be entitled to reimbursement for (i) one hundred percent (100%) of the first $10,000 of any such rent concessions and (ii) fifty percent (50%) of the next $80,000 of any such rent concessions. The provisions of this Section 2 shall be in addition to the rights and remedies available to Purchaser under the Agreement. Further, the provisions of Section 9(c) of the Agreement shall not apply to this Section 2, the Hold-Back Funds and/or the Hold-Back Funds Escrow Agreement.

(Exhibit C).

### Windows: Northern Glass and ARCO/Murray

28.     With respect to windows, Northern Glass and ARCO/Murray improperly installed the glass, mishandling materials including glazing upon installation, creating thermal stress breaks. Owners have discovered a systemic problem whereunder Defendants' improper workmanship and installation resulted in stress concentrating chips on the edge of glazing. These stress concentrating chips are a current defect at the Property, and have resulted in and will result in broken windows over time with ordinary and expected heating and cooling in the Chicago weather environment.

29.     Further with respect to windows, Defendants installed laminate glass throughout the Property (a design element utilized to minimize noise from the adjacent Chicago Transit Authority Blue Line) using improperly thick gaskets. These improperly thick gaskets Defendants installed created inordinate glazing pressure that is currently a defect throughout the Property and manifests itself in cracked and broken windows. These breaches of warranty created a defective condition that currently exists at the Property necessitating expensive repair and replacement.

30.     These defects occurred within the applicable warranty periods set out in Exhibit A (before August 15, 2020) and Exhibit B (before October 1, 2020).

FILED DATE: 5/25/2021 4:27 PM   2020L009537

31.     Owners have made timely and repeated demands upon Defendants under the subject Warranties (Exhibits A and B), including demands upon Northern Glass related to windows on February 12, 2019 and August 10, 2020, and demands upon ARCO/Murray related to windows on August 10, 2020.

32.     Defendants have refused to honor their Warranties as to windows.

33.     Northern Glass has even gone so far as to intentionally mischaracterize the nature of the Northern Glass Warranty, misstating on February 12, 2019 that: "Windows are under warranty of malfunction of parts and discoloration of materials and unfortunately glass breakage is not part of it."

34.     Northern Glass' assertions are in bad faith and fly in the face of the governing Northern Glass Warranty (Exhibit A), violating the obligation of good faith and fair dealing implied in every contract in Illinois.  Northern Glass' misrepresentation was an illegal attempt to "lull" Owners, as victim of Northern Glass' misconduct, into not taking action on the Northern Glass Warranty.

**Aluminum Cladding: ARCO/Murray**

35.     The Property is enveloped in aluminum sheet cladding, as designed and installed by ARCO/Murray.

36.     This aspect of the Property's envelope has leaked and, in many instances, entirely disconnected itself, from the Property over time.  These problems were caused by ARCO/Murray's use of poor and inadequate fastening systems and techniques, and insufficient stiffeners to support the aluminum panels and prevent them from separating and compromising the building envelope.

37.     In some instances, entire panels have flown off – fortunately, to date, this has not resulted in personal injury to any person.

FILED DATE: 5/25/2021 4:27 PM   2020L009537

38.     These defects occurred within the applicable warranty period set out in Exhibit B (before October 1, 2020).

39.     Owners have made timely and repeated demands upon Defendant ARCO/Murray under the ARCO/Murray Warranty (Exhibit B), including a demand related to aluminum envelope / cladding on August 10, 2020.

40.     While ARCO/Murray warranted "building envelope members including roofing, windows, waterproofing and corresponding flashing until October 1, 2020," ARCO/Murray has refused to honor the ARCO/Murray Warranty.

**Roofing and Other Building Envelope**

41.     The Property has a roof and associated envelope members, as designed and installed by ARCO/Murray.

42.     These aspects of the Property's envelope have leaked and failed on the Property over time.  These problems were caused by ARCO/Murray's use of poor materials and techniques, which permitted significant water infiltration at the Property with compromises in the building envelope.  These leaks have caused significant damage to the Property, inconvenience to Plaintiffs' tenants, many of whom are particularly sensitive to intrusions for repairs in the time of COVID-19, and loss of rental income and tenants.

43.     These defects occurred within the applicable warranty period set out in Exhibit B (before October 1, 2020).

44.     Owners have made timely and repeated demands upon Defendant ARCO/Murray under the ARCO/Murray Warranty (Exhibit B), including a demand related to roofing and associated envelope members on June 23, 2020, not to mention continuous and ongoing demands – with no satisfactory conclusion.

11

FILED DATE: 5/25/2021 4:27 PM    2020L009537

45.     While ARCO/Murray warranted "building envelope members including roofing, windows, waterproofing and corresponding flashing until October 1, 2020," ARCO/Murray has refused to honor the ARCO/Murray Warranty.

**HVAC: ARCO/Murray**

46.     The Property has an HVAC system, as designed and installed by ARCO/Murray.

47.     ARCO/Murray designed and installed an HVAC system that was inadequate for the Property and environment at hand.

48.     Among other defects, the HVAC was incapable of providing adequate, even minimum, heat during the well-known cold Chicago winter weather season.  During the first winter season after installation (the winter of 2018-2019), the HVAC system could not maintain heat in the Property even to the minimum temperature required by Chicago municipal ordinance.

49.     These defects occurred within the applicable warranty period set out in Exhibit B (before March 1, 2019).

50.     Owners have made timely and repeated demands upon Defendant ARCO/Murray under the ARCO/Murray Warranty (Exhibit B), including demands upon ARCO/Murray related to HVAC on February 25, 2019 and again on August 10, 2020.

51.     Even though the ARCO/Murray Warranty (Exhibit B) covers "Heating, ventilation and air conditions [sic] systems" for one year starting on March 1, 2018, and even though these defects manifested themselves before the expiration of the ARCO/Murray Warranty, and Owners made a timely demand, ARCO/Murray has failed fully to honor the ARCO/Murray Warranty.

**Demands under Sale Agreement: ARCO/Murray and Leaks / Building Envelope**

52.     Under the Sale Agreement, up to $400,000 in escrowed funds are available and held by Chicago Title Escrow Agent to fix leaks and perform related work regarding the building

12

FILED DATE: 5/25/2021 4:27 PM   2020L009537

envelope which were not performed by ARCO/Murray. The funds are to be disbursed if ARCO/Murray fails to diligently inspect, promptly commence work, and complete all corrective work in a good and workmanlike manner within a reasonable period of time, as provided in the Sale Agreement.

53.     Unfortunately, as outlined at length herein, ARCO/Murray has failed to diligently inspect, promptly commence, and complete corrective work in a good and workmanlike manner within a reasonable period of time.

54.     Plaintiffs made demand upon Milwaukee Leavitt Seller, with appropriate notice as well upon Chicago Title Escrow Agent, on several occasions, including June 23, 2020 and July 30, 2020, to release escrowed funds to address the problems with the roofing and building envelope.

55.     Defendant Milwaukee Leavitt Seller on August 13, 2020 objected to and refused to assent to the release of escrowed funds following demand by Plaintiffs to remedy the problems, and otherwise disputed the numerous grievances concerning leaks raised by Plaintiffs, and indeed ignored the numerous problems.

56.     In short, Milwaukee Leavitt Seller has stonewalled Plaintiffs about the problem, and is doing its best (in bad faith, and thus in derogation of the obligation of good faith and fair dealing present in every contract in the State of Illinois) to "run out the clock" on the escrow, and take back the entirety of its escrowed $400,000 – the "part of the deal" intended to remedy these problems. Milwaukee Leavitt Seller intends to leave Plaintiffs "holding the bag" on the profoundly flawed Property, with no one to turn to except ARCO/Murray and Northern Glass, who created the problem in the first place, and are doing their best to escape responsibility (including, as alleged

FILED DATE: 5/25/2021 4:27 PM  2020L009537

in Paragraph 28 above, Northern Glass' misrepresenting the terms of the Northern Glass Warranty).

57.     Chicago Title Escrow Agent no longer wishes to serve as escrow agent, presumably given the objection by Milwaukee Leavitt Seller and resulting controversy, and resigned on August 6, 2020, stating that it may commence litigation "for the appointment of a successor escrow agent."

## COUNT I – JURY TRIAL DEMANDED

## (Against Northern Glass; Breach of Northern Glass Warranty Contract Regarding Windows)

58.     Plaintiff Owners restate and reallege each of the foregoing paragraphs 1 – 57 as if fully incorporated herein.

59.     On or about September 12, 2018, Northern Glass submitted the Northern Warranty Contract (Exhibit A) to ARCO/Murray providing certain warranties for the window work completed at the Property.

60.     The Northern Glass Warranty was in the form of a letter and it did not list the parties subject to it, nor did it require any counter signatures.

61.     As occupants of the Property, Owners are intended beneficiaries under the Northern Glass Warranty, which was addressed "To Whom it May Concern" and expressly provided that "occupant" may provide notification of defects under the warranty.

62.     Owners are intended beneficiaries of the Northern Glass Warranty also because Northern Glass comprehensively assumed warranty obligations to Owners when it entered into the Subcontract with ARCO/Murray. (Exhibit F, Section 4.5).

63.     Moreover, the Northern Glass Warranty was freely assignable, and on October 31, 2018, ARCO/Murray, then the holder of the Northern Glass Warranty, extended warranties for

FILED DATE: 5/25/2021 4:27 PM  2020L009537

"for leaking of building envelope members including roofing, *windows*, waterproofing and corresponding flashings until October 1, 2020" to Owners by way of the ARCO/Murray Warranty. (Exhibit B).

64.    By way of the warranty extension in the ARCO/Murray Warranty, and Northern Glass' assumption of all warranties given by ARCO/Murray per the terms of their Subcontract, Owners are the intended beneficiaries of the Northern Glass Warranty.

65.    Northern Glass additionally owes warranty obligations to Owners on the basis that Northern Glass "expressly assumed an [undertook]" the warranties ARCO/Murray gave to Owners, as set forth in Exhibit F. Such warranties included glass. (Exhibit B).

66.    Owners have performed all of their obligations under the Northern Glass Warranty, including but not limited to giving timely notice and demand, as set out hereinabove.

67.    Northern Glass promised to "cover all parts and labor required to correct any defects" as to the windows at the Property, under the terms of the Northern Glass Warranty. (Exhibit A).

68.    Northern Glass breached the Northern Glass Warranty and their assumption of warranty under the ARCO/Murray Warranty, and it refuses to make good on it, as set forth at length in the facts pled herein.

69.    As a result of those breaches, Owners have sustained damages in an amount of no less than $100,000.

WHEREFORE, Plaintiffs pray that this Honorable Court enter an order and judgment in their favor and against Defendant Northern Glass as follows:

FILED DATE: 5/25/2021 4:27 PM    2020L009537

a.  An award of monetary damages in an amount according to proof, but not less than $100,000, including compensatory damages, consequential damages, and all other damages permitted by law

b.  Awarding prejudgment and/or post judgment interest, court costs and expenses to the extent permitted by law; and

c.  Awarding any such other and further relief that this Court deems necessary and just.

## <u>COUNT II – JURY TRIAL DEMANDED</u>

**(Against ARCO/Murray; Breach of Warranty Contract Regarding Windows, Aluminum Envelope / Cladding, Roofing and Envelope, and HVAC)**

70.    Plaintiff Owners restate and reallege each of the foregoing paragraphs 1 to 57 as if fully incorporated herein.

71.    On or about October 31, 2018 ARCO/Murray entered into the ARCO/Murray Warranty (Exhibit B) providing certain warranty benefits to Owners.

72.    Owners have performed all of their obligations under the ARCO/Murray Warranty, including but not limited to giving timely notice and demand, as set out hereinabove.

73.    ARCO/Murray promised to "insure[] and warrant[] that all work performed whether it be movable, adjustable or fixed, performed under this contract, including but not limited to, all workmanship, materials, machinery, equipment and hardware shall be free of any defects, shrinkages, warpages, defective materials or workmanship." (Exhibit B).

74.    ARCO/Murray breached the ARCO/Murray Warranty and refuses to make good on it, as set forth at length in the facts pled herein.

75.    As a result of those breaches, Owners have sustained damages in an amount of no less than $100,000.

16

FILED DATE: 5/25/2021 4:27 PM    2020L009537

WHEREFORE, Plaintiffs pray that this Honorable Court enter an order and judgment in their favor and against Defendant ARCO/Murray as follows:

    a.   An award of monetary damages in an amount according to proof but no less than $100,000, including compensatory damages, consequential damages, and all other damages permitted by law;

    b.   Awarding prejudgment and/or post judgment interest, court costs and expenses to the extent permitted by law; and

    c.   Awarding any such other and further relief that this Court deems necessary and just.

## COUNT III –JURY TRIAL DEMANDED

### (Against Milwaukee Leavitt Seller Breach of Sale Agreement)

76.    Plaintiff Owners restate and reallege each of the foregoing paragraphs 1 to 57 as if fully incorporated herein.

77.    On or about August 9, 2018 Milwaukee Leavitt Seller entered into the Sale Agreement providing certain benefits to Owners, providing an independent or collateral undertaking apart from the purpose of the deed transferring ownership of the Property. (Exhibit C).

78.    Owners have performed all of their obligations, including but not limited to giving timely notice and demand, as set out hereinabove.

79.    Milwaukee Leavitt Seller promised to release from escrow funds as required upon the failure of performance of ARCO/Murray concerning building envelope work.

80.    As set out at length above, ARCO/Murray has failed to perform concerning building envelope work, as provided under the Sale Agreement and triggered the obligations of payment thereunder.

FILED DATE: 5/25/2021 4:27 PM    2020L009537

81.    Milwaukee Leavitt Seller breached its contract and refuses to make good on it, as set forth at length in the facts pled herein.

82.    As a result of those breaches, Owners have sustained damages in an amount of no less than $100,000.

WHEREFORE, Plaintiffs pray that this Honorable Court enter an order and judgment in their favor and against Defendant Milwaukee Leavitt Seller as follows:

    a.  An award compelling and directing Defendant Milwaukee Leavitt Seller to authorize the release from escrow an amount of money according to proof, but no less than $100,000;

    b.  In the alternative an award of monetary damages in an amount according to proof but no less than $100,000, including compensatory damages, consequential damages, and all other damages permitted by law;

    c.  Awarding prejudgment and/or post judgment interest, court costs and expenses to the extent permitted by law; and

    d.  Awarding any such other and further relief that this Court deems necessary and just.

## COUNT IV – NO JURY TRIAL

### (Declaratory Judgment Against Milwaukee Leavitt Seller and Chicago Title Escrow Agent)

83.    Plaintiff Owners restate and reallege each of the foregoing paragraphs 1 to 57 as if fully incorporated herein.

84.    On or about August 9, 2018 Milwaukee Leavitt Seller entered into the Sale Agreement providing certain benefits to Owners, providing an independent or collateral undertaking apart from the purpose of the deed transferring ownership of the Property. (Exhibit C).

18

FILED DATE: 5/25/2021 4:27 PM   2020L009537

85.    On or about October 21, 2018 Milwaukee Leavitt Seller entered into the Escrow Agreement providing certain benefits to Owners, providing an independent or collateral undertaking apart from the purpose of the deed transferring ownership of the Property. (Exhibit D). The Escrow Agreement also includes a waiver of the right to a jury trial in paragraph 21. Exhibit D.

86.    Owners have performed all of their obligations, including but not limited to giving timely notice and demand, as set out hereinabove.

87.    Milwaukee Leavitt Seller promised to release from escrow funds as required upon the failure of performance of ARCO/Murray concerning building envelope work.

88.    As set out at length above, ARCO/Murray has failed to perform concerning building envelope work.

89.    Milwaukee Leavitt Seller breached its contract and refuses to make good on it, as set forth at length in the facts pled herein.

90.    With a dispute or controversy between Owners and Milwaukee Leavitt Seller as to the disposition of escrowed funds, Chicago Title Escrow Agent has not acted, but has resigned as escrow agent and stated that it may commence litigation to appoint a new escrow agent. (Exhibit E).

91.    An actual case or controversy exists regarding the Plaintiffs' rights and the obligations of Defendants Milwaukee Leavitt Seller and Chicago Title Escrow Agent under the Sale Agreement and Escrow Agreement, including the issue of disbursement of escrowed funds to reimburse Plaintiffs for the losses and damages incurred by Plaintiffs.

92.    Pursuant to 735 ILCS § 5/2-701, Plaintiffs seek a declaratory judgment from this Court declaring the following: (a) Plaintiff's losses and damages as to the roofing and building

19

FILED DATE: 5/25/2021 4:27 PM   2020L009537

envelope are covered by and should be paid out from the Sale Agreement and Escrow Agreement; (b) Defendant Milwaukee Leavitt Seller has wrongfully refused to authorize and obstructed disbursement for those losses and damages from escrow; (c) Defendant Milwaukee Leavitt Seller is obligated to and shall authorize disbursement for those losses and damages (in an amount according to proof); (d) Defendant Chicago Title Escrow Agent shall deposit the escrowed funds with the Clerk of Court under 735 ILCS § 5/2-1011; and (e) the Clerk of Court shall be ordered to disburse to Plaintiffs funds so deposited in accord with the order of this Court (in an amount according to proof).

WHEREFORE, Plaintiffs pray that this Honorable Court enter an order and judgment in their favor and against Defendants Milwaukee Leavitt Seller and Chicago Title Escrow Agent as follows:

a.  A Declaratory Judgment as set forth in paragraph 92 above;

b.  Awarding prejudgment and/or post judgment interest, court costs and expenses to the extent permitted by law; and

c.  Awarding any such other and further relief that this Court deems necessary and just

Respectfully Submitted,
FUKSA KHORSHID, LLC


/s/ William E. Meyer, Jr.
William E. Meyer, Jr.
*Attorney for Plaintiffs*

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues so triable as to Counts I, II and III.


/s/ William E. Meyer, Jr.
William E. Meyer, Jr.

20

FILED DATE: 5/25/2021 4:27 PM   2020L009537

FUKSA KHORSHID, LLC (45088)
William E. Meyer, Jr.
Lema A. Khorshid
Monika J. Malek
200 W. Superior, Suite 410
Chicago, IL 60654
T: 312.266.2221
F: 312.266.2224
william@fklawfirm.com
lema@fklawfirm.com
monika@fklawfirm.com

# EXHIBIT D

| 2120 - Served | 2121 - Served | 2620 - Sec. of State |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| Summons - Alias Summons | | (12/01/20) CCG 0001 A |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

ZERO COUPON, LLC, et al.,

Plaintiff(s)

v.

NORTHERN GLASS, INC., et al.

Case No. _2020L09537_

Defendant(s)

Kremer & Davis, Inc.

Address of Defendant(s)

PLEASE SERVE:

Kremer & Davis, Inc.
R/A: William Roehrick
19720 Waterford Place
Shorewood, MN 55331

Please serve as follows (check one):    Certified Mail    Sheriff Service    • Alias

## SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE.** You will need: a computer with internet access; an email address; a completed Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**

cookcountyclerkofcourt.org

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info:    (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info:    (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info:    (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info:    (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info:    (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info:    (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info:    (708) 232-4551

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**



FILED
1/29/2021 9:39 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2020L009537
12023481

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| ZERO COUPON LLC, a Delaware Limited, Liability Company; SECOND CITY EQUITIES LLC, a Delaware Limited Liability Company; and BUCKTOWN EQUITIES LLC, a Delaware Limited Liability Company, | ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| NORTHERN GLASS, INC., an Illinois Corporation; ARCO/MURRAY NATIONAL CONSTRUCTION COMPANY, INC., a Delaware Corporation; MILWAUKEE LEAVITT OWNER LLC, an Illinois Limited Liability Company; and CHICAGO TITLE INSURANCE COMPANY, a Florida Corporation. | ) ) ) ) ) ) ) ) |
| Defendants. | ) |
| ARCO/MURRAY NATIONAL CONSTRUCTION COMPANY, INC., a Delaware Corporation, | ) ) ) |
| Cross-Plaintiff/Third-Party Plaintiff | ) ) |
| v. | ) ) ) |
| NORTHERN GLASS, INC., an Illinois Corporation; KREMER & DAVIS, INC. WEISBROOK SHEET METAL, INC. AT MECHANICAL, LLC | ) ) ) ) ) |
| Cross-Defendant/Third-Party Defendants. | ) |

No. 2020 L 009537

**ARCO/Murray's CROSS-CLAIM AND THIRD-PARTY COMPLAINT**
**AGAINST CROSS-DEFENDANT AND THIRD-PARTY DEFENDANTS**

Defendant/Cross-Plaintiff/Third-Party Plaintiff, ARCO/Murray National Construction Company, Inc. ("ARCO/Murray"), by its attorneys, Ice Miller LLP, as and for its Cross-Claim against Defendant/Cross-Defendant, Northern Glass, Inc., ("Northern"), and ARCO/Murray's Third-Party Complaint against Third-Party Defendants, Kremer & Davis ("Kremer"), Wiesbrook Sheet Metal, Inc. ("Wiesbrook), and AT Mechanical, LLC ("AT Mechanical"), states as follows:

FILED DATE: 1/29/2021 9:39 AM    2020L009537

FILED DATE: 1/29/2021 9:39 AM    2020L008537

## THE PARTIES

1.      ARCO/Murray is a Delaware corporation, which is registered to do business in Illinois. ARCO/Murray is in the business of construction contracting. ARCO/Murray maintains an office at 3110 Woodcreek Dr., Downers Grove, Illinois.

2.      Upon information and belief, Northern is an Illinois corporation, with an office located at 1400 E. Higgins Ave., Elk Grove Village, Illinois. Northern is in the business of curtain wall, storefront and interior glazing contracting.

3.      Upon information and belief, Kremer is a Minnesota corporation, which is registered to do business in Illinois. Kremer is in the business of contracting for below-grade waterproofing and above-grade damp proofing air and vapor barriers.

4.      Upon information and belief, Wiesbrook is an Illinois corporation, with an office located at 910 Sumter Court, Naperville, Illinois. Wiesbrook is in the business of commercial sheet metal contracting.

5.      Upon information and belief, AT Mechanical is an Illinois limited liability company, with an office located at 2000 N. Hawthorne, Melrose Park, Illinois. AT Mechanical is in the business of contracting for heating, ventilation and air conditioning and mechanical services.

## FACTS

6.      On July 22, 2016, ARCO/Murray entered into a written agreement to construct a mixed-use building located at 1743 N. Leavitt St., Chicago, Illinois 60647 ("Project"), with Milwaukee Leavitt Owner, LLC, the owner of the Project. A true and correct copy of the written agreement for construction of the Project ("Construction Contract") is attached as **Exhibit A**.

7.      In order to perform some of its work under the Construction Contract, ARCO/Murray entered into written subcontracts with trade contractors in certain specialties, including:

2

FILED DATE: 1/29/2021 9:39 AM   2020L009537

    a.    Kremer in June 2016 (a true and correct copy of the Kremer Subcontract is attached as **Exhibit B**);

    b.    Northern in July 2016 (a true and correct copy of the Northern Subcontract is attached as **Exhibit C**);

    c.    Wiesbrook in February 2017 (a true and correct copy of the Wiesbrook Subcontract is attached as **Exhibit D**); and

    d.    AT Mechanical in July 2016 (a true and correct copy of the AT Mechanical Subcontract is attached as **Exhibit E**).

8.    Pursuant to each of the Cross-Defendant's and Third-Party Defendants' subcontracts, each of Kremer, Northern, Wiesbrook and AT Mechanical agreed to indemnify, defend and hold ARCO/Murray harmless from claims arising out of performance of their respective work, breach of their respective subcontracts and for property damage or destruction. (See Ex.(s) B, C, D, & E at Sec. 4.9).

9.    Pursuant to each of the Cross-Defendant's and Third-Party Defendants' subcontracts, each of Kremer, Northern, Wiesbrook and AT Mechanical agreed to procure insurance, including but not limited to general liability and other insurance naming ARCO/Murray, the Owner and others as an additional insureds on a primary and non-contributory basis for current, ongoing, and completed operations for three years after final completion of the project. (See Ex.(s) B, C, D, & E at Sec. 1.2 and Ex. B).

10.    On September 4, 2020, Plaintiffs, Zero Coupon LLC, Second City Equities LLC, and Bucktown Equities LLC (collectively "Plaintiffs"), filed this action against ARCO/Murray and Northern. Plaintiffs amended their complaint on September 30, 2020, adding the Project's Owner and Chicago Title as holder of an escrow. (See Plaintiffs' Amended Complaint, attached as **Exhibit F**).

11.    Plaintiffs claim to be successors in interest to or assignees of the Project Owner and allege certain defects and deficiencies in the Project's construction.

FILED DATE: 1/29/2021 9:39 AM    2020L009537

12.    ARCO/Murray has denied the material allegations of the Amended Complaint and denies any liability to the Plaintiffs.

13.    Plaintiffs' allegations, however, assert defects and deficiencies in construction arising out of the work performed by each of Northern, Kremer, Wiesbrook and AT Mechanical pursuant to their respective subcontracts.

14.    Pursuant to the subcontracts for each, ARCO/Murray tendered this action for defense and indemnification in writing to each of Northern, Kremer, Wiesbrook and AT Mechanical.  True and correct copies of ARCO/Murray's tenders of defense are attached together as **Exhibit G**).

15.    To date, none of Northern, Kremer, Wiesbrook or AT Mechanical has accepted ARCO/Murray's tender of defense or agreed to defend and indemnify ARCO/Murray, all in breach of their respective subcontracts.

## CROSS-CLAIM

## COUNT I

## BREACH OF SUBCONTRACT IN THE ALTERNATIVE

### (Northern)

16.    ARCO/Murray re-alleges and incorporates by reference as if set forth fully herein the allegations contained in Paragraph Nos. 1 through 15 as and for the allegations of this Paragraph No. 16 of Count I.

17.    As an alternative pleading, without admitting liability to the Plaintiffs, if ARCO/Murray is found liable to the Plaintiffs in any amount whatsoever, which liability ARCO/Murray continues to deny, such liability will have been caused in whole or in part by the acts, errors or omissions or breach of contract of Northern, and ARCO/Murray will be entitled to a judgment against Northern in like amount for breach of the Northern subcontract.

4

18.     ARCO/Murray has performed, or is excused from performing, all of its obligations under the subcontract between ARCO/Murray and Northern.

WHEREFORE, in the event that judgment is entered against ARCO/Murray, ARCO/Murray prays for judgment in its favor and against Northern, plus costs and for any further relief this Court deems just and proper.

## COUNT II – BREACH OF SUBCONTRACT
## FOR FAILURE TO PROCURE INSURANCE

### (Northern)

19.     ARCO/Murray incorporates by reference and re-alleges the allegations contained in Paragraphs Nos. 1 through 15, 17 and 18 as and for the allegations of this Paragraph No. 19 of Count II.

20.     On information and belief, Northern has failed to procure the insurance required under the subcontract, including but not limited to the obligation to cause its insurance policies to name ARCO/Murray as an additional insured on a primary and non-contributory basis.

21.     Northern's failure to procure insurance and to defend and indemnify ARCO/Murray is a breach of the Northern subcontract.

22.     As a direct and proximate result of Northern's breach of contract, ARCO/Murray has suffered and will suffer damages in the form of its costs of defense and potential liability to the Plaintiffs.

23.     As an alternative pleading, without admitting liability to the Plaintiffs, if ARCO/Murray is found liable to the Plaintiffs in any amount whatsoever, which liability ARCO/Murray continues to deny, such liability will have been caused in whole or in part by the acts, errors or omissions or breach of contract of Northern, and ARCO/Murray will be entitled to a judgment against Northern in like amount for breach of the Northern subcontract.

WHEREFORE, Defendant/Cross-Plaintiff, ARCO/Murray prays for judgment against Cross-Defendant, Northern, for breach of contract in an amount to be proven at trial, and for further relief this Court deems just and proper.

### THIRD-PARTY COMPLAINT

### COUNT III

### BREACH OF SUBCONTRACT IN THE ALTERNATIVE

#### (Kremer)

24.   ARCO/Murray re-alleges and incorporates by reference as if set forth fully herein, the allegations contained in Paragraphs Nos. 1 through 15 as and for the allegations of this Paragraph No. 24 of Count III.

25.   As an alternative pleading, without admitting liability to the Plaintiffs, if ARCO/Murray is found liable to the Plaintiffs in any amount whatsoever, which liability ARCO/Murray continues to deny, such liability will have been caused in whole or in part by the acts, errors and/or omissions of Kremer, and ARCO/Murray will be entitled to a judgment against Kremer in like amount for breach of the Kremer subcontract.

26.   ARCO/Murray has performed or is excused from performing all of its obligations under the ARCO/Murray and Kremer subcontract.

WHEREFORE, in the event that judgment is entered against ARCO/Murray, ARCO/Murray prays for judgment in its favor and against Kremer, plus costs and for any further relief this Court deems just and proper.

### COUNT IV

### BREACH OF SUBCONTRACT
### FOR FAILURE TO PROCURE INSURANCE

#### (Kremer)

27.   ARCO/Murray incorporates by reference and re-alleges the allegations contained

6

FILED DATE: 1/29/2021 9:39 AM   2020L008637

FILED DATE: 1/29/2021 9:39 AM 2020L009537

in Paragraphs Nos. 1 through 15, 25 and 26 as and for the allegations of this Paragraph No. 27 of Count IV.

28.    On information and belief, Kremer has failed to procure the insurance required under the subcontract, including but not limited to the obligation to cause its insurance policies to name ARCO/Murray as an additional insured on a primary and non-contributory basis.

29.    Kremer's failure to procure insurance and to defend and indemnify ARCO/Murray is a breach of the Kremer subcontract.

30.    As a direct and proximate result of Kremer's breach of contract, ARCO/Murray has suffered and will suffer damages in the form of its costs of defense and potential liability to the Plaintiffs.

31.    As an alternative pleading, without admitting liability to the Plaintiffs, if ARCO/Murray is found liable to the Plaintiffs in any amount whatsoever, which liability ARCO/Murray continues to deny, such liability will have been caused in whole or in part by the acts, errors or omissions or breach of contract of Kremer, and ARCO/Murray will be entitled to a judgment against Kremer in like amount for breach of the Kremer subcontract.

WHEREFORE, Defendant/Cross-Plaintiff, ARCO/Murray prays for judgment against Third Party Defendant, Kremer, for breach of contract in an amount to be proven at trial, and for further relief this Court deems just and proper.

## COUNT V

## BREACH OF SUBCONTRACT IN THE ALTERNATIVE

### (Wiesbrook)

32.    ARCO/Murray re-alleges and incorporates by reference as if set forth fully herein, the allegations contained in Paragraphs Nos. 1 through 15 as and for the allegations of this Paragraph No. 32 of Count V.

7

FILED DATE: 1/29/2021 9:39 AM    2020L009537

33.     As an alternative pleading, without admitting liability to the Plaintiffs, if ARCO/Murray is found liable to the Plaintiffs in any amount whatsoever, which liability ARCO/Murray continues to deny, such liability will have been caused in whole or in part by the acts, errors or omissions or breach of contract of Wiesbrook, and ARCO/Murray will be entitled to a judgment against Wiesbrook in like amount for breach of the Wiesbrook subcontract.

34.     ARCO/Murray has performed, or is excused from performing, all of its obligations under the subcontract between ARCO/Murray and Wiesbrook.

WHEREFORE, in the event that judgment is entered against ARCO/Murray, ARCO/Murray prays for judgment in its favor and against Third Party Defendant, Wiesbrook, plus costs and for any further relief this Court deems just and proper.

### COUNT VI

### BREACH OF SUBCONTRACT
### FOR FAILURE TO PROCURE INSURANCE

**(Wiesbrook)**

35.     ARCO/Murray incorporates by reference and re-alleges the allegations contained in Paragraphs Nos. 1 through 15, 33 and 34 as and for the allegations of this Paragraph No. 35 of Count VI.

36.     On information and belief, Wiesbrook has failed to procure the insurance required under the subcontract, including but not limited to the obligation to cause its insurance policies to name ARCO/Murray and an additional insured on a primary and non-contributory basis.

37.     Wiesbrook's failure to procure insurance and to defend and indemnify ARCO/Murray is a breach of the Wiesbrook subcontract.

38.     As a direct and proximate result of Wiesbrook breach of contract, ARCO/Murray has suffered and will suffer damages in the form of its costs of defense and potential liability to the Plaintiffs.

39.     As an alternative pleading, without admitting liability to the Plaintiffs, if ARCO/Murray is found liable to the Plaintiffs in any amount whatsoever, which liability ARCO/Murray continues to deny, such liability will have been caused in whole or in part by the acts, errors or omissions or breach of contract of Wiesbrook, and ARCO/Murray will be entitled to a judgment against Wiesbrook in like amount for breach of the Wiesbrook subcontract.

WHEREFORE, Defendant/Cross-Plaintiff, ARCO/Murray prays for judgment against Third Party Defendant, Wiesbrook, for breach of contract in an amount to be proven at trial, and for further relief this Court deems just and proper.

## COUNT VII

## BREACH OF SUBCONTRACT IN THE ALTERNATIVE

### (AT Mechanical)

40.     ARCO/Murray re-alleges and incorporates by reference as if set forth fully herein, the allegations contained in Paragraphs Nos. 1 through 15 as and for the allegations of this Paragraph No. 40 of Count V.

41.     As an alternative pleading, without admitting liability to the Plaintiffs, if ARCO/Murray is found liable to the Plaintiffs in any amount whatsoever, which liability ARCO/Murray continues to deny, such liability will have been caused in whole or in part by the acts, errors or omissions or breach of contract of AT Mechanical, and ARCO/Murray will be entitled to a judgment against AT Mechanical in like amount for breach of the AT Mechanical subcontract.

42.     ARCO/Murray has performed, or is excused from performing, all of its obligations under the subcontract between ARCO/Murray and AT Mechanical.

FILED DATE: 1/29/2021 9:39 AM    2020L009537

WHEREFORE, in the event that judgment is entered against ARCO/Murray, ARCO/Murray prays for judgment in its favor and against Third Party Defendant, AT Mechanical, plus costs and for any further relief this Court deems just and proper.

## COUNT VIII

### BREACH OF SUBCONTRACT
### FOR FAILURE TO PROCURE INSURANCE

**(AT Mechanical)**

43.    ARCO/Murray incorporates by reference and re-alleges the allegations contained in Paragraphs Nos. 1 through 15, 41 and 42 as and for the allegations of this Paragraph No. 43 of Count VIII.

44.    On information and belief, AT Mechanical has failed to procure the insurance required under the subcontract, including but not limited to the obligation to cause its insurance policies to name ARCO/Murray as an additional insured on a primary and non-contributory basis.

45.    AT Mechanical's failure to procure insurance and to defend and indemnify ARCO/Murray is a breach of the AT Mechanical subcontract.

46.    As a direct and proximate result of AT Mechanical breach of contract, ARCO/Murray has suffered and will suffer damages in the form of its costs of defense and potential liability to the Plaintiffs.

47.    As an alternative pleading, without admitting liability to the Plaintiffs, if ARCO/Murray is found liable to the Plaintiffs in any amount whatsoever, which liability ARCO/Murray continues to deny, such liability will have been caused in whole or in part by the acts, errors or omissions or breach of contract of AT Mechanical, and ARCO/Murray will be entitled to a judgment against AT Mechanical in like amount for breach of the AT Mechanical subcontract.

WHEREFORE, Defendant/Cross-Plaintiff, ARCO/Murray prays for judgment against

10

FILED DATE: 1/29/2021 9:39 AM   2020L009537

Third Party Defendant, AT Mechanical, for breach of contract in an amount to be proven at trial, and for further relief this Court deems just and proper.

DATED: January 29, 2021                           Respectfully submitted,

                                                  **ARCO/MURRAY NATIONAL
                                                  CONSTRUCTION COMPANY, INC.**

                                                  By:  /s/ Eric L. Singer_____
                                                          One of Its Attorneys

Eric L. Singer
Calvin A. Townsend II
**ICE MILLER LLP/39512**
200 W. Madison St., Suite 3500
Chicago, Illinois 60606
(630) 955-5826
eric.singer@icemiller.com
calvin.townsend@icemiller.com

11

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that on January 29, 2021, he caused a copy of the foregoing to be served on all counsel of record via electronic mail.

| | |
|---|---|
| William E. Meyer, Jr.<br>Lema Khorshid<br>Vincent P. Formica<br>**FUKSA KHORSHID, LLC (45088)**<br>200 W. Superior, Suite 410<br>Chicago, IL 60654<br>william.@fklawfirm.com<br>lema@fklawfirm.com<br>vince@fklawfirm.com | Julia Emfinger<br>Michael J. Baum<br>Greenberg Traurig, LLP<br>77 West Wacker Drive, Suite 3100<br>Chicago, IL 60601<br>emfingerj@gtlaw.com<br>BaumM@gtlaw.com |
| *Counsel for Plaintiffs* | *Counsel for Defendant* |

Ryan Hiss
Laurie & Brennan, LLP
Two North Riverside Plaza
Suite 1750
Chicago, IL 60606
rhiss@lauriebrennan.com

*Counsel for Defendant, Northern Glass*

C\1610670.3

EXHIBIT E



**MIDWEST FAMILY GROUP**
MIDWEST FAMILY MUTUAL INSURANCE COMPANY
MIDWEST FAMILY ADVANTAGE INSURANCE COMPANY
Telephone • 763-951-7000
Fax • 763-951-7092
4401 Westown Parkway Suite 305, West Des Moines, IA 50266
Mailing Address:
P.O. Box 9425 • Minneapolis, MN 55440-9425
www.midwestfamily.com

April 12, 2021

**VIA U.S. MAIL**
Kremer & Davis, Inc.
9385 Holly St. NW
Coon Rapids, MN 55433

RE:     Reservation of Rights
        Claimant:    Zero Coupon LLC, Second City Equities LLC and Bucktown
                     Equities LLC
        Insured:     Kremer & Davis, Inc.
        Claim No.:   00388764
        Date of Loss:  September 1, 2018

## RESERVATION OF RIGHTS

To Whom It May Concern:

This letter is to inform you that Midwest Family Mutual Insurance Company ("Midwest Family") is providing Kremer & Davis, Inc. ("Kremer") a defense to the Third-Party Complaint asserted against you by ARCO/Murray National Construction Company, Inc. ("ARCO/Murray") subject to a complete reservation of rights. In the event facts are discovered that preclude coverage, Midwest Family reserves the right to contest coverage and assert any and all defenses.

## FACTUAL BACKGROUND

**I.      Underlying Action.**

Kremer was a subcontractor of ARCO/Murray on the Centrum 606 project, which involved the construction of a mixed-use property located at 1743 N. Leavitt St., Chicago, IL 60647 (hereinafter, the "Project").

The Owner's initiated a lawsuit against ARCO/Murray alleging breach of contract, breach of warranty, and for a declaratory judgment relating to work performed. Defects and problems emerged with respect to: (1) windows (warranted by Northern Glass and ARCO/Murray); (2) aluminum envelope/cladding/roofing and other building envelope (warranted by ARCO/Murray); and (3) HVAC (warranted by ARCO/Murray).

ARCO/Murray served Kremer with a Third-Party Complaint alleging breach of its subcontract and a failure to procure insurance. ARCO/Murray further asserts that the Owner's allegations against it arise out of Kremer's work under the Subcontract and trigger Kremer's duty to defend ARCO/Murray, through its insurance carrier or otherwise.

**II.     Relevant Portions of Kremer's Subcontract with ARCO/Murray.**

Pursuant to the Subcontract, ARCO/Murray was required to be named as an additional insured on Kremer's insurance policies. The Subcontract between Kremer and ARCO/Murray provides in pertinent part, as follows:

4.9 Indemnity:

Subcontractor hereby agrees to indemnify, defend and hold Contractor [. . .] harmless from and against any and all demands, claims, suits and causes of action, liability, costs, incidental and consequential damages, expenses, settlements, and judgments, including without limitation court costs and attorney's fees [. . .] in connection with or arising out of: (i) the performance by Subcontractor or any of its employees, subcontractors, suppliers or anyone else for whom Subcontractor is responsible [. . .]; (ii) any breach by Subcontractor of this Agreement [. . .].

Exhibit B, Insurance Requirements:

\* \* \* \*

Additional Insureds: Subcontractor shall endorse Commercial General Liability [. . .] and Umbrella Excess Liability policies to name the following as additional insureds:

• Contractor: (ARCO/Murray National Construction Company, Inc.).

The above-listed entities should be added on a primary and non-contributory basis for current, ongoing, and completed operations for three (3) years after Final Completion of the Project.

\* \* \* \*

Exhibit E, Scope of Work

[Kremer] shall provide all labor, materials, equipment, supervision as required to complete all scope-of-work items of this Waterproofing Subcontract and related work, in accordance with the Drawings, Specifications and the Contract Documents ("Work").

\* \* \* \*

Definition of Work:
[Kremer] is to provide all labor, material, equipment, freight, supervision, taxes, etc. required to complete the below work:

A.      Basement Walls Waterproofing

\* \* \* \*

B.      Building Façade

\* \* \* \*

C.      Storm Water Detention Vault

\* \* \* \*

D.    Elevator Pits

* * * *

E.    First Level Nook

* * * *

F.    Pedestrian Traffic Coating

* * * *

**III.    Midwest Family's Policy.**

**A.    *Definitions and Applicability*.**

Midwest Family issued an insurance policy to Kremer, which is identified by policy number ▮▮▮▮▮▮1070 (herein, the "Policy") with a policy period running from September 1, 2018 to September 1, 2019. The Policy uses several definitions throughout. "You" or "your" refer to the named insured shown in the Declarations, which in this case is "Kremer & Davis, Inc." The words "we", "us", and "our" refer to Midwest Family.

Section II of the Policy provides Business Liability coverage and provides that this insurance applies to "bodily injury" and "property damage" only if the "bodily injury" or "property damage" is caused by an occurrence, takes place within the "coverage territory," and occurs during the policy period.[1] "Property damage" means:

a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

An "occurrence" is defined to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Your work" is defined as follows:

22.    "Your work":

a.    Means:

(1)    Work or operations performed by you or on your behalf; and

(2)    Materials, parts or equipment furnished in connection with such work or operations.

b.    Includes:

(1)    Warranties or representation made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

---

[1]    "Coverage territory" means the United States.

> **(2)**     The providing of or failure to provide warnings or instructions.

The Policy also contains several exclusions to which the insurance does not apply:

### SECTION II – LIABILITY

* * * *

**B.**     **Exclusions**

   **1.**     **Applicable To Business Liability Coverage**
      This insurance does not apply to:

* * * *

   **b.**     **Contractual Liability**
"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
   **(1)**     That the insured would have in the absence of the contract or agreement; or
   **(2)**     Assumed in a contract or agreement that is an "insured contract",   provided the "bodily injury" or "property damage" occurs     subsequent to the execution of the contract or agreement. Solely for     the purposes of liability assumed in an "insured contract",   reasonable attorney fees and necessary litigation expenses incurred     by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:
      **(a)**     Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract", and
      **(b)**     Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

* * * *

   **m.**     **Damage To Your Work**
"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

## DISCUSSION AND RESERVATION OF RIGHTS

Midwest Family will provide a defense to Kremer for the claims alleged against it subject to a full and complete reservation of rights. Although Midwest Family has decided to defend Kremer under this full and complete reservation of rights, Midwest Family does not intend to waive any other defenses to coverage that may be available based on the provisions of the Policy or applicable law. Additionally, Midwest Family does not intend to waive any of its rights under the Policy, including the right to restate our coverage opinion should new or additional information be brought to light. Midwest Family expressly reserves all of its rights and defenses, and nothing contained in this letter is intended to waive or otherwise limit any of those rights and defenses.

Very truly yours,

Jon Ness, AIC
Casualty Adjuster
Midwest Family Mutual Insurance
(800) 225-5636, ext. 7040

CC: AssuredPartners of MN

EXHIBIT F



**MIDWEST FAMILY GROUP**
**MIDWEST FAMILY MUTUAL INSURANCE COMPANY**
**MIDWEST FAMILY ADVANTAGE INSURANCE COMPANY**
Telephone • 763-951-7000
Fax • 763-951-7092
4401 Westown Parkway Suite 305, West Des Moines, IA 50266
Mailing Address:
P.O. Box 9425 • Minneapolis, MN 55440-9425
www.midwestfamily.com

May 27, 2021

Kremer & Davis, Inc.
9385 Holly St. NW
Coon Rapids, MN 55433

RE:      Reservation of Rights
      Claimant:           Zero Coupon LLC, Second City Equities LLC and Bucktown
                               Equities LLC
      Named Insured:    Kremer & Davis, Inc.
      Claim No.:         00388764
      Date of Loss:     September 1, 2018

## RESERVATION OF RIGHTS

To Whom It May Concern:

I write to update Midwest Family Mutual Insurance Company's ("MFM") coverage position related to the tender for coverage submitted by Kremer & Davis, Inc. ("Kremer"). On April 12, 2021, MFM agreed to defend Kremer subject to a complete reservation of rights. This letter updates and clarifies MFM's reservation of rights.

## FACTUAL BACKGROUND

**I.      Underlying Action.**

Kremer was a subcontractor of ARCO/Murray National Construction Company, Inc. ("ARCO/Murray") on the Centrum 606 project, which involved the construction of a mixed-use property located at 1743 N. Leavitt St., Chicago, IL 60647 (hereinafter, the "Project").

The Owner's initiated a lawsuit against ARCO/Murray alleging breach of contract, breach of warranty, and for a declaratory judgment relating to work performed. Defects and problems emerged with respect to: (1) windows (warranted by Northern Glass and ARCO/Murray); (2) aluminum envelope/cladding/roofing and other building envelope (warranted by ARCO/Murray); and (3) HVAC (warranted by ARCO/Murray).

ARCO/Murray served Kremer with a Third-Party Complaint alleging breach of its subcontract and a failure to procure insurance. Essentially, ARCO/Murray asserts that the Owner's allegations against it arise out of Kremer's work under the Subcontract and trigger Kremer's duty to defend ARCO/Murray, through its insurance carrier or otherwise.

Collectively, the Owner's lawsuit and ARCO/Murray's third party complaint are referred to as the "Underlying Action."

II.    **Relevant Portions of Kremer's Subcontract with ARCO/Murray.**

Pursuant to the Subcontract, ARCO/Murray was required to be named as an additional insured on Kremer's insurance policies. The Subcontract between Kremer and ARCO/Murray provides in pertinent part, as follows:

4.9 <u>Indemnity</u>:

Subcontractor hereby agrees to indemnify, defend and hold Contractor [. . .] harmless from and against any and all demands, claims, suits and causes of action, liability, costs, incidental and consequential damages, expenses, settlements, and judgments, including without limitation court costs and attorney's fees [. . .] in connection with or arising out of: (i) the performance by Subcontractor or any of its employees, subcontractors, suppliers or anyone else for whom Subcontractor is responsible [. . .]; (ii) any breach by Subcontractor of this Agreement [. . .].

<u>Exhibit B, Insurance Requirements</u>:

* * *

<u>Additional Insureds</u>: Subcontractor shall endorse Commercial General Liability [. . .] and Umbrella Excess Liability policies to name the following as additional insureds:

• Contractor: (ARCO/Murray National Construction Company, Inc.).

The above-listed entities should be added on a primary and non-contributory basis for current, ongoing, and completed operations for three (3) years after Final Completion of the Project.

* * *

<u>Exhibit E, Scope of Work</u>:

[Kremer] shall provide all labor, materials, equipment, supervision as required to complete all scope-of-work items of this Waterproofing Subcontract and related work, in accordance with the Drawings, Specifications and the Contract Documents ("Work").

* * *

<u>Definition of Work</u>:

[Kremer] is to provide all labor, material, equipment, freight, supervision, taxes, etc. required to complete the below work:

A.    Basement Walls Waterproofing

B.    Building Façade

C.    Storm Water Detention Vault

D.    Elevator Pits

    E.     First Level Nook

    F.     Pedestrian Traffic Coating

## III.   MFM's Policy.

### A.   Definitions and Applicability.

MFM issued an insurance policy to Kremer, which is identified by policy number
████████1070 (herein, the "Policy") with a policy period running from September 1, 2018 to
September 1, 2019. The Policy uses several definitions throughout. "You" or "your" refer to the
named insured shown in the Declarations, which in this case is "Kremer & Davis, Inc." The words
"we", "us", and "our" refer to MFM. Section II of the Policy provides Business Liability
coverage and provides that this insurance applies to "bodily injury" and "property damage" only if
the "bodily injury" or "property damage" is caused by an occurrence, takes place within the
"coverage territory," and occurs during the policy period.

"Property damage" means:

    a.    Physical injury to tangible property, including all resulting loss of use of that property.
          All such loss of use shall be deemed to occur at the time of the physical injury that
          caused it; or
    b.    Loss of use of tangible property that is not physically injured. All such loss of use
          shall be deemed to occur at the time of the "occurrence" that caused it.

An "occurrence" is defined to mean "an accident, including continuous or repeated exposure to
substantially the same general harmful conditions."

"Your work":
    a. Means:
        (1) Work or operations performed by you or on your behalf; and
        (2) Materials, parts or equipment furnished in connection with such work or operations.

    b. Includes:
        (1) Warranties or representations made at any time with respect to the fitness, quality,
        durability, performance or use of "your work"; and
        (2) The providing of or failure to provide warnings or instructions.

### B.   The Policy's Endorsements.

The Policy contains an endorsement named the "Blanket Additional Insured—Primary and Non-
Contributory." The endorsement modifies the insurance provided under the Businessowners
Coverage Form by adding the following to the definition of "Who Is An Insured":

    A.    Section C "Who Is An Insured" is amended as follows:

    3.    Insured is amended to include as an insured any person or organization who you are
required to add as an additional insured on this policy under a written contract or a written
agreement, but only with respect to liability for bodily injury, property damage or personal
and advertising injury causes in whole or in part by:
        1.    Your acts or omissions; or
        2.    The acts or omissions of those acting on your behalf; and resulting from;

      a.    Your ongoing operations performed for the additional insured;

      b.    Your work completed as included in the products completed operations hazard performed for the additional insured.

B.   However, regarding of provisions A above:

    1.   We will not extend insurance coverage to any additional insured or organization

      a.    That is not provided to you in this policy; or

      b.    That is any broader coverage than you are required to provide to the additional insured person or organization in the written contract or written agreement.

    2.   We will not provide Limits of Insurance to any additional insured or organization that exceed the lower of:

      a.    The Limits of Insurance provided to you in this policy; or

      b.    The Limits of Insurance you are required to provide in the written contract or written agreement.

C.   The insurance provided to the additional insured person or organization   does not apply: Bodily injury, property damage, or personal and advertising injury arising out of our rendering of, or the failure to render, any   professional architectural, engineering or surveying services including:

    1.   The preparing, approving or failing to prepare or approve maps, show drawings, opinions, reports, surveys, filed orders, change orders or drawings and specifications; and

    2.   Supervisory inspection, architectural or engineering activities

D.   For the coverage provided by this endorsement:

    1.   The insurance is primary insurance as respects our coverage for the additional insured person or organization where the written contract or written agreement requires this insurance by primary and non- contributory. In that event, we will not seek contribution from any other insurance policy available to the additional insured on which the additional insured person or organization is a Named Insured.

    2.   This insurance is excess over any other insurance, whether primary, excess, contingent or an any other basis, available to an additional insured, in which the additional insured on our policy is also covered as an additional insured by attachment of an endorsement to another policy providing coverage for the same occurred, claim or suit. This provision does not apply to any policy which the additional insured is a Named Insured on such other policy and where our policy is required by written contract or written agreement to provide coverage to the additional insured on a primary and non-contributory basis.

The "Work Performed Exclusion" Endorsement adds the following exclusion to the Businessowners Coverage Form:

    SECTION II- LIABILITY- B. Exclusions- 1.m. is deleted and replaced with the following:

    m. Damage To Your Work

    We do not pay for "property damage" to "your work" arising out of it or any part of it and included in the "property-completed operations hazard".  This exclusion applies if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**C.    Policy Exclusions**

In addition to the Work Performed Exclusion set forth in the Endorsement, the Policy also contains the following potentially applicable exclusions:

B.  Exclusions
    1.  Applicable to Business Liability Coverage
    This insurance does not apply to:

       b. Contractual liability

       "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
          (1) That the insured would have in the absence of the contract or agreement; or
          (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:
             (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and
             (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

       k. Damage To Property
       "Property damage" to:
          (5) That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on
          your behalf is performing operations, if the "property damage" arises out of those operations; or
          (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

**D.    Other Insurance Clause**

The Policy contains the following "Other Insurance" Clause:
H.  Other Insurance
    1. If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance of Section 1- Property.
    2. Business Liability Coverage is excess over:
       a. Any other insurance that insures for direct physical loss or damage; or
       b. Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

3. When this insurance is excess, we will have no duty under Business Liability Coverage to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

Where H.1 is then replaced by the following per the Illinois Changes Endorsement:

2. Paragraph H.1. Other Insurance is replaced by the following:
H. Other Insurance
1. You may have other insurance subject to the same plan, terms, conditions, and provisions as the insurance under this Coverage Form. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Form bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance of Section 1- Property.

**E.    Defense Costs Reimbursement**

The Policy has the following Endorsement, titled, "Illinois Changes – Defense Costs," which states the following:
The following is added to Section II - Liability Paragraph A. Coverages:

If we initially defend an insured or pay for an insured's defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement for the defense costs under this provision will only apply to defense costs we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense costs.

## DISCUSSION AND RESERVATION OF RIGHTS

MFM agrees to defend Kremer in the Underlying Action subject to a complete reservation of rights.

It appears that coverage could be excluded. The "Work Performed Exclusion" Endorsement excludes coverage for property damage to "your work."

Exclusion (k), Damage to Property, also excludes "property damage" to property on which a contractor or subcontractor performed operations, and that portion of the property that must be restored, repaired, or replaced because of "your work."

Exclusion (b), Contractual Liability, excludes coverage for claims arising from an assumption in a contract.

Since the property damage alleged in the Underlying Action arises from Kremer's work, and since the claims arise from an alleged breach of contract, each of the above exclusions, individually and taken together, could preclude coverage for the claims in the Underlying Action. MFM expressly reserves the right to deny coverage on the basis that coverage is excluded.

The MFM Policy allows MFM to seek reimbursement of defense costs in the event that it determines that coverage does not exist. MFM expressly reserves the right to seek reimbursement from Kremer for the defense costs that it incurs in defending Kremer in the Underlying Action if it is determined that coverage does not exist for Kremer for the claims asserted in the Underlying Action.

Please note that there may be other reasons that are not evident at this time that might warrant a denial of coverage or a change in coverage position. By pointing out instances where coverage may not exist, there is no intent to waive any rights that MFM might have to deny coverage on any other grounds, whether or not specifically referred to in this letter. Please be advised that the coverage issues raised in this letter may be subject to further review and modification by MFM. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions, or other provision of the MFM Policy, or any other policies of insurance issued by MFM, or in prior reservations of rights. MFM expressly reserves all of its rights under the MFM Policy, including the right to assert additional defenses to any claims for coverage, that may or may not be addressed in this letter and that may become available upon new information. MFM also expressly reserves the right to file an action for declaratory judgment seeking a judicial determination of its obligations, if any, under the MFM Policy. MFM reserves its right to withdraw its defense if it determines that coverage is precluded and to seek reimbursement for defense costs.

As set forth in MFM's correspondence dated April 12, 2021, MFM appointed John White of Mulherin, Rehfeldt & Varchetto, P.C. to defend Kremer in the Underlying Action. MFM has assigned Claims Representative Austin Fentiman to oversee the defense of Kremer.

This appointment and acceptance of the defense is subject to a complete reservation of rights. MFM reserves its right to continue to investigate the facts, and to amend its coverage position if new facts emerge or if the pleadings are filed. MFM reserves its right to participate in the defense of any claim asserted against Kremer if facts arise triggering a duty to defend.

If you have or come upon any additional information or documents that you believe might be helpful in MFM's investigation of the claims or its coverage determination, please provide me with that information as soon as possible.

Also, please forward a copy of any additional insurance that might cover these claims.

Part 919 of the Rules and Regulations of the Illinois Department of Insurance requires that we advise you that if you wish to take this matter up with the Illinois Department of Insurance, the Department maintains a Consumer Division in Chicago at 100 West Randolph Street, Suite 15-100, Chicago, Illinois 60601 and in Springfield at 320 West Washington Street, Springfield, Illinois 62767.

If you have any questions about the coverage issues raised in this letter, or if you disagree with the position taken in this letter, please do not hesitate to contact me.

Sincerely,

Jon Ness, AIC
Casualty Adjuster
800-225-5636 ext. 7040
jness@midwestfamily.com

CC: AssuredPartners of MN, LLC

EXHIBIT G



**MIDWEST FAMILY GROUP**
**MIDWEST FAMILY MUTUAL INSURANCE COMPANY**
**MIDWEST FAMILY ADVANTAGE INSURANCE COMPANY**
Telephone • 763-951-7000
Fax • 763-951-7092
4401 Westown Parkway Suite 305, West Des Moines, IA 50266
Mailing Address:
P.O. Box 9425 • Minneapolis, MN 55440-9425
www.midwestfamily.com

August 18, 2021 *[handwritten: Jan-2021]*

*[handwritten: John Jason White 630-653-9300]*

*[handwritten: 1) damaged  Leak Repairs  2) re-do - tested/passed  Plaza RE-Tested continued to leak  other destroyed again]*

Kremer & Davis, Inc.
9385 Holly Street NW
Coon Rapids, MN 55433

*[handwritten: air barrier  ↑  exterior ripped it off]*

RE:    Denial of Coverage and Withdrawal of Defense
Claimant:            ARCO/Murray National Construction Company, Inc.
Named Insured:       Kremer & Davis, Inc.
Claim No.:           00388764
Date of Loss:        September 1, 2018

## DENIAL OF COVERAGE AND WITHDRAWAL OF DEFENSE

To Whom It May Concern:

I write to update Midwest Family Mutual Insurance Company's ("MFM") coverage position related to the tender for coverage submitted by Kremer and Davis, Inc. ("Kremer"), for the matter of *Zero Coupon, LLC et al. v. Northern Glass, Inc. et al.*, case number 20-L-9537, filed in the Circuit Court for Cook County (the "Underlying Action") and the Third-Party Complaint filed by ARCO/Murray National Construction Company, Inc.'s ("ARCO/Murray"). On April 8, 2021, MFM agreed via letter to defend Kremer in the Third-Party Complaint subject to a complete reservation of rights. On May 27, 2021, MFM updated its reservation of rights letter.

By this letter, I regret to inform you that MFM has reconsidered its coverage position and is denying coverage for Kremer in the Third-Party Complaint. Effective September 15, 2021, MFM will no longer be providing a defense for Kremer and will instruct its defense counsel to withdraw from defending you in the Third-Party Complaint. Furthermore, MFM anticipates filing a declaratory judgment action seeking a judicial determination that MFM does not owe a duty to defend Kremer in the Third-Party Complaint and will seek reimbursement of defense costs paid by MFM for Kremer's defense from May 27, 2021 until present.

## FACTUAL BACKGROUND

### I.    Underlying Action.

Kremer was a subcontractor of ARCO/Murray on the Centrum 606 project, which involved the construction of a mixed-use property located at 1743 N. Leavitt St., Chicago, IL 60647 (hereinafter, the "Project").

Zero Coupon, LLC, Second City Equities LLC, and Bucktown Equities LLC (the "Owners") initiated a lawsuit against ARCO/Murray, Northern Glass, Inc., Milwaukee Leavitt Owner LLC, and Chicago Title

Insurance Company alleging breach of contract and breach of warranty, and seeking a declaratory judgment relating to work performed. Defects and problems allegedly emerged with respect to: (l) windows (warranted by Northern Glass and ARCO/Murray); (2) aluminum envelope/cladding/roofing and other building envelope (warranted by ARCO/Murray); and (3) HVAC (warranted by ARCO/Murray) (the "Underlying Action").

ARCO/Murray served Kremer with a Third-Party Complaint alleging breach of its subcontract and a failure to procure insurance. Essentially, ARCO/Murray asserts that the Owner's allegations against it arise out of Kremer's work under the Subcontract and trigger Kremer's duty to defend ARCO/Murray, through its insurance carrier or otherwise.

## II.    Relevant Portions of Kremer's Subcontract with ARCO/Murray.

Pursuant to the Subcontract, ARCO/Murray was required to be named as an additional insured on Kremer's insurance policies. The Subcontract between Kremer and ARCO/Murray provides in pertinent part, as follows:

> 4.9 Indemnity:
>
> Subcontractor hereby agrees to indemnify, defend and hold Contractor [. . .] harmless from and against any and all demands, claims, suits and causes of action, liability, costs, incidental and consequential damages, expenses, settlements, and judgments, including without limitation court costs and attorney's fees [. . .] in connection with or arising out of: (i) the performance by Subcontractor or any of its employees, subcontractors, suppliers or anyone else for whom Subcontractor is responsible [. . .]; (ii) any breach by Subcontractor of this Agreement [. . .].
>
> Exhibit B, Insurance Requirements:
>
> * * *<br>*
>
> Additional Insureds: Subcontractor shall endorse Commercial General Liability [. . .] and Umbrella Excess Liability policies to name the following as additional insureds:
>
> • Contractor: (ARCO/Murray National Construction Company, Inc.).
>
> The above-listed entities should be added on a primary and non-contributory basis for current, ongoing, and completed operations for three (3) years after Final Completion of the Project.
>
> * * * *
>
> Exhibit E, Scope of Work

[Kremer] shall provide all labor, materials, equipment, supervision as required to complete all scope-of-work items of this Waterproofing Subcontract and related work, in accordance with the Drawings, Specifications and the Contract Documents ("Work").

\* \* \*

\* <u>Definition of Work:</u>
[Kremer] is to provide all labor, material, equipment, freight, supervision, taxes, etc. required to complete the below work:

A.    Basement Walls Waterproofing

\* \* \*

\* B.    Building Façade

\* \* \*

\* C.    Storm Water Detention Vault

\* \* \*

\*

D.    Elevator Pits

\* \* \*
\*

E.    First Level Nook

\* \* \*
\*

F.    Pedestrian Traffic Coating

\* \* \*
\*

## III.    MFM's Policy.

### A.    Definitions and Applicability.

MFM issued an insurance policy to Kremer, which is identified by policy number ████████1070 (herein, the "Policy") with a policy period running from September 1, 2018 to September 1, 2019. The Policy uses several definitions throughout. "You" or "your" refer to the

named insured shown in the Declarations, which in this case is "Kremer & Davis, Inc." The words "we", "us", and "our" refer to MFM. Section II of the Policy provides Business Liability coverage and provides that this insurance applies to "bodily injury" and "property damage" only if the "bodily injury" or "property damage" is caused by an occurrence, takes place within the "coverage territory," and occurs during the policy period.

"Property damage" means:

    a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

An "occurrence" is defined to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

"Your work":
    a. Means:
        (1) Work or operations performed by you or on your behalf; and
        (2) Materials, parts or equipment furnished in connection with such work or operations.

    b. Includes:
        (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
        (2) The providing of or failure to provide warnings or instructions.

**B.    The Policy's Endorsements.**

The Policy contains an endorsement named the "Blanket Additional Insured—Primary and Non-Contributory." The endorsement modifies the insurance provided under the Businessowners Coverage Form by adding the following to the definition of "Who Is An Insured":

A.    Section C "Who Is An Insured" is amended as follows:

3.    Insured is amended to include as an insured any person or organization who you are required to add as an additional insured on this policy under a written contract or a written agreement, but only with respect to liability for bodily injury, property damage or personal and advertising injury causes in whole or in part by:
    1.    Your acts or omissions; or
    2.    The acts or omissions of those acting on your behalf; and resulting from;
        a.    Your ongoing operations performed for the additional insured;
        b.    Your work completed as included in the products completed operations hazard performed for the additional insured.

B.   However, regarding of provisions A above:
    1.   We will not extend insurance coverage to any additional insured or organization
        a.   That is not provided to you in this policy; or
        b.   That is any broader coverage than you are required to provide to the
            additional insured person or organization in the written contract or
            written agreement.
    2.   We will not provide Limits of Insurance to any additional insured or
        organization that exceed the lower of:
        a.   The Limits of Insurance provided to you in this policy; or
        b.   The Limits of Insurance you are required to provide in the written
            contract or written agreement.

C.   The insurance provided to the additional insured person or organization   does not apply:
Bodily injury, property damage, or personal and advertising injury arising out of our
rendering of, or the failure to render, any   professional architectural, engineering or
surveying services including:
    1.   The preparing, approving or failing to prepare or approve maps, show drawings,
        opinions, reports, surveys, filed orders, change orders or drawings and
        specifications; and
    2.   Supervisory inspection, architectural or engineering activities

D.   For the coverage provided by this endorsement:
    1.   The insurance is primary insurance as respects our coverage for the additional
        insured person or organization where the written contract or written agreement
        requires this insurance by primary and non- contributory. In that event, we will
        not seek contribution from any other insurance policy available to the additional
        insured on which the additional insured person or organization is a Named
        Insured.
    2.   This insurance is excess over any other insurance, whether primary, excess,
        contingent or an any other basis, available to an additional insured, in which the
        additional insured on our policy is also covered as an additional insured by
        attachment of an endorsement to another policy providing coverage for the
        same occurred, claim or suit. This provision does not apply to any policy which
        the additional insured is a Named Insured on such other policy and where our
        policy is required by written contract or written agreement to provide coverage
        to the additional insured on a primary and non-contributory basis.

The "Work Performed Exclusion" Endorsement adds the following exclusion to the Businessowners
Coverage Form:
    SECTION II- LIABILITY- B. Exclusions- 1.m. is deleted and replaced with the following:
    m. Damage To Your Work
    We do not pay for "property damage" to "your work" arising out of it or any part of it and
    included in the "property-completed operations hazard". This exclusion applies if the damaged
    work or the work out of which the damage arises was performed on your behalf by a
    subcontractor.

**C.    Policy Exclusions**

In addition to the Work Performed Exclusion set forth in the Endorsement, the Policy also contains the following potentially applicable exclusions:

B.  Exclusions
1.  Applicable to Business Liability Coverage
This insurance does not apply to:

b. Contractual liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
(1) That the insured would have in the absence of the contract or agreement; or
(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:
(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured
contract"; and
(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

k. Damage To Property
"Property damage" to:
(5) That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on
your behalf is performing operations, if the "property damage" arises out of those operations; or
(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

**D.    Other Insurance Clause**

The Policy contains the following "Other Insurance" Clause:
H. Other Insurance
1. If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance of Section 1- Property.
2. Business Liability Coverage is excess over:

a. Any other insurance that insures for direct physical loss or damage; or

b. Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

3. When this insurance is excess, we will have no duty under Business Liability Coverage to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

Where H.1 is then replaced by the following per the Illinois Changes Endorsement:

2. Paragraph H.1. Other Insurance is replaced by the following:

H. Other Insurance

1. You may have other insurance subject to the same plan, terms, conditions, and provisions as the insurance under this Coverage Form. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Form bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance of Section 1- Property.

**E.    Defense Costs Reimbursement**

The Policy has the following Endorsement, titled, "Illinois Changes – Defense Costs," which states the following:

The following is added to Section II - Liability Paragraph A. Coverages:

If we initially defend an insured or pay for an insured's defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred.

The right to reimbursement for the defense costs under this provision will only apply to defense costs we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense costs.

## DISCUSSION AND RESERVATION OF RIGHTS

The MFM Policy does not cover the Third-Party Complaint filed against Kremer.

The Third-Party Complaint does not allege an "occurrence" or "property damage." The Third Party Complaint alleges only defective construction, and damages in the nature of repair and replacement of the defective construction. *See Viking Const. Mgmt, Inc. v. Liberty Mut. Ins. Co.*, 358 Ill. App. 3d 34 (1st Dist. 2005).

Also, coverage is excluded pursuant to the following nonexhaustive list of exclusions:

a) The Work Performed Exclusion Endorsement excludes coverage for "property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard." This exclusion also applies if the damaged work or the work out of which the damage arises was performed on ARCO/Murray's behalf by a subcontractor.

b) Exclusion b, Contractual Liability, excludes coverage for "bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement, unless the insured would have been liable in the absence of the contract or agreement, or unless assumed in an "insured contract."

c) Exclusion k(5), Damage to Property, excludes "property damage" to the particular part of real property on which ARCO/Murray or any subcontractor that worked directly or indirectly on ARCO/Murray's behalf performed operations, if the property damage arises from those operations, unless the liability was assumed under a sidetrack agreement.

d) Exclusion k(6), Damage to Property, excludes "property damage" to that particular part of any property that must be restored, repaired or replaced because ARCO/Murray's work was incorrectly performed on it, unless such liability is assumed under a sidetrack agreement or the "property damage" is part of the "products-completed operations hazard."

e) Exclusion *l*, Damage to Your Product, excludes "property damage" to "your product" arising out of it or any part of it.

f) Exclusion n, Damage to Impaired Property or Property Not Physically Injured, excludes "property damage" to "impaired property" arising out of a defect, deficiency, inadequacy or dangerous conditions in "your product" or "your work."

Since the property damage alleged in the Third-Party Complaint arises from Kremer's work, and since the claims arise from an alleged breach of contract, each of the above exclusions, individually and taken together, preclude coverage for the claims in the Underlying Action.

Also, since there is not coverage for Kremer under the MFM Policy, the MFM Policy allows MFM to seek reimbursement of defense costs incurred. Pursuant to this policy provision, MFM demands that Kremer reimburse MFM for all defense costs incurred from May 27, 2021 until present.

Please note that there may be other reasons that are not evident at this time that might warrant a denial of coverage or a change in coverage position. By pointing out instances where coverage may not exist, there is no intent to waive any rights that MFM might have to deny coverage on any other grounds, whether or not specifically referred to in this letter. Please be advised that the coverage issues raised in this letter may be subject to further review and modification by MFM. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions, or other provision of the MFM Policy, or any other policies of insurance issued by MFM, or in prior reservations of rights. MFM expressly reserves all of its rights under the MFM Policy, including the right to assert

additional defenses to any claims for coverage, that may or may not be addressed in this letter and that may become available upon new information.

MFM has advised its Claims Representative overseeing the defense of Kremer, Austin Fentiman, that it is withdrawing its defense of Kremer effective September 15, 2021.

MFM anticipates filing a declaratory judgment action seeking a judicial determination that MFM does not owe a duty to defend Kremer. However, in lieu of litigating a declaratory judgment action at this time, please advise if Kremer is alternatively agreeable to withdrawing the tender of its defense to MFM, which is within its paramount right, *Richard Marker Associates v. Pekin Inc. Co.*, 318 Ill. App. 3d 1137, 1141 (2d Dist. 2001), or entering into a Standstill Agreement to toll the time by which MFM must file a declaratory judgment action.

If you have or come upon any additional information or documents that you believe might be helpful in MFM's investigation of the claims or its coverage determination, please provide me with that information as soon as possible.

Part 919 of the Rules and Regulations of the Illinois Department of Insurance requires that we advise you that if you wish to take this matter up with the Illinois Department of Insurance, the Department maintains a Consumer Division in Chicago at 100 West Randolph Street, Suite 15-100, Chicago, Illinois 60601 and in Springfield at 320 West Washington Street, Springfield, Illinois 62767.

If you have any questions about the coverage issues raised in this letter, or if you disagree with the position taken in this letter, please do not hesitate to contact me.

Sincerely,

Jon Ness, AIC
Casualty Adjuster
800-225-5636 ext. 7040
jness@midwestfamily.com


CC: AssuredPartners of MN, LLC